UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――― x

PAUL BEISEL, Individually and on Behalf of
All Others Similarly Situated,

                     Plaintiff,

    vs.

LA QUINTA HOLDINGS INC., WAYNE B.
GOLDBERG, KEITH A. CLINE, JAMES H.
FORSON, GLENN ALBA, ALAN J.
BOWERS, HENRY G. CISNEROS,
GIOVANNI CUTAIA, BRIAN KIM,
MICHAEL NASH, MITESH B. SHAH,
GARY M. SUMERS, THE BLACKSTONE
GROUP L.P., J.P. MORGAN SECURITIES,
LLC, MORGAN STANLEY & CO. LLC,

                     Defendants.

―――――――――――――――――――――――― x

: Civil Action No.
:
: CLASS ACTION
:
: COMPLAINT FOR VIOLATIONS OF THE
: FEDERAL SECURITIES LAWS
:
:
:
:
:
:
:
:
:
: DEMAND FOR JURY TRIAL
:
:
:
:
:
:

Plaintiff Paul Beisel ("Plaintiff") makes the following allegations based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by La Quinta Holdings Inc. ("La Quinta" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all those who purchased the common stock of La Quinta pursuant to the Company's secondary public offering (the "SPO") on or about March 24, 2015 seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), as well as on behalf of the purchasers of La Quinta common stock between February 25, 2015 and September 17, 2015, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

4.      Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  Certain of the Underwriter

Defendants (as defined herein) are either headquartered or maintain offices in this District.  The acts and conduct complained of herein occurred in substantial part in this District.  The SPO was marketed in this District and the Company's common stock trades on the New York Stock Exchange ("NYSE"), which is located in this District.

5.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the NYSE, a national securities exchange

## PARTIES

6.      Plaintiff Paul Beisel purchased La Quinta common stock, as set forth in the certification attached hereto and incorporated herein by reference, and was damaged thereby.

7.      Defendant La Quinta, a Delaware company that was incorporated in 2013, is an owner, operator and franchisor of select-service hotels.

8.      Defendant Wayne B. Goldberg ("Goldberg") served, at all relevant times, as President, Chief Executive Officer and a Director of La Quinta.

9.      Defendant Keith A. Cline ("Cline") served, at all relevant times, as Executive Vice President and Chief Financial Officer of La Quinta.

10.     Defendant James H. Forson ("Forson") served, at all relevant times, as Senior Vice President, Chief Accounting Officer and Treasurer of La Quinta.

11.     Defendants Glenn Alba ("Alba"), Alan J. Bowers ("Bowers"), Henry G. Cisneros ("Cisneros"), Giovanni Cutaia ("Cutaia"), Brian Kim ("Kim"), Michael Nash ("Nash"), Mitesh B. Shah ("Shah") and Gary M. Sumers ("Sumers") each served, at all relevant times, as a members of La Quinta's Board of Directors.

12.     Defendants Goldberg, Cline, Forson, Alba, Bowers, Cisneros, Cutaia, Kim, Nash, Shah, and Sumers are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement (defined herein) issued in connection with the SPO.

13.     Defendant The Blackstone Group L.P. ("Blackstone") is an American multinational private equity, investment banking, alternative asset management and financial services corporation based in New York City. Defendant Blackstone was the largest beneficial owner of La Quinta common stock at the time of the SPO. Defendant Blackstone sold a total of 23,862,500,00 shares of La Quinta common stock in the SPO to the public for total proceeds of $550.8 million. According to the Prospectus, Blackstone maintains "significant influence" over La Quinta business affairs, in part, due to the composition of La Quinta's Board of Directors, who are affiliated with Blackstone and have real estate investment expertise.

14.     Defendants J.P. Morgan Securities, LLC ("J.P. Morgan") and Morgan Stanley & Co. LLC ("Morgan Stanley") each served as lead underwriters for the SPO. The underwriters collectively received estimated discounts and commissions of approximately $15.0 million in connection therewith.

15.     Defendants J.P. Morgan and Morgan Stanley are collectively referred to herein as the "Underwriter Defendants."

16.     The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement.

17.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement

was prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

18.    Defendant La Quinta, the Individual Defendants and the Underwriter Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.    Defendant La Quinta describes itself as a leading owner, operator and franchisor of select-service hotels that primarily serves the midscale and upper-midscale markets.  The Company was founded in in 1968 and has a 46-year history of owning and operating hotels.

20.    During the period from 1973 to January 2006, La Quinta operated as a public company *via* predecessor entities.  In January 2006, La Quinta was acquired by The Blackstone Group L.P. and its affiliates (collectively referred to herein as "Blackstone") and taken private.

21.    On April 14, 2014, La Quinta completed its initial public offering of approximately 44.0 million shares of La Quinta common stock.  In November 2014, La Quinta completed a secondary public stock offering (the "November 2014 offering"), whereby Blackstone sold 23.0 million shares of the Company's common stock to the public.  Prior to the November 2014 offering, Blackstone beneficially owned 82,035,576 shares, or 62.8%, of the Company's common stock. After the November 2014 offering, Blackstone beneficially owned 59,035,576 shares, or 45.2%, of the Company's common stock.

22.    On or about March 24, 2015, La Quinta completed the SPO, in which Blackstone sold 23,862,500 shares of La Quinta common stock to the public.  After the SPO, Blackstone beneficially owned 35,173,076 shares, or 26.9%, of the Company's outstanding common stock.

**The Registration Statement for the SPO Contained
Inaccurate Statements of Material Fact and Omitted
Material Information Required to Be Disclosed Therein**

23.    On March 13, 2015, La Quinta filed with the SEC its Form S-1 registration statement (the "Form S-1") for the SPO.  On March 24, 2015, the SEC declared the Form S-1, as amended, effective.

24.    On March 25, 2015, La Quinta filed with the SEC a prospectus (the "Prospectus") for the SPO offering to register for sale 23,862,500 shares of the Company's common stock (including 3,112,500 shares of the Company's common stock pursuant to an overallotment option issued to the Underwriter Defendants) owned by Blackstone at a price of $23.71 per share.  Blackstone, the largest beneficial owner of La Quinta common stock at the time of the SPO, sold 40% of its common stock holdings in La Quinta to the public in the SPO for net proceeds of approximately $550.8 million.

25.    The SPO was sold pursuant to the Form S-1, as amended, and the Prospectus (jointly referred to herein as the "Registration Statement").  The Registration Statement was negligently prepared and, as a result, contained inaccurate statements of material fact and omitted material information required to be disclosed therein.

26.    Specifically, the Registration Statement failed to disclose known trends, events, demands, commitments and uncertainties that were reasonably likely to have a material effect on the Company's operating results.  These known but undisclosed trends, events, demands, commitments and uncertainties caused the financial information of La Quinta reported in the Registration Statement not to be necessarily indicative of the Company's future operating results.

27.    Under the rules and regulations governing its preparation, the Registration Statement was required to disclose information called for by Item 303 of Regulation S-K.  [17 C.F.R.

§229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

28.     Item 303(a) of Regulation S-K required the Registration Statement to describe "any known trends or uncertainties that have had or that the registrant reasonable expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

29.     The instructions to Item 303(a) of Regulation S-K required that the disclosure in the Registration Statement to "focus specifically" on material events and uncertainties known to management that would cause La Quinta's previously reported financial information not to be indicative of future operating results, stating, in pertinent part, as follows:

> The discussion and analysis shall **focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results** or of future financial condition.  This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations. [1]

30.     As set forth in the SEC's interpretative guidance to Item 303 of Regulation S-K, MD&A requires not only a "discussion" but also an "analysis" of known material trends, events, demands, commitments and uncertainties.  In this regard, disclosure of a trend, demand, commitment, event or uncertainty is required when it is reasonably likely that the trend, uncertainty or other event will have a material effect on the company's liquidity, capital resources or results of operations.

31.     The Registration Statement failed to disclose the following material trends, events and/or uncertainties as follows: (i) declining customer demand in La Quinta's key Texas market;

---

[1]     Unless otherwise noted, emphasis herein is added.

(ii) on-going disruptions caused by the transitioning of the Company's call center operations; and (iii) declining customer demand and market share losses due, in part, to certain of La Quinta's facilities being outdated and in need of major renovation, thereby necessitating that the Company make significant capital expenditures and undergo operational disruptions.

32.     According to La Quinta's 2014 Form 10-K, the Texas market accounts for approximately 25% of La Quinta's room space and operating income.  At the time of the SPO, declining oil prices were then having and were expected to continue to have a material adverse effect on La Quinta's business in its Texas market.

33.     In a December 2014 report, the Federal Reserve Bank of Dallas noted that oil prices at $55 a barrel would cost Texas around 128,000 jobs by the middle of 2015.  These job losses were expected to have a particularly adverse impact on the Texas economy since the average oil and gas industry salary in Texas (excluding gas stations) is more than twice the amount of the average annual Texas salary across all industries.

34.     According to information provided by Baker Hughes Incorporated, a top-tier oilfield service company, prior to the SPO, the number of active rotary rigs in Texas *declined by more than half* during a short *18 week* period:



35.     The Federal Reserve Bank of Dallas December 2014 report also noted that the sharp drop in drilling resulting from sustained oil prices below $60 per barrel would dampen Texas's overall 2015 economic activity.  Indeed, the recent bust in oil prices has had a ripple effect on the Texas economy as industries that support oil and gas drilling companies, including La Quinta's hospitality industry, have witnessed a substantial decline in business activity with businesses and individuals curtailing expenditures.

36.     The Registration Statement failed to disclose the reasonable likely material adverse effect on the Company's revenues and operating income ensuing from declining customer demand in La Quinta's key Texas market.

37.     The Registration Statement also failed to disclose the material adverse effect on the Company's operating income associated with business disruptions caused by the transitioning of its call center.

38.     As noted in La Quinta's Form 10-Q for the quarter ended March 31, 2015 (the "Q1 Form 10-Q"), during the first quarter of 2015, La Quinta had been in the process of transitioning its reservation call center to a new provider.  This process was fraught with "disruptions" causing the

Company to lose a material amount of business. The Registration Statement negligently failed to disclose the known material adverse effects on the Company's business associated with this event and uncertainty.

39.     In addition, prior to the SPO, La Quinta began experiencing declining customer demand and market share losses ensuing from poor guest experiences at a number of its facilities. Indeed, prior to the SPO, the Company's marketing department had determined that, unlike before, La Quinta was experiencing difficulty attracting new guests to its facilities. On information and belief, the decline in customer demand, market share losses and difficulties attracting new guests to its facilities were, in part, due to a number of its facilities being outdated and in need of major renovation.

40.     The Registration Statement negligently failed to disclose known material adverse effects on the Company's revenues and operating results associated with the uncertainty and change in demand by hotel guests.

41.     In addition, the Registration Statement negligently failed to disclose significant known risks that caused the SPO to be speculative or risky. Item 3 of Form S-1 required the Registration Statement to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the offering speculative or risky."

42.     The Registration Statement negligently failed to disclose the then-existing (as opposed to potential) key risks, including those associated with La Quinta's key Texas market, the business disruptions caused by the transitioning of the Company's call center, and the change in customers demand for the Company's hotels.

43.    For example, the 2013 Form 10-K incorporated by reference in the Registration Statement disclosed, in pertinent part:

> ***Macroeconomic and other factors beyond our control can adversely affect and reduce demand for rooms at hotels that we own or franchise.***
>
> Macroeconomic and other factors beyond our control can reduce demand for rooms at hotels that we own or franchise.  These factors include, but are not limited to:
>
> - **changes in general economic conditions**, including the severity and duration of any downturn in the U.S. or global economy and financial markets;
>
> - war, political conditions or civil unrest, terrorist activities or threats and heightened travel security measures instituted in response to these events;
>
> - outbreaks of pandemic or contagious diseases, such as measles, Ebola, avian flu, severe acute respiratory syndrome (SARS) and H1N1 (swine flu);
>
> - natural or man-made disasters, such as earthquakes, tsunamis, tornadoes, hurricanes, typhoons, floods, oil spills and nuclear incidents;
>
> - **decreased corporate** or government **travel-related budgets and spending and cancellations, deferrals or renegotiations of group business**;
>
> - low consumer confidence, high levels of unemployment or depressed real estate prices;
>
> - the financial condition and general business condition of the airline, automotive, and other transportation-related industries and its impact on travel;
>
> - decreased airline capacities and routes;
>
> - travel-related accidents;
>
> - **oil prices** and travel costs;
>
> - statements, actions or interventions by governmental officials related to travel and corporate travel-related activities and the resulting negative public perception of such travel and activities;
>
> - climate change and resource scarcity, such as water and energy scarcity;
>
> - domestic and international political and geo-political conditions; and
>
> - cyclical over-building in the hotel and lodging industries.  [First emphasis in the original.]

- 10 -

\*      \*      \*

Our reservation system is an important component of the La Quinta brand and **a disruption** to its functioning **could have** an adverse effect on our hotels.

We license software from unaffiliated third parties for the La Quinta hotels reservation system. Losing these licenses may adversely affect our ability to maintain a technically adequate reservations system, which, in the absence of suitable alternatives, would inhibit our ability to conduct our business (including our ability to attract and retain franchise arrangements) and, ultimately, diminish our ability to generate revenue.

We manage a reservation system that communicates reservations to our owned and franchised hotels that have been made by individuals directly, either online or by telephone to our call centers, or through intermediaries like travel agents, internet travel web sites and other distribution channels. The cost, speed, efficacy and efficiency of the reservation system, as well as protection of personal or confidential information of its users, are important aspects of the business and are major considerations of franchisees in choosing to affiliate with the La Quinta brand. Any degradation of, failure of adequate development relative to, or security breach of, our reservation system may adversely affect our business.

Our reservation system relies on data communications networks operated by unaffiliated third parties. **Any significant interruption** of the function of our reservation system (or significant parts of our reservation system) **may** adversely affect our business as well as our ability to generate revenues. [First emphasis in the original.]

\*      \*      \*

*We are exposed to the risks resulting from significant investments in owned real estate, which could increase our costs, reduce our profits and limit our ability to respond to market conditions.*

Real estate ownership is subject to risks not applicable to franchised and managed hotels, including:

•    governmental regulations relating to real estate ownership or operations, including tax, environmental, zoning and eminent domain laws;

•    loss in value or functionality, or unanticipated liabilities, due to environmental conditions, governmental takings, uninsured casualties or restrictive changes in zoning and similar land use laws and regulations or in health, safety and environmental laws, rules and regulations and other governmental and regulatory action;

•    changes in tax laws and property taxes, even if the hotel level cash flows remain the same or decrease;

- increased potential civil liability for accidents or other occurrences on owned hotels;

- **the ongoing need for owner funded capital improvements and expenditures to maintain or upgrade hotels**;

- **periodic total or partial closures due to renovations and hotel improvements**;

- risks associated with mortgage debt, including the possibility of default, fluctuating interest rate levels and uncertainties in the availability of replacement financing;

- risks associated with the possibility that cost increases will outpace revenue increases and that in the event of an economic slowdown, the high proportion of fixed costs will make it difficult to reduce costs to the extent required to offset declining revenues;

- acts of God, including earthquakes, hurricanes, floods, winter storms and other natural disasters (that may result in uninsured losses);

- fluctuations in real estate values or potential impairments in the value of our assets; and

- maintaining tenants for leased properties.  [First emphasis in the original.]

44.    The statements in ¶43 above were each inaccurate statements of material fact because they negligently failed to disclose the significant, then existing (as opposed to potential) risks La Quinta had been confronting.

45.    As a result of the foregoing, the Registration Statement violated the Securities Act in that it contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not inaccurate, was not prepared in accordance with the rules and regulations governing its preparation.

46.    At the time of the filing of this Complaint, La Quinta common stock trades at less than half the SPO price.

**Materially False and Misleading Statements Issued During the Class Period**

47.    For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldberg, Cline and Forson.

48.    The Class Period begins on February 25, 2015.

49.    After the close of trading on February 24, 2015, La Quinta issued a press release announcing "STRONG RESULTS FOR BOTH FOURTH QUARTER AND FULL YEAR 2014," the periods ended December 31, 2014. For the 2014 fourth quarter and the 2014 fiscal year, La Quinta reported system-wide comparable RevPAR[2] increased 8.4% and 8.0%, respectively. Defendant Goldberg commented on the Company's prospects, stating, in pertinent part, as follows:

> Our 2014 results demonstrate solid performance delivered across our key metrics, including strong growth in RevPAR, franchise units, Adjusted EBITDA, and Adjusted EBITDA margin. **Overall, the lodging industry remains healthy, with a steadily improving economy and strong transient travel demand. La Quinta is extremely well-positioned to continue to capture this demand as we capitalize on our refreshed and upgraded portfolio and our repositioned brand.** Over the last twelve months, we have grown our franchise base 8% and opened an additional 45 franchise properties, bringing total hotels in our system to 867 with approximately 86,500 rooms. This unit growth, along with our increased occupancy, allows our geographic reach and customer base to continue to grow. Franchise interest in the La Quinta brand remains robust and our ongoing system growth is further supported by a continued strong pipeline. Furthermore, we have continued to de-lever our balance sheet and we remain focused on our strategic objectives, all of which are designed to increase shareholder value.

50.    With regard to the Company's guidance for 2015, Defendants stated, in pertinent part, as follows:

**Outlook**

Based upon management's current estimates, the Company is introducing its guidance for full year 2015:

|  | Guidance |
|---|---|
| RevPAR growth on a system-wide comparable hotel basis | 5.5 percent to 7.0 percent |

---

[2]    "RevPAR" or revenue per available room, is a performance metric in the hotel industry that is calculated by multiplying the average daily room rate (hotel room revenues divided by total number of rooms sold in a given period) and the average daily occupancy achieved.

| Adjusted EBITDA | $398 million to $410 million |
|---|---|
| Interest expense | Approximately $87 million |
| Franchise hotel openings | 50 to 55 |
| Weighted average shares of common stock outstanding | Approximately 131.7 million |

51.    Later that evening, on February 24, 2015, the Company held a conference call with analysts and investors to discuss La Quinta's 2014 fourth quarter and year end operating results. During the conference call, Defendants Goldberg and Cline made positive statements concerning La Quinta's product and its 2015 growth and outlook stating, in pertinent, part as follows:

Defendant Goldberg:

Going into 2015, **I am optimistic and excited about our ongoing opportunities for growth**. The momentum that we experienced last year has continued into the first couple of months of 2015, as a solid lodging environment is providing a nice tailwind to our operating performance and our growth initiatives.

**There were a few macroeconomic factors supporting our optimism. Industry fundamentals are positive with demand continuing to outpace supply**, setting the stage for our ability to continue to drive [room] rate [increases]. **Increased employment, consumer confidence and disposal income providing favorable backdrop to increasing travel, and La Quinta is extremely well-positioned to continue to capture this demand as we capitalize on our refreshed and upgraded portfolio**.

\*        \*        \*

All indications, based on what is taking place today in Arizona and Florida, which are in their season, bode very well for what we anticipate to be strong leisure demand as the rest of the markets increase that leisure travel coming in the spring and through the summer months.

Defendant Cline:

Finally, I'll provide outlook for 2015. As Wayne mentioned earlier, we are optimistic and excited about our ongoing opportunities for continued growth. **The momentum that we experienced last year has continued into the early part of 2015 as a solid lodging environment is providing a nice tailwind to our operating performance and growth initiatives.**

- 14 -

For full-year 2015, we anticipate RevPAR on a systemwide comparable hotel basis to increase between 5.5% and 7% as compared to 2014. We expect pro forma adjusted EBITDA between $398 million and $410 million and expect to open between 50 and 55 new franchise locations.

We would also like to provide guidance on two important elements of earnings per share, interest expense and fully diluted share count. We expect total interest expense for 2015 to be approximately $87 million, which includes cash interest on our term loan, defects of our swap and unused revolver commitment fees, as well as noncash interest related to amortization of deferred finance cost. This amount is impacted by the amount and timing of our scheduled and planned discretionary debt repayment. We expect weighted-average fully diluted shares outstanding of approximately 131.7 million shares.

52.     During the conference call, Defendant Goldberg referred to the "potential impact of lower energy prices [on La Quinta's business] due to the size of our footprint in Texas," as a "net positive," stating, in pertinent part, as follows:

**I also wanted to take a moment to address some questions you might have about the potential impact of lower energy prices due to the size of our footprint in Texas. There are a small number of properties that we believe will be impacted by a reduction in the price of oil.** And we have, in fact, budgeted for this impact in 2015, as we did in several of these markets in 2014 when demand of those details was impacted by the introduction of temporary housing facilities. Due to our broad geographic distribution and the existence of multiple demand generators, these impacts did not hurt our system-wide performance in 2014, and **we have not seen and do not an anticipate an impact to our system-wide performance in 2015**.

To be clear, **we view lower oil prices as a net positive to our business. Despite the number of hotels we have in Texas, our exposure to oil-related corporate travel is not significant**. For 2014, system-wide revenue generated from our corporate accounts directly related to the oil and gas industry totaled approximately 3% of total system room revenue. Much of this revenue is from large corporate customers who, while they may cut back, will not likely cease all corporate travel.

**Importantly, lower energy costs actually provide a number of positive factors that we believe more than offset any potential impacts**. First, and most importantly, is the potential increase in domestic travel as we believe lower gas prices will stimulate additional leisure demand for our brand. Second is the potential for increases in revenue from corporate accounts that benefit from reductions in oil and gas pricing. Finally, we anticipate lower utility costs, which represent one of our largest operating expenses at our owned hotels.

53.     During the Q&A session of the conference call, analysts sought additional information about the Company's Texas operations.  Defendant Goldberg misleadingly noted "we continue to perform overall in Texas very strong in the first several months of 2015 [sic]."  The following exchange took place:

Thomas Allen - Morgan Stanley - Analyst:

Good afternoon.  **Just talking about your Texas exposure a little more**.  Wayne, in your prepared remarks you said that you had budgeted some impact to 2015 similar to how you budgeted some impact in 2014 from the supply increases.  Can you help us think about numerically how you are thinking about maybe the RevPAR in 2015 in places like Houston and then places like Midland and the oil towns?  What are you factoring in, in your 2015 guidance?  Thank you.

Defendant Goldberg:

First of all, we are seeing some impacts as we anticipated in Midland, Odessa, Victoria and San Angelo.  **Those are the four markets where we own and operate hotels that have the most impact.  Again, in a couple of those markets, we saw the impact begin in 2014.  And again, the impact of those properties did not impact or negatively impact our overall performance, nor do we anticipate they will in 2015, nor have they in the first several months of the year**.

We are seeing, as expected, a little bit of softening in Houston, overall, as well.  However, those impacts are more than made up by very strong performance in Dallas, San Antonio, Austin and all of those other markets that we operate in Texas.  Again, we have accounted for the impact.  **The impact that we are seeing is in line with what we've anticipated and what we planned for, and we continue to perform overall in Texas very strong in the first several months of 2015**.

54.     Later during the Q&A session of the conference call, analysts sought additional information about the impact of lower energy prices on the Company's operations.  Defendant Cline falsely and misleadingly stated that La Quinta did not "see any disproportionate EBITDA exposure driven by oil and gas industry."  The following exchange took place:

Shaun Kelley - BofA Merrill Lynch - Analyst:

. . .  And then my other question would be, we have gotten **a few people who have asked whether or not there is a disproportion out of profitability coming from your exposure for hotels in Texas**.  We obviously know your revenue mix; I think you've been really clear on all that.  But maybe to put the issue to bed, if you could

comment on, is there any material difference in EBITDA mix exposure to Texas or oil-specific regions relative to revenue or RevPAR?  That would be great.

<u>Defendant Keith Cline</u>:

No, as you think about it, if you look at proxy for the number of hotels in Texas, and let's just use simple math and apply that to EBITDA, right?  Just as an example.  We are still looking at an oil and gas business not just in Texas, but through the entire country that is roughly 3% of our system wide revenue.  It relates to 4 owned hotels in the markets that Wayne articulated and 21 franchise properties that re in both Texas and in the Dakotas in oil drilling areas.  Our exposure there is really some subset of 3% on our own properties.  There really is a lot of EBITDA, the rest is franchise business.  It really, as Wayne indicated, is a small part of our Business that's directly related to oil and gas.  **We don't see any disproportionate EBITDA exposure driven by oil and gas industry**.

55.     As noted herein, during the Class Period, the state of Texas accounted for approximately 25% of La Quinta's room space and operating income.  At the time Defendants Goldberg and Cline made the above noted statements, the price of crude oil had fallen precipitously from approximately $90 - $95 a barrel in July 2014 to $55 -$60 a barrel in February 2015.

56.     On December 18, 2014, *The Wall Street Journal*, reported that "[t]he global plunge in oil prices could lead to a painful economic downturn in Texas, J.P. Morgan Chase's chief U.S. economist said Thursday.  'As we weigh the evidence, we think Texas will, at the least, have a rough 2015 ahead, and is at risk of slipping into a regional recession,' Michael Feroli said in a note to clients."

57.     On December 23, 2014, the *Houston Chronicle* reported that "Barclays warned that the Texas housing market correlates with oil prices and therefore could take a major hit if oil prices stabilize at current levels."

58.     Indeed, by the beginning of the Class Period, lower oil prices were having a material adverse effect on La Quinta's room rates in Texas.  Falling room rates and available highly discounted room inventory are a negative forward indicators for La Quinta's business.

59. On February 25, 2015, La Quinta filed the 2014 Form 10-K with the SEC, which was signed by the Individual Defendants. The 2014 Form 10-K contained materially false and misleading representations about La Quinta's risk factors, management's discussion and analysis, disclosure controls and Defendants Goldberg's and Cline's false and misleading certifications thereon, which stated, in pertinent part, as follows:

I, [Defendants Goldberg and Cline], certify that:

1. I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 31, 2014 of La Quinta Holdings Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's

auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

60.      The above certifications by Defendants Goldberg and Cline were repeated, in all material respects, in the Form 10-Q that La Quinta filed with the SEC later in the Class Period.

61.      On March 25, 2015, La Quinta filed with the Registration Statement with the SEC, which, as noted above, failed to disclose material information required to be disclosed pursuant to the regulations governing its preparation.

62.      On March 30 and April 2 of 2015, Blackstone sold a total of 23,862,500.00 shares of La Quinta common stock in the SPO to the public pursuant to the Registration Statement at $23.08 per share for total proceeds of ***$550.8 million***.

63.      On April 29, 2015, La Quinta issued a press release announcing "STRONG RESULTS FOR THE FIRST QUARTER 2015," the period ended March 31, 2015. For the quarter, La Quinta reported system-wide comparable RevPAR increased 8.2%. Defendant Goldberg commented on the Company's business, stating, in pertinent part, as follows:

> Our first quarter 2015 results are reflective of our ongoing commitment to deliver enhanced value to all of our stakeholders. We once again delivered strong performance across our key metrics, including growth in RevPAR, franchise units, Adjusted EBITDA, and Adjusted EBITDA margin. **The lodging industry remains healthy, particularly in our segments, and the steady economic environment continues to drive strong transient leisure and business travel demand**. In the first quarter, we continued to expand our system with the opening of five franchise properties, including our first hotel in Honduras, bringing our system to 870 hotels with approximately 86,700 rooms. This unit growth, along with our increased occupancy, allows our geographic reach and customer base to continue to grow. Franchise interest in the La Quinta brand remains robust and our system growth is

supported by an increasing pipeline. **We also continued to deliver on a key element of our growth strategy, expanding our brand in urban and central business district locations.** I am pleased to announce that in the first quarter we signed new franchise agreements for urban locations in the Chelsea neighborhood of Manhattan, Miami Midtown, and Oklahoma City Bricktown. In addition we signed a franchise agreement for the development of our first hotel in Santiago, Chile. Furthermore, we have continued to de-lever our balance sheet and we remain focused on our strategic objectives, all of which are designed to increase shareholder value.

64.    With respect to the Company's 2015 outlook, Defendants stated, in pertinent part, as follows:

**Outlook**

Based upon management's current estimates, the Company is updating its guidance for full year 2015 and is expecting:

|  | **Updated Guidance** | **Prior Guidance** |
|---|---|---|
| RevPAR growth on a system-wide comparable hotel basis | 6.0 percent to 7.0 percent | 5.5 percent to 7.0 percent |
| Adjusted EBITDA | $402 million to $410 million | $398 million to $410 million |
| Interest expense | Approximately $87 million | Approximately $87 million |
| Franchise hotel openings | 50 to 55 | 50 to 55 |
| Weighted average shares of common stock outstanding | Approximately 131.7 million | Approximately 131.7 million |

65.    Later that evening, on April 29, 2015, La Quinta held a conference call with analysts and investors to discuss La Quinta's 2015 first quarter operating results. During the conference call, Defendant Cline made misleading statements with respect to La Quinta's 2015 outlook stating, in pertinent, part, as follows:

Finally, I will provide an update on our outlook for 2015. As Wayne mentioned earlier, we are optimistic about our ongoing opportunities for continued growth. The momentum that we experienced last year has continued into the early part of 2015 as

- 20 -

the solid lodging environment is providing a nice tailwind to our operating performance and growth initiatives. Due to our strong performance in the first quarter, we are bringing up the bottom end of our RevPAR and adjusted EBITDA guidance. For full-year 2015, we now anticipate RevPAR on a system-wide comparable basis to increase between 6% and 7% as compared to 2014. We expect pro forma adjusted EBITDA between $402 million and $410 million and expect to open between 50 and 55 new franchise locations.

Similar to the discussion during our year-end call, we'd also like to provide guidance on important elements of earnings per share. We continue to expect total interest expense for 2015 to be approximately $87 million, which includes cash interest on our term loan, effects of our swap, and unused revolver commitment fees, as well as non-cash interest related to amortization of deferred finance cost. This amount is impacted by the amount and timing of our scheduled and planned discretionary debt repayment. We expect run rate, share-based compensation expense for 2015 to be approximately $14 million, and we expect weighted-average fully diluted outstanding shares of approximately 131.7 million shares.

66.     Defendant Goldberg commented on La Quinta's 2015 growth and outlook, and noted the La Quinta had seen a "minimal impact resulting from volatility in oil prices" and that "lower oil prices are a net benefit to our business," stating,  in pertinent part, as follows:

We have had a very strong start to the year. Industry conditions remained favorable, and the macroeconomic environment continues to support ongoing transient travel growth. **Ongoing demand for the La Quinta brand, both from consumers and from franchise partners is strong** and we remain optimistic about our future.

*       *       *

From a geographic perspective, this performance is in line with what we had anticipated and communicated on our year-end call. **We have seen minimal impact resulting from volatility in oil prices**. As was contemplated in our guidance for the year, we have experienced a decline in the small number of markets that have been impacted by reduced oil production. **As also mentioned during our year-end call, we believe lower oil prices are a net benefit to our business, particularly as it relates to lower gasoline prices for our leisure guests and the drive-to nature of many of our locations**.

67.     During the Q&A session of the conference call, analysts sought additional information about the impact of oil prices on the Company in oil-related markets. Defendant Goldberg minimized the impact of lower oil prices and commented that lower gas prices were "a tailwind, not a headwind." The following exchange took place:

<u>Thomas Allen - Morgan Stanley – Analyst</u>:

. . . And, just one quick follow-up is just **you highlighted that you are feeling actually a net benefit from the lower oil prices. But, can you help us think about for the few markets where you are feeling an impact**, what kind of declines you are seeing? **There were clearly concerns that there would be massive declines there**. And, maybe for a market like Houston, could you give us any stats around RevPAR in that market? That would be helpful.

<u>Defendant Goldberg</u>:

I will give you a couple of data points. **First and foremost, we talk about the effect of lower gas prices being a net -- a tailwind, not a headwind**. We saw very strong performance in Miami-Fort Lauderdale, Tampa-St. Petersburg, Phoenix, Orlando, San Diego, Los Angeles in the peak season for those properties which is in the wintertime. That peak leisure demand in those markets.

**We see very strong demand for Memorial Day weekend which is a leisure demand time. So, we feel very good that that should then translate into a strong peak season as we get into the summer months for the majority of the properties** that would be considered their peak leisure season.

There our markets, as you indicated, where we are seeing some impact. **Houston is down. It is down -- again, it is down a little bit over 2%. Nothing that we are overly concerned about. However, Dallas is up** -- and Dallas is up. **Austin is up**. San Antonio, again, we have a couple things going on in San Antonio, but **San Antonio is up**.

Let me think where I am missing here? But, **we have other large markets in Texas doing well**. So, again, there are some impacts to those markets we've said and we anticipated, and they are in line with or up -- or down less than we assumed.

<u>Defendant Cline</u>:

To that point, Thomas, those markets where we know there is a much larger impact -- Midland, Odessa, San Angelo, Victoria. Those markets are down double-digit RevPAR as you would expect, and once again, that's reflected in the guidance we provided.

68.    Later during the Q&A session of the conference call, when analysts sought information about the sale of Company-owned hotels, Defendant Cline noted that La Quinta had been presented with offers to buy Company-owned properties on a regular basis and that there were "built-in gains on these assets," and noted that "cutting a large check for taxes [on the built-in gains] is something we would like to avoid." The following exchange took place:

<u>Chris Woronka - Deutsche Bank – Analyst</u>:

. . . If you were to-- as we think about maybe some strategic redevelopment projects or even a few sales and refranchises.  **Is there a situation where you could sell a few owned hotels**, and to the extent there is a tax situation, then redeploy proceeds into developing, say, urban hotels on your balance sheet in a 1031 exchange?  Is that within your wheelhouse?

<u>Defendant Cline</u>:

Sure.  Clearly**, we are presented -- given the attractiveness of our brand -- with offers on a regular basis for franchisees to refranchise locations.  But, you are on point exactly.  There is built-in gains on these assets**.  And, if we do a transaction, it needs to be accretive as Wayne said.  **So, cutting a large check for taxes is something we would like to avoid**.  So, in those cases, if there is a chance or us to put footprint in an urban location that we're then enabled to accelerate growth in our franchise business in that region that would make a lot of sense.

69.    Defendants Cline and Goldberg also discussed the sale of a Company-owned hotel near Oklahoma City.  While Defendants Cline and Goldberg made positive statements about the transaction, including "[w]e got an attractive economic value for the property, and we feel that this is a no-brainer and it is a win-win-win," they deceptively failed to disclose that La Quinta lost millions of dollars on the sale of the property, stating, in pertinent part, as follows:

<u>Defendant Goldberg</u>:

We are also excited to announce that we have entered into an agreement to sell our owned hotel near Oklahoma City airport to a current franchise partner.  This franchise partner will temporarily operate the existing hotel as a franchise La Quinta while developing a brand-new Del Sol hotel prototype on the adjacent land.  This transaction generates a long-term revenue stream through our franchise segment with a brand-new Del Sol hotel prototype.  Allows us to redeploy capital that would have otherwise been used for renovation, strengthens our relationship with a valued franchise partner, and it delivers attractive economics on one of our oldest exterior corridor hotels.

\*        \*        \*

The Oklahoma City transaction is a great opportunity.  **It is a win-win-win**.  Our guests will ultimately win.  Our Company wins.  Our franchise partner wins.  We dealing with a very high profile partner here who has done a number of deals with us.  We will end up with a beautiful asset.

- 23 -

This is one of the older assets and our property.  In fact, this is one of the oldest assets probably in our system.  This was an acquisition many years ago.  It is an old, two-story exterior quarter hotel that is actually older than our Company because the hotel was built prior to La Quinta even being founded.  But, it was in -- it was due for a renovation.  There were just a number of reasons that this made sense.  **We got an attractive economic value for the property, and we feel that this is a no-brainer and it is a win-win-win**.

Again, we have some properties that I can tell you there's no question we have some enduring locations, and we have some properties that are prime for the potential to be redevelopment opportunities with franchise partners or even if we were to consider to do something with some of these assets that might be enduring locations that are high barrier-to-entry.  High ADR-type markets.  These are markets that we've always said strategically we would invest in.  We will invest today with key money for a location like that.

Again, so there could be other properties -- we do have properties that we know fit that description.  But, it is not something that we are aggressively working on right now.  Other than if we have opportunities we will pursue those, and I assure you that we won't do anything that doesn't drive value for our shareholders and all of our stakeholders.

70.     On April 30, 2015, La Quinta filed its Form 10-Q for the quarter ended March 31, 2015 (the "Q1 Form 10-Q") with the SEC, which was signed by Defendants Cline and Forson.  The Q1 Form 10-Q contained materially false and misleading representations about La Quinta's risk factors, management's discussion and analysis, disclosure controls and Defendants Goldberg's and Cline's false and misleading certifications thereon.

71.     The statements referenced above in ¶¶49-54, 59, and 63-69 were materially false and misleading at the time they we made because they misrepresented and failed to disclose the following adverse facts which were known to Defendants, or recklessly disregarded by them:

(a)     that La Quinta was experiencing a known, but undisclosed, material slowdown in demand for its hotel rooms in its key Texas market during the Class Period;

(b)     that La Quinta was experiencing known but undisclosed disruptions associated with a "transition" of the Company's reservation call center, which was having a material adverse effect on the Company's operations;

(c)    that La Quinta was experiencing market share losses and declining customer demand due, in part, to its outdated facilities;

(d)    contrary to Defendant Goldberg's representation that the Company was positioned to "capitalize on our refreshed and upgraded portfolio," a significant number of La Quinta's hotels were in need of major renovation that would require significant capital expenditures and result in operational disruptions;

(e)    that La Quinta had received offers to purchase certain of its properties and, contrary to Defendant Cline's representation that there were "built-in gains on these assets," the amounts buyers were willing to pay for such assets were materially less than their reported values;

(f)    that (a) - (e) above were reasonably likely to have a material adverse effect on La Quinta's future operating results;

(g)    that the certifications issued by Defendants Goldberg and Cline associated with the Company's disclosure controls were materially false and misleading; and

(h)    that, based on the foregoing, Defendants lacked a reasonable basis for the Company's 2015 guidance and their positive statements about La Quinta's then-current business and future financial prospects.

72.    After the market closed on July 29, 2015, the Company issued a press release announcing the financial results for its 2015 second quarter ended June 30, 2015 ("Q2"). For Q2, La Quinta reported less than expected RevPAR growth of 4.0%. In addition, the Q2 earnings press release also noted that the Company's earnings were adversely affected by a $4 million loss on the sale of a property and an approximate *$42 million* impairment charge associated with the potential sale of 24 owned Company hotels, stating, in pertinent part, as follows:

**The Company entered into discussions for the sale of 24 of its owned hotels.**
There is no guarantee that these sales will occur, but the Company believes that a

sale of these assets would have many benefits, including an aggregate sales price with an accretive EBITDA multiple, the opening of several markets to new franchise development as the vast majority of these hotels will be removed from the La Quinta system, improvement of key operating metrics, and acceleration of the Company's debt reduction. Due to the potential reduced holding period of these assets, **the Company recorded an impairment charge of approximately $42 million in the quarter**.

As previously announced, **during the second quarter of 2015, the Company sold one of its owned hotels for $3.0 million and recorded a loss on sale of $4.0 million related to this transaction**. The purchaser subsequently signed franchise agreements to temporarily operate the existing hotel as a franchised La Quinta, while developing a brand-new Del Sol prototype hotel on the site.

73.    In addition, the Q2 earnings press release announced that La Quinta had lowered its 2015 RevPar growth and pro-forma adjusted EBITDA guidance.[3] The Q2 earnings press release noted that the Company experienced "several unusual items during the second quarter, some of which will have continuing impacts in the second half of the year, which significantly impact RevPAR and Pro Forma Adjusted EBITDA." These items included: (i) a decline in business in Texas, which the press release deceptively attributed to "inclement weather," (ii) the "transition of

---

[3]    According to the Q2 earnings press release:

"EBITDA" and "Adjusted EBITDA." Earnings before interest, taxes, depreciation and amortization ("EBITDA") is a commonly used measure in many industries. We adjust EBITDA when evaluating our performance because we believe that the adjustment for certain items, such as restructuring and acquisition transaction expenses, impairment charges related to long-lived assets, non-cash equity-based compensation, discontinued operations, and other items not indicative of ongoing operating performance, including other items relating to the IPO Transactions, provides useful supplemental information to management and investors regarding our ongoing operating performance. We believe that EBITDA and Adjusted EBITDA provide useful information to investors about us and our financial condition and results of operations for the following reasons: (i) EBITDA and Adjusted EBITDA are among the measures used by our management team to evaluate our operating performance and make day-to-day operating decisions; and (ii) EBITDA and Adjusted EBITDA are frequently used by securities analysts, investors, lenders and other interested parties as a common performance measure to compare results or estimate valuations across companies in our industry.

the Company's reservation call center," and (iii) the closure of one of the Company's largest owned hotels for structural repairs.

74.     In response to these revelations, the price of La Quinta common stock declined approximately 3.5% on July 30, 2015.

75.     After the market closed on September 17, 2015, La Quinta issued press releases announcing, among other things, that it had further reduced its 2015 financial guidance and that Defendant Goldberg had "stepped down from his leadership positions in the Company by mutual agreement with the Company's Board of Directors."

76.     In response to these revelations, the price of La Quinta common stock declined more than 15% on September 18, 2015.

### Post Class Period Revelations

77.     On Monday, September 21, 2015, Jim Cramer, host of CNBC's Mad Money television program, castigated La Quinta and Defendant Goldberg on national television stating that "*management has now pretty much lost all credibility*."   Cramer noted that "one of the main reasons we liked La Quinta was because [Defendant] Goldberg was so bullish on his repeated appearances here on Mad Money.  Not only that, but whenever there were concerns about the Company, he'd show up and reassure us that there was nothing to worry about.  Now Goldberg is gone for who knows what reason and its turning out that his *[Defendant Goldberg's] reassurances were a lot less credible than they had seemed*."  The Mad Money report continued:

Jim Cramer:

Let me walk you through **some of Goldberg's overly ambitious statements**.  The last time we heard from Goldberg was back on May 8 [2015], less than a month before his stock peeked and started going down the drain. Hey, I asked him about La Quinta's prospects and here's what he said - -

Defendant Goldberg:

- 27 -

We will continue to grow this brand.  **We feel very good about the outlook in the horizon.  We have a lot of momentum**.

<u>Jim Cramer</u>:

**Now that interview took place well into the second quarter a time when La Quinta really should have had some clarity of the softness that was occurring in its business** - don't you think?  **It just doesn't look good when the CEO says he feels very good about the outlook and then two months later he slashes the outlook dramatically.  This** kind of thing **tells you that management is either clueless or way to promotional, and neither one is a good thing**.

Then the previous time we spoke to Goldberg back on February 25 [2015], **I grilled him about the impact of lower oil and gas prices in La Quinta's business, given that 30% of his sales came from Texas.  We would expect there would be a lot less corporate travel given the collapse in the price of crude**.  I kind of said listen I don't get it!  Oh, but **Goldberg had the answers; he basically said the bears, well they were wrong**, watch this - - -

<u>Defendant Goldberg</u>:

**We view lower oil and lower gas prices as a net positive to our business**.

<u>Jim Cramer</u>:

In retrospect, it's looking like that's simply not the case.  **When you consider the nose dive in La Quinta's performance this August when the price of oil crashed down to its lowest level since the great recession, it seems pretty clear that lower oil is not a positive to La Quinta's business**.  Now look, I got La Quinta wrong - - mia culpa - -  **I should have been** more skeptical and **less willing to believe the CEO's exuberant bullishness** but I was quite enamored.  Here's the bottom line though, when the facts change, you gotta change your mind.  Boy-o-boy, have the facts changed at La Quinta.  With the immediate resignation of its yes promotional CEO and the Company cutting its 4 year forecast for the second time in 2 months.  When this kind of disaster strikes, you know what you have to do?  You have to be willing to admit that you got it wrong.  Simply walk away rather than trying to convince yourself if this is the pull back of some sort of buying opportunity, it isn't.  In fact, I would say that when Goldberg left the office he took the bull case for La Quinta with him.

78.    On October 28, 2015, after the market closed, La Quinta announced its operating results for the 2015 third quarter, the three month period ended September 30, 2015.  That same day, the Company held a conference call with analysts and investors to discuss La Quinta's 2015 third quarter operating results (the "Q3 conference call").  On the Q3 conference call, Defendant Cline

explained that La Quinta needed "to enhance the consistency of the brand experience across our platform, which will likely require incremental investment." In this regard, Defendant Cline noted:

> What we've experienced in this environment **over the past call it six months or so is an increasing pressure in the competitive landscape**, and that spreads across everything from **the quality of assets** to loyalty programs and the network effect and the increasing competitive environment to distribution channels and disruption there, and as I mentioned, the transparency of the hospitality experience. So as we think about it, we're taking a look at potential investment alternatives into all of these areas that we will assess and discuss more on our year-end earnings call.

79.    Later, on the conference call, Defendant Cline explained that La Quinta's hotels were in need of major renovation. Defendant Cline commented that guests have a "level of expectation" from the La Quinta brand and that "we intend to make certain that our physical assets support that expectation." As a result, La Quinta announced that it needed to incrementally invest "a little more than *$600 million*" to renovate its facilities.

80.    With respect to business in La Quinta's Texas market, Defendant Cline stated on the Q3 conference call, that "[c]ertainly in Texas, we're seeing a weakening in oil markets." Defendant Cline contrasted the Company's Texas and non-Texas business as follows:

- in the first quarter of 2015, Texas was up 4.5%, while the rest of the country was up almost 10%;

- in the second quarter of 2015, Texas was down about 3%, while the rest of the country was up almost 6.5%; and

- in third quarter of 2015, Texas was down about 4%, while the rest of the country was up about 4.7%.

81.    Also, on the Q3 conference call, Defendant Cline acknowledged that "the ongoing transition of the call center did weigh on our performance in the quarter."

82.    In response to these revelations, the price of La Quinta common stock declined by another 9% on October 29, 2015.

83.     The market for La Quinta common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and omissions alleged herein, La Quinta common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired La Quinta common stock relying upon the integrity of the market price of La Quinta common stock and market information relating to La Quinta, and have been damaged thereby.

84.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of La Quinta common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

85.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about La Quinta operations, acquisitions and future financial prospects.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of La Quinta common stock and its business, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

86.     For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldberg, Cline and Forson.

87.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name during the Class Period, were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding La Quinta, their control over, and/or receipt and/or modification of La Quinta's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

88.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including Defendants Goldberg, Cline and Forson.

89.     Defendants Goldberg, Cline and Forson, because of their positions with La Quinta, controlled the contents of La Quinta's public statements during the Class Period.  Defendants Goldberg, Cline and Forson were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Defendants Goldberg, Cline and Forson knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were

being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of La Quinta's corporate statements and are, therefore, responsible and liable for the representations contained therein.

90.    In addition, the scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendants Goldberg and Cline, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about La Quinta was made known to them and that the Company's disclosure related controls were operating effectively.

91.    Defendants were also motivated to engage in this course of conduct to allow Company insiders to sell an unusually large amount of their personally held La Quinta common stock at inflated prices. As noted herein, Blackstone, the largest beneficial owner of La Quinta common stock during the Class Period, sold *40%* of its common stock holdings in the Company to the public at artificially inflated prices in the SPO for net proceeds of approximately *$550.8 million*.

92.    Indeed, Blackstone was knowledgeable about the operations of La Quinta during the Class Period because, as noted in the Prospectus, Blackstone maintains "significant influence" over La Quinta business affairs, in part, due to the composition of La Quinta's Board of Directors, who are affiliated with Blackstone and have real estate investment expertise.

93.    For example, Defendant Alba is a Managing Director in the Real Estate Group of Blackstone, where he is involved in the asset management of a broad range of Blackstone's real estate investments in the U.S. and Europe including office, hotel, multi-family and industrial assets. Defendant Cutaia is a Senior Managing Director and Chief Operating Officer of asset management in the Real Estate Group at Blackstone. Defendant Kim is a Managing Director in the Real Estate

Group at Blackstone.  Defendant Nash is a Senior Managing Director in the Real Estate Group of Blackstone, the Chief Investment Officer of Blackstone Real Estate Debt Strategies and a member of the Real Estate Investment Committee for both Blackstone Real Estate Debt Strategies and Blackstone Real Estate Advisors.  Defendant Sumers was recently a Senior Managing Director and Chief Operating Officer in the Real Estate Group of Blackstone where he headed Blackstone Real Estate Advisors' Strategic Asset Management Group, including the oversight of all financial reporting activities and responsibility for the property disposition activities.

94.    In total, Company insiders to sold approximately 24.2 million shares of their personally held La Quinta common stock at inflated prices, yielding those insiders proceeds of approximately $557.7 million during the Class Period:

| Filer Name | Title | Ownership | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 3,593,527 | $23.08 | $82,944,640 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 309,150 | $23.08 | $7,135,701 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 225,063 | $23.08 | $5,194,832 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 358,776 | $23.08 | $8,281,153 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 3,324,860 | $23.08 | $76,743,355 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 524,219 | $23.08 | $12,099,855 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 7,987,378 | $23.08 | $184,362,103 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 909,128 | $23.08 | $20,984,202 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 84,516 | $23.08 | $1,950,771 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 104,173 | $23.08 | $2,404,488 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 208,894 | $23.08 | $4,821,624 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 105,200 | $23.08 | $2,428,193 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 1,294,134 | $23.08 | $29,870,787 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 621,131 | $23.08 | $14,336,747 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 03/30/15 | 1,099,851 | $23.08 | $25,386,409 |
| | | | | **20,750,000** | | **$478,944,860** |
| | | | | | | |

| Filer Name | Title | Ownership | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 93,169 | $23.08 | $2,150,497 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 15,626 | $23.08 | $360,674 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 46,373 | $23.08 | $1,070,367 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 194,120 | $23.08 | $4,480,616 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 498,730 | $23.08 | $11,511,526 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 15,780 | $23.08 | $364,229 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 12,678 | $23.08 | $292,630 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 53,816 | $23.08 | $1,242,164 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 1,198,106 | $23.08 | $27,654,299 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 33,759 | $23.08 | $779,214 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 539,029 | $23.08 | $12,441,695 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 78,633 | $23.08 | $1,814,982 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 164,977 | $23.08 | $3,807,946 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 136,369 | $23.08 | $3,147,626 |
| Blackstone | Beneficial Owner of More than 10% Class | I | 04/02/15 | 31,335 | $23.08 | $723,264 |
| | | | | **3,112,500** | | **$71,841,729** |
| | | | | | | |
| Cary, Julie M. | Officer | D | 07/13/15 | 9,592 | $23.50 | $225,412 |
| | | | | **9,592** | | **$225,412** |
| | | | | | | |
| Chloupek, Mark M. | General Counsel | D | 02/25/15 | 2,220 | $22.77 | $50,549 |
| Chloupek, Mark M. | General Counsel | D | 03/11/15 | 1,905 | $23.02 | $43,853 |
| Chloupek, Mark M. | General Counsel | D | 03/12/15 | 10,000 | $23.29 | $232,900 |
| Chloupek, Mark M. | General Counsel | D | 03/1815 | 4,800 | $23.76 | $114,048 |
| Chloupek, Mark M. | General Counsel | D | 03/19/15 | 5,200 | $23.78 | $123,656 |
| Chloupek, Mark M. | General Counsel | D | 03/20/15 | 8,641 | $24.25 | $209,544 |
| Chloupek, Mark M. | General Counsel | D | 03/25/15 | 1,359 | $24.25 | $32,956 |
| Chloupek, Mark M. | General Counsel | D | 04/27/15 | 17,500 | $24.11 | $421,925 |
| Chloupek, Mark M. | General Counsel | D | 04/30/15 | 17,500 | $24.58 | $430,150 |
| | | | | **69,125** | | **$1,659,582** |
| | | | | | | |
| Forson, James H. | Officer and Treasurer | D | 03/09/15 | 10,000 | $22.50 | $225,000 |
| Forson, James H. | Officer and Treasurer | D | 03/11/15 | 3,996 | $23.02 | $91,988 |
| Forson, James H. | Officer and Treasurer | D | 04/20/15 | 21,000 | $22.92 | $481,320 |
| Forson, James H. | Officer and Treasurer | D | 04/23/15 | 1,294 | $24.00 | $31,056 |
| Forson, James H. | Officer and Treasurer | D | 04/24/15 | 5,700 | $24.07 | $137,199 |
| | | | | **41,990** | | **$966,563** |
| | | | | | | |

| Filer Name | Title | Ownership | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| Lombardi, Angelo J. | Chief Operating Officer | D | 03/11/15 | 11,394 | $23.02 | $262,290 |
| Lombardi, Angelo J. | Chief Operating Officer | D | 03/20/15 | 11,394 | $24.02 | $273,684 |
| Lombardi, Angelo J. | Chief Operating Officer | D | 04/20/15 | 5,697 | $22.87 | $130,290 |
| Lombardi, Angelo J. | Chief Operating Officer | D | 04/22/15 | 5,698 | $23.55 | $134,188 |
| Lombardi, Angelo J. | Chief Operating Officer | D | 04/23/15 | 1,423 | $24.00 | $34,152 |
| Lombardi, Angelo J. | Chief Operating Officer | D | 04/24/15 | 20,395 | $24.07 | $490,908 |
| Lombardi, Angelo J. | Chief Operating Officer | D | 04/30/15 | 5,698 | $24.54 | $139,829 |
| Lombardi, Angelo J. | Chief Operating Officer | D | 05/18/15 | 35,577 | $24.47 | $870,569 |
| Lombardi, Angelo J. | Chief Operating Officer | D | 06/08/15 | 35,578 | $24.30 | $864,545 |
| | | | | 132,854 | | $3,200,455 |
| | | | | | | |
| Trivedi, Rajiv K. | Officer | D | 07/14/15 | 4,418 | $24.00 | $106,032 |
| Trivedi, Rajiv K. | Officer | D | 07/16/15 | 30,970 | $24.08 | $745,758 |
| | | | | 35,388 | | $851,790 |
| | | | | | | |
| | | | | | | |
| | | | Totals | 24,151,449 | | $557,690,390 |

## LOSS CAUSATION

95.     For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldberg, Cline and Forson.

96.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of La Quinta common stock and operated as a fraud or deceit on Class Period purchasers of La Quinta common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of La Quinta common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

97.     As a result of their purchases of La Quinta common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal

securities laws. Defendants' false and misleading statements had the intended effect and caused La Quinta common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $24.94 per share on May 28, 2015.

98.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of La Quinta's business and future financial prospects. When the truth about the Company was revealed to the market, the price of La Quinta common stock fell significantly. The declines in the price of La Quinta common stock detailed herein removed the inflation therefrom, causing real economic loss to investors who had purchased La Quinta common stock during the Class Period.

99.     The declines in the price of La Quinta common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in La Quinta common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

100.     The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of La Quinta common stock and the subsequent significant declines in the value of La Quinta common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

101.     At all relevant times, the market for La Quinta common stock was an efficient market for the following reasons, among others:

(a)     La Quinta common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, La Quinta filed periodic public reports with the SEC and the NYSE;

(c)     La Quinta regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     La Quinta was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

102.    As a result of the foregoing, the market for La Quinta common stock promptly digested current information regarding La Quinta from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of La Quinta common stock during the Class Period suffered similar injury through their purchase of La Quinta common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

103.    For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldberg, Cline and Forson.

104.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of La Quinta who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all persons other than Defendants who purchased the common stock of La Quinta in the SPO on or about March 24, 2015, as well as purchasers of La Quinta common stock between February 25, 2015 and September 17, 2015, inclusive (the "Class").

106.    Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

107.    The members of the Class are so numerous that joinder of all members is impracticable. More than 130 million shares of La Quinta common stock were outstanding during the Class Period. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of La Quinta, its transfer agent or the underwriters of the SPO. Notice can be provided to such record owners by a combination of published notice and first-

class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

108.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

109.    Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

110.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

111.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the registration statement issued by La Quinta to the investing public in connection with the SPO negligently omitted and/or misrepresented material facts about the Company and its business;

(c)    whether statements made by Defendants La Quinta, Goldberg, Cline and Forson to the investing public during the Class Period were materially false and misleading;

(d)    whether the price of La Quinta common stock was artificially inflated during the Class Period; and

(e)    the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

112.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

113.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class against all Defendants.  With respect to this Count, Plaintiff does not claim that Defendants acted with scienter or fraudulent intent.

114.    The Registration Statement for the SPO was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made accurate and omitted to state material facts required to be stated therein.

115.    Plaintiff acquired La Quinta common stock pursuant to, and in reliance on, the Registration Statement, without knowledge of the untruths and/or admissions alleged herein. Plaintiff and the Class sustained damages when the price of La Quinta common stock declined substantially as the material inaccuracies in the Registration Statement were revealed to the market.

116.    Defendant La Quinta was the registrant for the SPO.  As such, La Quinta is strictly liable to the Plaintiff and the Class under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement and its failure to be complete and accurate.

117.    The Individual Defendants signed the Registration Statement either personally or through an Attorney-in-Fact and caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are liable to Plaintiff and the Class.

118.    The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Underwriter Defendants are strictly liable to Plaintiff and the Class.

119.    The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate.  By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

120.    At the time of his purchases of La Quinta common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years has elapsed between the time that the securities were offered to the public and the time Plaintiff commenced this action in this Court.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

121.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

122.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of the Class against all Defendants.  With respect to this Count, Plaintiff does not claim that Defendants acted with scienter or fraudulent intent.

123.    Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Registration Statement.  Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the SPO.  The Registration Statement contained a Prospectus that was used to induce investors, such as Plaintiff and the other members of the Class, to purchase the stock registered in the SPO.

124.    The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not inaccurate, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included participating in the

preparation of the false and inaccurate Registration Statement and participating in road shows to market the SPO to investors.

125.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit. But for their participation in the SPO, including their solicitation as set forth herein, the SPO could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a)    made the decision to underwrite the SPO and do it at the price set forth in the Registration Statement. The Underwriter Defendants drafted, revised and/or approved the Registration Statement and participated in its being declared effective by the SEC. The Prospectus was calculated to create interest in La Quinta common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose; and

(b)    orchestrated all activities necessary to affect the sale of the stock in the SPO to the investing public, by issuing stock, promoting the stock and supervising their distribution and ultimate sale to the investing public.

126.    The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and omitted to state material facts required to be stated therein. Defendants' actions of solicitation included preparing the defective and inaccurate Registration Statement and participating in efforts to market the SPO to investors.

127.    Defendants owed to the purchasers of La Quinta common stock, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact. Defendants, in the

exercise of reasonable care, should have known that the Registration Statement contained misstatements and omissions of material fact.

128.    Plaintiff and the other members of the Class purchased or otherwise acquired La Quinta common stock pursuant to the Registration Statement, and neither Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement.

129.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff, individually and on behalf of the Class, hereby offers to tender to Defendants those shares of stock that Plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon. Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants and Blackstone

130.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

131.    This Count is asserted by Plaintiff against all the Individual Defendants and Blackstone for violations of Section 15 of the Securities Act. For purposes of this Count, Plaintiff does not claim that the Individual Defendants acted with fraudulent intent.

132.    The Individual Defendants and Blackstone acted as controlling persons of La Quinta within the meaning of Section 15 of the Securities Act. By reason of their ownership interest, senior management positions and/or directorships at the Company, the Individual Defendants individually, and acting pursuant to a common plan, and Blackstone had the power to influence and exercised the same to cause La Quinta to engage in the conduct complained of herein and were therefore control

- 44 -

persons of La Quinta. By reason of such conduct, the Individual Defendants and Blackstone are liable pursuant to Section 15 of the Securities Act.

133.    Each of the Individual Defendants and Blackstone were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the SPO to be successfully completed.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants La Quinta, Goldberg, Cline and Forson

134.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135.    During the Class Period, Defendants La Quinta, Goldberg, Cline and Forson (the "Count IV Defendants") disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.    The Count IV Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

> (a)    employed devices, schemes and artifices to defraud;

> (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Plaintiff and others similarly situated in connection with their purchases of La Quinta common stock during the Class Period.

137.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for La Quinta common stock. Plaintiff and the Class would not have purchased La Quinta common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

138.    As a direct and proximate result of these Defendants' wrongful conduct, the Plaintiff and the other members of the Class suffered damages in connection with their purchases of La Quinta common stock during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Goldberg, Cline and Forson

139.    Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

140.    Defendants Goldberg, Cline and Forson (the "Count V Defendants") acted as controlling persons of La Quinta within the meaning of Section 20(a) of the Exchange Act. By reason of their positions as officers and/or directors of La Quinta, the Count V Defendants had the power and authority to cause La Quinta and its employees to engage in the wrongful conduct complained of herein. La Quinta controlled each of the Count V Defendants and all of its employees. By reason of such conduct, the Count V Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, on behalf of himself and the Class, pray for judgment as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding the Plaintiff and other members of the Class damages together with interest thereon;

C.      With respect to Count II, ordering that the SPO be rescinded;

D.      Awarding the Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.      Awarding the Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  April 25, 2016                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD
                                          MARIO ALBA JR.


                                          _____
                                              */s/ Samuel H. Rudman*
                                          SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
malba@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL P. DEES
1200 Ashwood Parkway, Suite 410
Atlanta, GA 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| LQ | 3-25-15 | 100 | 23.71 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| LQ | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __23__ day of __March__, 2016 in __Happy Valley__, __Or__.
                                                         City              State

(Signature) X _Paul Beisel_

(Print Name) _PAUl BEiSE_