**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PAUL BEISEL, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>        vs.<br><br>LA QUINTA HOLDINGS INC., WAYNE B. GOLDBERG, KEITH A. CLINE, JAMES H. FORSON, GLENN ALBA, ALAN J. BOWERS, HENRY G. CISNEROS, GIOVANNI CUTAIA, BRIAN KIM, MICHAEL NASH, MITESH B. SHAH, GARY M. SUMERS, THE BLACKSTONE GROUP L.P., J.P. MORGAN SECURITIES, LLC, MORGAN STANLEY & CO. LLC,<br><br>                        Defendants. | Civil Action No.: 16 Civ. 3068 (AJN)<br><br>CLASS ACTION<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br><br>DEMAND FOR JURY TRIAL |

Court-Appointed Lead Plaintiff, the Police and Fire Retirement System of the City of Detroit ("Lead Plaintiff"), makes the following allegations based upon the investigation of Lead Plaintiff's counsel, which has included a review of United States Securities and Exchange Commission ("SEC") filings by La Quinta Holdings Inc. ("La Quinta" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company, as well as interviews of former La Quinta employees. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of: (i) all purchasers of La Quinta common stock between November 19, 2014 and February 24, 2016, inclusive (the "Class Period"), pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and (ii) a subclass of all those who purchased La Quinta common stock in the Company's secondary public offering on or about March 24, 2015 (the "March 2015 SPO"), pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2.      La Quinta operates as a hotel chain located in the United States, Mexico and Honduras, with approximately 25% of its hotels located in Texas. It was a privately held company until its majority shareholder, Blackstone, took the Company public in early 2014. As La Quinta admitted in the prospectus accompanying the March 2015 SPO, Blackstone continued to maintain "significant influence" over La Quinta during 2015, and, in fact, controlled La Quinta through at least June 2015, because a majority of La Quinta's Board of Directors were both Blackstone appointees and current/former employees. During the Class Period, Defendants, *inter alia*: (i) misled

investors about the impact that the steep decline in oil prices was having on its Texas business; and (ii) concealed the fact its hotels across the entire chain were in dire need of renovations, which resulted in lost business. Defendants also failed to disclose early in the Class Period that their transition to a new reservation system was fraught with technical problems, resulting in a negative material impact on the Company's business.

3.    Defendants were motivated, in part, to mislead investors as to the true state of La Quinta's business in order to elevate/maintain La Quinta's stock price at artificial levels and thereby benefit Blackstone's sale of 20 million La Quinta shares in a November 19, 2014 Secondary Public Offering (the "November 2014 SPO), and its sale of 23.8 million La Quinta shares in the March 2015 SPO, for a combined total in excess of **$1.01 billion**.    As reported in a December 22, 2014 Bloomberg article entitled *Oil Crash Wipes $11.7 Billion From Buy Out Firms' Holdings,* "[m]ore than a dozen firms -- including . . . . Blackstone -- have lost a combined $11.7 billion in 27 publicly traded oil producers since June, when crude prices reached this year's peak before beginning their six-month slide . . . ." Blackstone – realizing that the the impact of the downturn of the oil industry on the Texas economy had not been factored into La Quinta's stock price – was thereby able to recoup the losses it suffered in connection with other investments that were dependent on the oil industry. In addition, other Defendants also sold significant amounts of La Quinta shares during the Class Period, prior to the Company's acknowledgment of the true impact of the downturn in the Texas economy and the dilapidated state of its properties on its business.

4.    Even after Blackstone's sale, La Quinta continued to mislead investors, claiming that the crash in oil prices was not having a systemic impact on the Company's Texas-wide revenues, and that any effect was limited to oil-producing regions. It was only after Defendant Goldberg was

replaced as La Quinta CEO in September 2015, that La Quinta admitted that from the start of 2015, Texas – which was the Company's primary source of revenue – was significantly underperforming compared to the Company's business in the remainder of the country. And finally, it was only at the end of the class period, that La Quinta announced that it was required to institute an "accelerated renovation program," costing hundreds of millions of dollars, in order to refurbish its properties and remain competitive, despite being aware of the dilapidated condition of numerous of its properties from the outset of 2015.

5.      As a result of Defendants' misconduct, La Quinta's stock price, which traded at a high of $24.89 per share during the Class Period, and which was sold through the March 2015 SPO at a share price of $23.71 per share, declined materially as the truth concerning La Quinta's operations, and the effect of the previously undisclosed operational difficulties, were revealed in a series of partial corrective disclosures starting mid-to-late 2015 and lasting through February 24, 2016.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

7.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

8.      Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c). Certain of the Underwriter Defendants (as defined herein) are either headquartered or maintain offices in this District. The acts

and conduct complained of herein occurred in substantial part in this District. The March 2015 SPO was marketed in this District and the Company's common stock trades on the New York Stock Exchange ("NYSE"), which is located in this District.

9.      In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the NYSE, a national securities exchange.

## PARTIES

10.      Lead Plaintiff purchased La Quinta common stock during the Class Period and in the March 2015 SPO, as set forth in the certification that was previously filed with this Court, and was damaged thereby.  With respect to the March 2015 SPO, Lead Plaintiff purchased its shares from Defendant Morgan Stanley, one of the offering's lead underwriters.

11.      Defendant La Quinta, a Delaware company that was incorporated in 2013, is an owner, operator and franchisor of select-service hotels.

12.      Defendant Wayne B. Goldberg ("Goldberg") served, at all relevant times until September 17, 2015, as President, Chief Executive Officer and a Director of La Quinta.

13.      Defendant Keith A. Cline ("Cline") served, at all relevant times, as Executive Vice President and Chief Financial Officer of La Quinta.

14.      Defendant James H. Forson ("Forson") served, at all relevant times, as Senior Vice President, Chief Accounting Officer and Treasurer of La Quinta.

15.      Defendants Glenn Alba ("Alba"), Alan J. Bowers ("Bowers"), Henry G. Cisneros ("Cisneros"), Giovanni Cutaia ("Cutaia"), Brian Kim ("Kim"), Michael Nash ("Nash"), Mitesh B.

Shah ("Shah") and Gary M. Sumers ("Sumers") each served, at all relevant times, as a members of La Quinta's Board of Directors.

16.    Defendants Goldberg, Cline, Forson, Alba, Bowers, Cisneros, Cutaia, Kim, Nash, Shah, and Sumers are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement (defined herein) issued in connection with the March 2015 SPO.

17.    Defendant The Blackstone Group L.P. ("Blackstone") is an American multinational private equity, investment banking, alternative asset management and financial services corporation based in New York City. Defendant Blackstone was the largest beneficial owner of La Quinta common stock at the time of the March 2015 SPO.  Defendant Blackstone sold a total of 23,862,500,00 shares of La Quinta common stock in the March 2015 SPO to the public for total proceeds of $550.8 million.  According to the Prospectus, Blackstone maintains "significant influence" over La Quinta business affairs, in part, due to the composition of La Quinta's Board of Directors, who are affiliated with Blackstone and have real estate investment expertise.  However, Blackstone, in fact, controlled La Quinta through at least June 2015, because a majority of La Quinta's Board of Directors were both Blackstone appointees and current/former employees.

18.    Defendants J.P. Morgan Securities, LLC ("J.P. Morgan") and Morgan Stanley & Co. LLC ("Morgan Stanley") each served as lead underwriters for the March 2015 SPO.  The underwriters collectively received estimated discounts and commissions of approximately $15 million in connection therewith.

19.    Defendants J.P. Morgan and Morgan Stanley are collectively referred to herein as the "Underwriter Defendants."

20.    The Underwriter Defendants participated in the drafting and dissemination of the March 2015 SPO's Registration Statement.

21.    The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

22.    Defendant La Quinta, the Individual Defendants, Blackstone, and the Underwriter Defendants are collectively referred to herein as "Defendants."

**RELEVANT NON-PARTIES**

23.    Confidential Witness Number 1 ("CW 1") worked as the Acting General Manager of the La Quinta hotel in Midland, Texas. CW 1 was employed by La Quinta from September 2014 through October 2015. CW 1 reported to Regional Vice President Scott Whitney ("Whitney"), who was located at La Quinta's corporate headquarters. Whitney was responsible for all of the hotels in West Texas "oil country," including Odessa, Abilene, and Midland.

24.    Confidential Witness Number 2 ("CW 2") was one of La Quinta's 14 Regional Sales Managers, from February 2014 to October 2015. CW 2 was responsible for La Quinta's entire Midwest Region (with the exception of Chicago), which consisted of approximately 35 hotels, 28 of which were located in Wisconsin and Michigan. As a Regional Sales Manager, CW 2's primary focus was on corporate travel, and CW 2 frequently met with corporate clients. CW 2 reported to Nancy Johns ("Johns"), La Quinta's Director of Regional Sales for the Eastern United States, who in turn reported to Donna Cooper ("Cooper"), La Quinta's Executive Vice President of Sales. Cooper, in turn, reported to Defendant Goldberg and COO Angelo Lombardi.

25.    Confidential Witness Number 3 ("CW 3"), worked at La Quinta for approximately 18 months as a floating general manager from the summer of 2014 until December 2015.  As a floating general manager, CW 3 would be assigned to hotels where the day-to-day GM was unavailable.  CW 3 was assigned to hotels in the South Florida Region, which included Miami, Fort Lauderdale, Orlando and West Palm Beach.

26.    Confidential Witness Number 4 ("CW 4") worked for La Quinta as a hotel manager from 2000 until August 2015.  CW 4 started working for La Quinta in the West Texas and Dallas/Fort Worth regions.  CW 4's last year with La Quinta was spent managing a large La Quinta property in Charleston, South Carolina.

## CLASS ACTION ALLEGATIONS

27.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and: (i) all persons other than Defendants who were purchasers of La Quinta common stock between November 19, 2014 and February 24, 2016, inclusive (the "Class"), and (ii) a subclass of all persons other than Defendants who purchased the common stock of La Quinta in the March 2015 SPO on or about March 24, 2015 (the "Subclass").

28.    Excluded from the Class and Subclass are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

29.    The members of the Class and Subclass are so numerous that joinder of all members is impracticable.  More than 130 million shares of La Quinta common stock were outstanding during

the Class Period, and 23,862,500 shares were sold in the March 2015 SPO. The precise number of Class and Subclass members is unknown to Lead Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class and Subclass members can be ascertained from the books and records of La Quinta, its transfer agent or the underwriters of the March 2015 SPO. Notice can be provided to such record owners by a combination of published notice and first class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

30.    Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and Subclass. Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

31.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class and Subclass because Lead Plaintiffs' and Class and Subclass members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

32.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class and Subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class and Subclass members to seek redress for the wrongful conduct alleged. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

33. Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class and Subclass. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants La Quinta, Goldberg, Cline, and Forson to the investing public during the Class Period were materially false and misleading;

(c) whether Defendants acted with scienter in making false or misleading statements during the Class Period;

(d) whether the price of La Quinta common stock was artificially inflated during the Class Period; and

(e) the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

34. Among questions of law and fact common to the Subclass are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein; and

(b) whether the registration statement issued by La Quinta to the investing public in connection with the March 2015 SPO negligently omitted and/or misrepresented material facts about the Company and its business.

**SUBSTANTIVE ALLEGATIONS**

**I.**

**ALLEGATIONS PERTINENT TO THE EXCHANGE ACT CLAIMS**

35.    For the purposes of Section I of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldman, Cline, and Forson.

36.    Throughout the Class Period, Defendants repeatedly: (i) failed to disclose, and at times openly disputed, that the precipitous drop in oil prices during the latter half of 2014 would adversely impact the Company in 2015, despite the fact that 25% of its business was based in Texas and Texas' economy was highly dependent on the oil industry; and (ii) failed to disclose that their properties were extremely dilapidated and in dire need of renovations, that the poor condition of its hotels cost them business, and that it would cost the Company hundreds of millions of dollars to modernize their properties in order to remain competitive. In addition, Defendants also failed to disclose at the beginning of the Class Period that their transition to a new reservation system was fraught with technical set-backs, and cost them substantial business.

37.    As discussed below, Defendants possessed contrary internal information demonstrating the known false or misleading nature of their Class Period statements on these subjects.

**A.    General Background Regarding La Quinta's Business Operations and Information Systems**

38.    Defendant La Quinta describes itself as a leading owner, operator, and franchisor of select-service hotels that primarily serves the midscale and upper-midscale markets. The Company was founded in 1968 and has a 46-year history of owning and operating hotels.

39.     During the period from 1973 to January 2006, La Quinta operated as a public company *via* predecessor entities. In January 2006, La Quinta was acquired by Blackstone and taken private.

40.     On April 14, 2014, La Quinta completed its initial public offering of approximately 44.0 million shares of La Quinta common stock. Pursuant to the November 2014 SPO, Blackstone sold 23.0 million shares of the Company's common stock to the public. Prior to the November 2014 offering, Blackstone beneficially owned 82,035,576 shares, or 62.8%, of the Company's common stock. After the November 2014 offering, Blackstone beneficially owned 59,035,576 shares, or 45.2%, of the Company's common stock.

41.     On or about March 24, 2015, La Quinta completed the March 2015 SPO, in which Blackstone sold 23,862,500 shares of La Quinta common stock to the public. After the March 2015 SPO, Blackstone beneficially owned 35,173,076 shares, or 26.9%, of the Company's outstanding common stock.

42.     Two of the primary metrics La Quinta used in measuring its performance was its average daily rate ("ADR") and its revenue per available room ("RevPAR"). The ADR is calculated by dividing hotel room revenues divided by the total number of rooms sold in a given period, while RevPAR is calculated by multiplying the ADR by the average daily occupancy acheived.

43.     ADR and RevPAR trends provide useful information concerning pricing policies and the nature of the guest base of a hotel or group of hotels. As La Quinta has stated, "[c]hanges in room rates have an impact on overall revenues and profitability."

44.     In order to compete effectively, La Quinta placed especial emphasis on the real time reporting of rate and occupancy data for review by key members of La Quinta's staff as well as by

members of senior management.

45.     For example, La Quinta's Form 10-K for the year ended December 31, 2014 ("2014 Form 10-K"), highlights that "[u]nder the direction of our revenue management team, the hotel general managers, field leadership team and **senior management continually review our room rates, and price rooms into the demand curve based on the prevailing market conditions at each owned hotel**."   La Quinta's 2014 Form 10-K further explained that "through our computer network, **we continually update the number of rooms sold at each hotel** to maximize the sale of available rooms . . . ." *Id.* at 14.  La Quinta also used its up-to-the-minute occupancy and pricing data to create a "website [that] provide[d] guests with **real time information**" for "rates and availability for specific La Quinta hotels." *Id.* at 15.

46.     Thus, La Quinta's focus on the collection of daily performance metrics provided it with a window into La Quinta's performance on a real-time basis.  According to CW 1, the projected and actual performance of any given La Quinta hotel was available on computer on what was known as the "LQ System."

47.     CW 4 confirmed that La Quinta's management was "really focused" on the real time reporting of performance-related information.  CW 4 recalled that each hotel was responsible for completing a "night audit" by 2:00 a.m., so that the information could be consolidated company wide by 2:30 a.m.   According to CW 4, La Quinta COO Angelo Lombardi, was particularly knowledgeable of La Quinta's performance, and during company-wide conference calls would frequently refer to lists that had been compiled utilizing such data and that identified, *inter alia*, those La Quinta hotels in the bottom 25% for:  occupancy; customer service; EBITDA; and market share.

48. CW 4 further explained that for poorly performing hotels, management would devise action plans that would routinely involve weekly or even bi-weekly calls and site visits from the responsible Regional Vice President in order to improve performance.

49. CW 2 recounted that La Quinta's Sales Force was provided with Weekly Activity Reports, that set forth sales goals for each person in the company as well as that individual's performance during the past week. If a salesperson did not meet their specified goal, their sales numbers were printed in "red."

50. Accordingly, Defendants were aware in real-time of declining occupancy or declining room prices at any of the La Quinta properties.

51. Moreover, once Defendants volunteered information regarding the impact of the decline in oil prices on their business, or agreed to respond to analyst questions regarding that issue, they are presumed to have reasonably educated themselves as to the data then available to La Quinta relevant to that issue.

**B.     The Texas Economy's Reliance on Oil and La Quinta's Heavy Presence in Texas**

52. Between 2009 and 2014, Texas' share of the United States' domestic oil production grew by approximately 25%, to over 40% of the national production.

53. According to data compiled by the U.S. Energy Information Administration, Texas produced approximately 97.5 million barrels of oil in September 2014 (or 3.23 million barrels per day), which was more than three times as much oil as the next largest producing state.

54. Texas' dependence on oil revenues also directly impacted La Quinta, which had a disproportionate number of its properties in Texas. Specifically, in the prospectus accompanying its November 2014 Secondary Offering, La Quinta noted that "[o]ur hotels are geographically

concentrated, *with 25% of our hotel rooms and 31% of our pipeline properties located in Texas*, which exposes our business to the effects of regional events and occurrences." That same admonition was repeated in La Quinta's 2014 Form 10-K.

55.     As further reported in its 2014 Form 10-K, by the end of 2014 La Quinta owned 78 hotels with a total of 10,364 rooms in Texas alone, which was more than the number of hotels and rooms in La Quinta's next two largest markets combined: Florida and California. For this reason, La Quinta admitted that "given our concentration of hotels in Texas, a downturn in the oil and gas industry could have an adverse effect on our business."

56.     La Quinta's reliance on oil-related business was echoed by various market observers. A January 14, 2015 analysis published by Josh Young, a hedge fund manager and writer for the investor website Seeking Alpha, entitled *Time to Sell? Insiders Dump La Quinta Stock*, reported that "[a] disproportionate share of La Quinta's profits may be coming from hotels in close proximity to oil fields, and management and insiders would be the first to know how much exposure is there and how quickly room rates and room utilization [are] falling." Relatedly, a January 2, 2015 Goldman Sachs analyst report noted that approximately 8% of all La Quinta's hotels were in close proximity to oil fields.

**C.     The Crash of Oil Prices in 2014 and the Impact on the Texas Economy**

57.     According to the U.S. Energy Information Administration, as of July 28, 2014, the WTI Cushing, Oklahoma spot price for crude oil was $105.68 a barrel.[1] Approximately 4 months later, on December 1, 2014, that price had crashed by roughly 40% to $68.98 per barrel. By the end of December, the spot price had fallen further to $53.45 a barrel, more than a 50% drop in price from

---

[1] *See* https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=D

July 28, 2014.

58.     On December 14, 2014, the investment website, *Seeking Alpha*, predicted that Texas' GDP would decline substantially in 2015 owing to the rapid decline in oil prices.

59.     On December 18, 2014, a CNN Money article entitled, *Texas is in danger of a recession*, warned that due to the steep decline in oil prices, Texas shale companies would "be forced to dial back capital spending and cut jobs." It further noted that Texas "was poised to take a hit" from cheaper gas prices because "of the pivotal role that oil plays in that state's economy."

60.     Similarly, on December 19, 2014, JP Morgan's Chief Economist for the U.S., Michael Feroli, predicted that Texas would face economic hardship in 2015, and could enter into a recession, as a result of the "global swoon in oil prices."

61.     According to Mr. Feroli, a similar 50% drop in oil prices in 1986 had triggered a state-wide recession in Texas. Mr. Feroli noted "[t]he labor market response was severe and swift," and resulted in a spike in unemployment. CNN Money, *Texas is in danger of a recession*, (Dec. 18, 2014). Mr. Feroli added that Texas' current economy was just as heavily dependent on oil as it had been in the 1980s.

62.      The sentiment that Texas' economy was likely to experience a steep decline in 2015, reminiscent of that in 1986, was echoed in the pages of the *LA Times*: "The weight of the oil industry in the Texas economy resembles that of mid-1986, when a similar oil price collapse created a major recession in the state . . . ." Michael Hiltzik, *Is the oil crash about to snuff out the "Texas Miracle"?*, L.A. Times (Dec. 22, 2014).

63.     Market observers noted that this meant not only "a general slowdown in drilling activity" but also "less money coming into the state . . . ." *Id.*

15

64.     As reported in a December 18, 2014 article published on FuelFix.com (affiliated with the Houston Chronicle), the Federal Reserve Bank of Dallas released a model indicating that if oil remained at $55 a barrel, it would cost Texas around 128,000 jobs by the middle of 2015.  That article further noted that a study prepared by Dallas Fed economists for the Council on Foreign Relations identified Texas as one of eight states that suffers overall job losses when crude prices fall at least 25 percent for sustained periods.  The predicted job losses were expected to have a particularly adverse impact on the Texas economy since the average oil and gas industry salary in Texas (excluding gas stations) is more than twice the amount of the average annual Texas salary across all industries.

65.     In fact, by the end of 2014 Texas had already started experiencing significant layoffs. As reported in a December 30, 2014 article published by FuelFix.com entitled *Fewer workers expected at the oil patch next year, lodging firm says*, Civeo Corp. ("Civeo") – a Houston-based company that provides lodging for energy industry workers and executives worldwide, including Texas – announced that it had trimmed its U.S. workforce by 45% as a result of lower oil prices impacting business in Texas and North Dakota.  According to Fuelfix, these cuts were just "the latest harbinger of a downturn" in the oil industry, and "follow similar announcements from Houston's Hercules Offshore and Haliburton, a driller and an oil field service giant."

66.     In its news release explaining why its occupancy rates were far lower than previously predicted, Civeo stated that "the acceleration in November of the decline in global crude oil prices *and forecasts for a potentially protracted period of lower prices* have resulted in major oil companies reducing their 2015 capital budgets from 2014 levels."  Globe Newswire, Civeo Announces Initial 2015 Operating Guidance (Dec. 29, 2014).

67.    According to information provided by Baker Hughes Incorporated, a top-tier oil field service company,  the number of active rotary rigs in Texas *declined by more than half* during a short *18 week* period from December 2014 to March 2015.

68.    The negative impact on Texas' economy from falling oil prices was not confined to the oil industry however.  On December 29, 2014, the Federal Reserve Bank of Dallas issued a Texas Manufacturing Survey.  That survey included comments from selected respondents, across many different industries, who expressed concern that the decline in oil prices would negatively impact their business.  For example, one of the respondents in the fabricated metal manufacturing industry stated:  "The drop in crude oil prices is going to make things ugly . . . quickly."  Similarly a respondent in the machinery manufacturing industry stated "low oil prices will drive reductions in U.S. drilling rigs, which will in turn reduce the market for our products," while a respondent in the chemical manufacturing industry stated "Lower oil prices will adversely impact margins.  Energy volatility will cause our customers to keep inventories tight."  And lastly, a respondent in the electrical equipment, appliance and component manufacturing industry succinctly observed that "Falling oil prices will negatively impact our business."

69.    The Federal Reserve Bank of Dallas December 2014 report also noted that the sharp drop in drilling resulting from sustained oil prices below $60 per barrel would dampen Texas' overall 2015 economic activity.  Indeed, the recent bust in oil prices has had a ripple effect on the Texas economy as industries that support oil and gas drilling companies, including La Quinta's hospitality industry, have witnessed a substantial decline in business activity with businesses and individuals curtailing expenditures.

70.     In a February 9, 2015, CNN Money article by Ivana Kottasova, entitled *Oil at $55 per barrel is here to stay*, the International Energy Agency said that "oil prices will stay substantially below the highs of the last three years for the foreseeable future.  The IEA's medium-term forecast sees prices averaging $55 per barrel in 2015.  They should then start to recover but it will take five years for them to get to $73."

**D.     La Quinta Felt the Effects of the Oil Price Crash Immediately in 2015**

71.     During the Class Period certain market observers publicly opined that the drastic decline in oil prices would adversely impact La Quinta's performance because "[a] disproportionate share of La Quinta's profits may be coming from hotels in close proximity to oil fields."  Seeking Alpha, *Time to Sell?  Insiders Dump La Quinta Stock* (Jan. 14, 2015).  The sale of substantial amount of shares by Defendants' Goldberg and Cline (*see* Section I.G, *infra*), also caught the attention of market observers who noted that "management and insiders [at La Quinta] would be the first to know how much exposure is there and how quickly room rates and room utilization [are] falling."

72.     On January 14, 2015, Joshua Young, the Chief Investment Officer of a Houston-based hedge fund focused on oil and gas companies, published an analysis of the impact of the decline in oil prices on La Quinta's performance in a piece entitled *Profit From The Oil Price Crash and Follow Blackstone: Short La Quinta Holdings* (the "Seeking Alpha Analysis").  That analysis emphasized that "La Quinta has an unusual concentration of hotels in close proximity to oil fields, and these will be the first to be affected. For a company with 5.5x trailing Debt to EBITDA, the effect of this downturn will be magnified."

73. The Seeking Alpha Analysis predicted that even if there was no impact on La Quinta hotels in Texas that were not in close proximity to oil fields, La Quinta's business would nonetheless see material declines. Citing a Goldman Sachs research report which stated that 8% of La Quinta's hotels were in close proximity to oil fields, the Seeking Alpha Analysis concluded that "La Quinta is so levered that if there were no spillover effects and 'only' 8% of La Quinta's hotels were affected with lower utilization and pricing, there would be a material impact to La Quinta's financial results."

74. This conclusion was based, in part, on the fact that, "[d]ue to the demand for hotel accommodations in oil producing areas, La Quinta charged significantly higher room rates in locales such Midland, Texas, than in non-oil producing areas like Little Rock, Arkansas and Omaha, Nebraska."

75. Relying on real time data provided on the travel and accommodations website, Kayak.com, the Seeking Alpha Analysis showed that for dates between January 13, 2015 and January 15, 2015, the first two La Quinta hotel listings in Midland, Texas had advertised nightly room rates of $175 and $296, while the first two listings in Little Rock, Arkansas advertised room rates of $59 and $82, and the first two listings for Omaha, Nebraska published advertised rates of $52 and $67.

76. The reported Midland rates were also substantially higher – between 2 and 3.5 times higher – than the average room rate charged by La Quinta company-wide, which La Quinta reported in its October 2014 Form S-1 reported was $83.92 a night.

77. The Seeking Alpha analysis also provided real time data showing that La Quinta's rates in oil producing areas had already started dropping precipitously in January 2015. For example, during the last two weeks of January 2015, the travel website Tingo reported that La Quinta's

19

nightly room rate in the oil-dependent town of Sweetwater, Texas, was decreased 8 separate times by an average amount of $6.18, to a then current price of $114. Meaning that in just 14 days, the advertised nightly room rate for that region decreased from $163 to $114.

78.     A follow-up Seeking Alpha analysis published on March 12, 2015 entitled *La Quinta Texas Room Rates Drop 25%, Management Evades Question About Regional Exposure*, reported that the same La Quinta rooms that had been previously listed as $296 and $175 per night had been reduced to $218 and $130 per night, respectively, again showing real time declines in rates as a result of the drop in oil prices.

79.     That analysis further reported that comparable three star hotel rooms in the Midland area were listed on Priceline.com and Hotwire.com websites for approximately $58 a night, significantly less than the rates La Quinta had been charging, and concluded that this was problematic for La Quinta because "[d]eeply discounted Priceline and Hotwire rates can be forward indicators for room rates . . . ."

80.     The concerns raised by market outsiders, however, were well known within La Quinta, including by La Quinta's management.

81.     CW 2 stated that oil-related business represented a "huge chunk" of La Quinta's business, and that this business was "not doing well" and had been "failing" from the outset of 2015 and "not coming back." CW 2 was "quite familiar" with the impact of falling oil prices on La Quinta's performance, as was La Quinta's management, which was "pretty frantic" that the company was losing money "in that vertical," meaning the market segment associated with oil and gas. CW 2 stated that this concern exhibited itself "in every sales call" at the beginning of 2015 and thereafter.

82.    CW 2 added that the overriding sentiment during these calls was that new business had to be found to replace declining oil-related business. CW 2 noted that the impact of declining oil prices on La Quinta's performance was not limited to its Texas hotels, but also impacted the Midwest Region because the fracking industry in the Dakotas and Michigan was "a huge sector for mid-service hotels" like La Quinta.

83.    The first time CW 2 recalled the need for new business to offset the loss of oil industry related revenues being raised was during a meeting of the Regional Sales Managers at the start of 2015. CW 2 recounted that, subsequent to that meeting, there were "numerous conference calls" about how to replace diminishing oil industry related revenues. Those calls included La Quinta's 14 Regional Managers and also included, at times, La Quinta's National Account Managers, and were led by Cooper and/or Angie Gadwood.

84.    According to CW 2, there was one National Account Manager who was responsible solely for handling large oil and gas customers. CW 2 knew from Weekly Activity Reports provided to La Quinta's Sales Force during these conference calls that his "numbers were bad" from the start of 2015. According to CW 2, the Weekly Activity Reports set forth sales goals for each sales person in the company and set forth that individual's performance. If a salesperson did not met his or her specified goal, their sales numbers were printed in "red." CW 2 recalled that in 2015, almost all results were recorded in red because just "about everyone was not making goal."

85.    CW 2 explained that despite the emphasis La Quinta placed on finding new revenue sources in early 2015, those efforts were likely to be unsuccessful in the short-term, because in CW 2's experience, it typically takes a year to develop "that much" business. CW 2 explained that the most likely source of new revenue would be to pursue the corporate customers of La Quinta's

competitors, but that those companies did the same thing to La Quinta, and that it was very difficult to divert such clients to La Quinta from other hotels, since such agreements were generally entered into at year's end and that it was therefore very difficult to get business accounts to change mid year.

86. CW 1 echoed CW 2's experiences, and explained that La Quinta Management was aware of the fact that revenues attributable to oil-related business were declining, and hoped to offset that decline by attracting more leisure and non oil-related business clientele.

87. CW 1 explained that the La Quinta in Midland was located in "a big oil field" area, and was the *number one revenue generating hotel for the Company in 2014*. The Midland location's outsized revenues were attributable to the fact that oil and gas companies would book blocks of rooms for their workers for extended periods of time. CW 1 added that this business, however, began declining by November 2014, as oil prices fell.

88. CW 1 learned that the Midlands property had achieved $6 million in revenues for 2014 and was the Company's best performer during weekly revenue meetings with La Quinta's general managers ("GMs") in the West Texas region. CW 1 noted that the weekly revenue meetings were led by Revenue Manager Robin Small ("Small"). Small was responsible for, *inter alia*, evaluating the so-called "comp set" of competitor hotels. The "comp set" would be used to assess a given hotel's performance *vis-a-vis* its competitors and to assess the reasonableness of its charged rates.

89. According to CW 1, the drop-off in the Midland hotel's revenues, which began at the end of 2014, was discussed during the weekly revenue meetings and that the participants acknowledged that this was due to the decline in the oil industry.

90.     CW 1 explained that the Midland property went from having an 80% occupancy rate in 2014, to only a 20% occupancy rate at the beginning of 2015, which did not improve as time went on.  Although the Midland location had reduced its rates *by more than 50%* in April 2015, that move had little positive impact on occupancy.

91.     While the concerns were accurate and, given La Quinta's management's access to real-time occupancy and price data, the conditions were known to La Quinta's management, throughout the Class Period Defendants publicly denied any suggestion that declining oil prices were having material impact on La Quinta's business (*see* Section I.F, *infra*).  As a result, La Quinta's stock continued to trade at artificially inflated levels throughout the Class Period.

**E.     La Quinta Knowingly Delayed Necessary Renovations, Which Negatively Impacted Revenues in 2015**

92.     In addition to La Quinta's business suffering from the downturn in the Texas economy, La Quinta also suffered due to its failure to make necessary renovations to it properties chain-wide.

93.     According to CW 4, La Quinta had a "scope team," which was responsible for traveling to each La Quinta hotel and assessing its need for renovations. As reported by the CWs, all hailing from different regions in the United States, La Quinta consistently refused to fund necessary renovations and repairs.

94.     CW 3 explained that a lot of the La Quinta hotels in the South Florida region were "run down" and needed "a lot of work and capital investment." CW 3 added that the overall quality of the "majority" of the La Quinta hotels in the South Florida region was "poor."

95.     CW 3 explained that GMs were empowered to make requests for renovation funds to the responsible Regional Vice President, who would then decide whether and how much funds to allocate.  CW 3's experience was that the allocated funds were typically insufficient to make the necessary improvements and that the quality of the hotels was a "constant struggle" that persisted through his tenure.

96.     CW 2 stated that one of the major impediments to La Quinta's efforts to obtain new business and retain preexisting clients was the poor conditions of its facilities.  CW 2 explained that prior to and during 2015, customers in the Midwest region had been "dropping off" because many of the hotels were "in dire need of renovation."  Of the 28 hotels in Wisconsin and Michigan, CW 2 stated 90% of them were in "bad shape" and "poor condition," but that only one hotel had been renovated during CW 2's tenure.  CW 2 explained that the poor condition of La Quinta's properties was readily apparent to business travelers who typically are "very savvy."

97.     CW 2 further explained that renovations fell into two categories: (i) soft renovations, which entailed, among other things,  replacing worn  mattresses, bed spreads and curtains, *etc*.; and (ii) full renovations, which extended beyond rooms, and were much more extensive and included work such as replacing worn carpets in the hallways and lobby.  According to CW 2, of the hotels in the Midwest Region, approximately 40% required soft renovations, while 50% required full renovations.

98.     CW 2 explained that the lack of renovations put La Quinta at a disadvantage versus competitors, such as Red Roof Inn, which had undertaken a "massive renovation." As a result, CW 2 stated that La Quinta had lost substantial business to the Red Roof Inn in the Midwest Region.

99.     CW 2's direct supervisors were "quite aware" that the hotels in the Midwest Region were in need of renovations. CW 2 stated that this topic was discussed during sales conference calls, as well as during one-on-one conversations with CW 2's managers. CW 2 recalled that the need for renovations was cited during these calls as the reason why La Quinta had not gotten certain corporate clients, or had received bad reviews. CW 2 added that prospective customers on several occasions made it clear that their decision not to select La Quinta was based on the poor quality of La Quinta's properties.

100.     CW 1 added that despite its importance to the Midland hotel to the Company, it was badly in need of renovations, which the Company did not fund during CW 1's tenure. Due to the lack of renovations, CW 1 reported that between 20 to 40 rooms were always "out of order" during 2015.

101.     According to CW 1, the dilapidated state of the Midland hotel severely hampered management's efforts to attract new leisure related business at that location, when the oil-related business began declining. According to CW 1, "leisure was hard for us to sell" because of the Midland property's poor condition, which resulted in the hotel receiving many negative online reviews.

102.     CW 1 stated that the Midland hotel was "basically a dangerous facility," and that during a training session in Irving, Texas, shortly after joining the company in 2014, CW 1 asked the COO, Angelo Lombardi, whether Midland would be renovated. Mr. Lombardi responded that La Quinta would not renovate the Midland property until the oil sector really slowed down, because until it did, the oil workers staying there would continue to "dirty up" the hotel. Mr. Lombardi added that if the rooms were renovated, they would not be available to rent.

103.     Although CW 1 stated that, at the time, Mr. Lombardi's explanation seemed to make sense, CW1 did not understand why the renovations did not commence when occupancy at the Midland hotel started to decline drastically at the end of 2014/beginning of 2015.  CW 1 added that one of the Midland hotel's former GMs, who had moved on to manage the La Quinta property in Corpus Christi, informed CW 1 that the Corpus Christi property was "the same crap" as the Midland location.

104.     CW 1 further explained that CW1's supervisor, Whitney, visited the Midland property on two occasions and was aware of the fact that several of the rooms were out of order and that the hotel required renovations, but that CW 1 did not receive any support from management.

105.     The dilapidated state of La Quinta's hotels was the subject of numerous customer complaints on the website Trip Advisor, including complaints for properties in La Quinta's primary areas of business: Texas, Florida and California.

106.     For example, the following customer complaints are representative of the numerous complaints published for various La Quinta properties in Texas:

1/20/15, La Quinta Inn & Suites Pasadena, review entitled *Needs Renovations and cleaning*: "The floor is uneven making it easy to trip.  The carpet was filthy.  The shower was only partly functional."

2/28/15, La Quinta Inn Houston Greenway Plaza, review entitled *Filthy – Outdated*: "Horrible stay . . . . Rate does not match the condition of this hotel.  More like a roadisde motel than a hotel.  No elevator to get to the second floor . . ."

3/29/15, La Quinta Inn Corpus Christi South, review entitled *LQ has lost my Allegiance:* "Facility needs to be torn down. Maintenance and upkeep have been done very poorly, rooms are musty and dirty . . . ."

3/13/15, La Quinta Inn & Suites Dallas Mesquite, review entitled *Under Construction BEWARE*: "As others said, this hotel is completely torn apart but not disclosed on website when booking.  By the looks construction may have been delayed or will not start for a long

time."

3/16/15, La Quinta Inn Killeen, review entitled *Disgusting*: "My stay was supposed to be on 3/14/15, but that quickly changed in a matter of seconds. When you walk in you can tell it is old and run down. I got my key and walked up to my room and as soon as I walked in I walked right back out. The room reeked of dog pee so bad . . . . I just don't get how you can run a hotel like that and expect people to come back."

4/26/15, La Quinta Inn & Suites Austin Airport, review entitled *Disappointing*: "Would not recommend this hotel. It is badly in need of remodeling . . . .   There are newer hotels surrounding this property. We [left] after one night."

5/17/15, La Quinta Inn Amarillo East Airport Area, review entitled *needs work*: "this property is in need of repairs and renovation . . . . we will try a new location next time."

7/29/15, La Quinta Inn & Suites San Antonio Fiesta, review entitled *Under Construction*: "This place need major construction . . . the elevator is on the verge of breaking . . . . I regret stopping at this abomination."

107.    Similarly poor reviews were common for La Quinta's properties in Florida:

2/2/15, La Quinta Inn & Suites Tampa Bay Clearwater, reviewed entitled *Don't stay here*: "In a word, this hotel is awful! The rooms are old and in need of repairs. Don't walk across the floors in clean, white socks! The carpet is filthy."

2/8/15, La Quinta Inn & Suites Port Orange/Daytona, review entitled *Stay far away from this property*: "The hotel is very run down and dirty."

2/15/15, La Quinta Inn Jupiter, review entitled review entitled *Hard not to be disappointed here . . .*: "Serious maintenance issues sound throughout the property, to many to mention here, but the ones I will mention is the toilet in our room that was somehow not attached to the floor and the heat in the room that smelled like burning oily rags."

2/24/15, La Quinta Inn Pensacola, review entitled *Not worthy of the LQ Name*: "This property is old, worn out and dirty.  We found this motel disgusting . . . ."

4/21/15, La Quinta Inn Orlando International Drive, review entitled *Just an old hotel*: "[I]t  smelled like an old hotel, it was damp and needs to be upgraded.  We had to fight with a very old lock to get into our room."

5/9/2015, La Quinta Inn Pensacola, review entitled *Better to skip this one*: "This location is in dire need of updates.  The doors, the railings, the elevators are all in

deplorable condition."

108.    The same complaints concerning the poor condition of the facilities were also frequently made about La Quinta's California properties:

1/22/2015, La Quinta Inn John Wayne Orange Country Airport, Review entitled *Falling Apart and Rude Staff*: "The website says its renovated. That means that they painted the interiors (and did a lousy job too) . . . . Maintenance is lacking . . . . This place is cheap for a reason."

2/16/15, La Quinta Inn Stockton, California, review entitled *Very old hotel in need of renovation*: "From the front the hotel looks okay but it's very old and in need of renovation. The bed sagged in the middle terribly. I plugged a charger into the wall and its fell out, the outlet was so old that it could not hold a plug."

2/19/15, La Quinta Inn & Suites LAX, review entitled *Needs refurbishing*: "[E]levator was out of order, door key not functioning, our room was not very clean, the carpet had a smell, the bathroom suite was outdated."

4/21/15, La Quinta Inn Sacramento Downtown, review entitled *Poor Quality*:  Very disappointed in the facility . . . . my last 2 experiences have been very bad. No more LQ for me and my family.

5/25/15, La Quinta Inn Stockton, California, review entitled *Needs renovations, dirty*: "Room smelled like stale smoke and the furniture looked very worn and stained."

109.    On February 24, 2016, La Quinta announced that it was instituting an "accelerated renovation program," pursuant to which it would spend several hundred million dollars to renovate its properties.

**F.     Defendants' Materially False and Misleading Statements Issued During the Class Period**[2]

**1.     The November 2014 SPO and Registration Statement**

110.    On November 19, 2014, La Quinta filed with the SEC a prospectus (the "Prospectus") for the November 2014 SPO offering to register for sale 20,000,000 shares of the Company's common stock (including 3,000,000 shares of the Company's common stock pursuant to an over allotment option issued to the Underwriter Defendants) owned by Blackstone at a price of $20.00 per share.

111.    The Prospectus stated the following with respect to investment risks:

An investment in shares of our common stock involves substantial risks and uncertainties that may adversely affect our business, financial condition and results of operations and cash flows. Some of the more significant challenges and risks relating to an investment in our Company include, among other things, the following:

*     *     *     *     *

Macroeconomic and other factors beyond our control can adversely affect and reduce demand for rooms at hotels that we own or franchise.

*     *     *     *     *

Our efforts to renovate, redevelop or develop our hotels could be delayed or become more expensive, which could reduce profits or impair our ability to compete effectively.

*     *     *     *     *

The hotels in our owned portfolio have an average age of 27 years, and the hotels in our franchise portfolio have an average age of 13 years. Our business is capital intensive and our failure or the failure of our franchises to make necessary investments could adversely affect the quality and reputation of our brand.

---

[2] For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldberg, Cline, and Forson.

112.    Among other risk factors, the Prospectus noted that La Quinta's "hotels are geographically concentrated, which exposes our business to the effects of regional events and occurrences." The Prospectus added that:

[A]s of September 30, 2014, approximately 42% of rooms in our system were located in Texas, Florida and California with approximately 25% of rooms in our system located in Texas. In addition, as of September 30, 2014, approximately 31% of our pipeline properties are to be located in Texas. The concentration of hotels in one region or a limited number of markets may expose us to risks of adverse economic developments that are greater than if our portfolio were more geographically diverse. These economic developments include regional economic downturns . . . .

113.    These statements were misleading due to the failure to disclose that La Quinta's business was already suffering materially by November 2014 due to its concentration in Texas and the sudden and swift drop in oil prices and its broader impact on the Texas economy. La Quinta's Midland hotel, its top revenue producing hotel in 2014, had already started experiencing occupancy declines by November as a result of the downturn in the oil industry.

114.    Defendants were aware, by virtue of their real time monitoring of room and occupancy rates, that La Quinta's hotels in proximity to oil producing areas were starting to experience occupancy declines by November 2014.

115.    Additionally, Defendants statements regarding its efforts "to renovate, redevelop or develop our hotels," their hotels "average age of 27 years" and that "the failure of our franchises to make necessary investments could adversely affect the quality and reputation of our brand," were misleading due to Defendants' failure to disclose that they were losing business due to the poor condition of their hotels.

116.    Specifically, Defendants were aware that: (i) La Quinta's properties were dilapidated and in dire need of renovations across the Company's entire chain; (ii) that the poor state of La

Quinta's facilities put them at a competitive disadvantage, had cost them customers and made

attracting new customer difficult, and (iii) renovations would require the expenditure of significant

resources and result in the closure of revenue producing rooms.  *See* ¶¶ 92-109.

> **2.    February 24, 2015 Press Release and Earnings Call, and 2014 Form 10-K Filed**
> **February 25, 2015**

117.    After the close of trading on February 24, 2015, La Quinta issued a press release

announcing "STRONG RESULTS FOR BOTH FOURTH QUARTER AND FULL YEAR 2014."

For the 2014 fourth quarter and the 2014 fiscal year, La Quinta reported system-wide comparable

RevPAR increased 8.4% and 8.0%, respectively.   Defendant Goldberg commented on the

Company's prospects, stating, in pertinent part, as follows:

> Our 2014 results demonstrate solid performance delivered across our key metrics,
> including strong growth in RevPAR, franchise units, Adjusted EBITDA, and
> Adjusted EBITDA margin.  **Overall, the lodging industry remains healthy, with
> a steadily improving economy and strong transient travel demand.  La Quinta
> is extremely well-positioned to continue to capture this demand as we capitalize
> on our refreshed and upgraded portfolio and our repositioned brand.**  Over the
> last twelve months, we have grown our franchise base 8% and opened an additional
> 45 franchise properties, bringing total hotels in our system to 867 with approximately
> 86,500 rooms.  This unit growth, along with our increased occupancy, allows our
> geographic reach and customer base to continue to grow.  Franchise interest in the
> La Quinta brand remains robust and our ongoing system growth is further supported
> by a continued strong pipeline.  Furthermore, we have continued to de-lever our
> balance sheet and we remain focused on our strategic objectives, all of which are
> designed to increase shareholder value.

118.    With regard to the Company's guidance for 2015, Defendants stated, in pertinent part,

as follows:

> **Outlook**
>
> Based upon management's current estimates, the Company is introducing its
> guidance for full year 2015:

|  | Guidance |
|---|---|
| RevPAR growth on a system-wide comparable hotel basis | 5.5 percent to 7.0 percent |
| Adjusted EBITDA | $398 million to $410 million |
| Interest expense | Approximately $87 million |
| Franchise hotel openings | 50 to 55 |
| Weighted average shares of common stock outstanding | approximately 131.7 million |

119.    Later that evening, on February 24, 2015, the Company held a conference call with analysts and investors to discuss La Quinta's 2014 fourth quarter and year end operating results. During the conference call, Defendants Goldberg and Cline made positive statements concerning La Quinta's product and its 2015 growth and outlook stating, in pertinent, part as follows:

Defendant Goldberg:

Going into 2015, **I am optimistic and excited about our ongoing opportunities for growth**. The momentum that we experienced last year has continued into the first couple of months of 2015, as a solid lodging environment is providing a nice tailwind to our operating performance and our growth initiatives.

**There were a few macroeconomic factors supporting our optimism. Industry fundamentals are positive with demand continuing to outpace supply**, setting the stage for our ability to continue to drive [room] rate [increases]. **Increased employment, consumer confidence and disposal income providing favorable backdrop to increasing travel, and La Quinta is extremely well-positioned to continue to capture this demand as we capitalize on our refreshed and upgraded portfolio**.

\*    \*    \*    \*    \*

All indications, based on what is taking place today in Arizona and Florida, which are in their season, bode very well for what we anticipate to be strong leisure demand as the rest of the markets increase that leisure travel coming in the spring and through the summer months.

Defendant Cline:

Finally, I'll provide outlook for 2015. As Wayne mentioned earlier, we are optimistic and excited about our ongoing opportunities for continued growth. **The momentum that we experienced last year has continued into the early part of 2015 as a solid lodging environment is providing a nice tailwind to our operating performance and growth initiatives**.

For full-year 2015, we anticipate RevPAR on a systemwide comparable hotel basis to increase between 5.5% and 7% as compared to 2014. We expect pro forma adjusted EBITDA between $398 million and $410 million and expect to open between 50 and 55 new franchise locations.

We would also like to provide guidance on two important elements of earnings per share, interest expense and fully diluted share count. We expect total interest expense for 2015 to be approximately $87 million, which includes cash interest on our term loan, defects of our swap and unused revolver commitment fees, as well as noncash interest related to amortization of deferred finance cost. This amount is impacted by the amount and timing of our scheduled and planned discretionary debt repayment. We expect weighted-average fully diluted shares outstanding of approximately 131.7 million shares.

120.    During the conference call, Defendant Goldberg referred to the "potential impact of lower energy prices [on La Quinta's business] due to the size of our footprint in Texas," as a "net positive," stating, in pertinent part, as follows:

> **I also wanted to take a moment to address some questions you might have about the potential impact of lower energy prices due to the size of our footprint in Texas. There are a small number of properties that we believe will be impacted by a reduction in the price of oil.** And we have, in fact, budgeted for this impact in 2015, as we did in several of these markets in 2014 when demand of those details was impacted by the introduction of temporary housing facilities. Due to our broad geographic distribution and the existence of multiple demand generators, these impacts did not hurt our system-wide performance in 2014, and **we have not seen and do not an anticipate an impact to our system-wide performance in 2015.**
>
> To be clear, **we view lower oil prices as a net positive to our business. Despite the number of hotels we have in Texas, our exposure to oil-related corporate travel is not significant.** For 2014, system-wide revenue generated from our corporate accounts directly related to the oil and gas industry totaled approximately 3% of total system room revenue. Much of this revenue is from large corporate customers who,

while they may cut back, will not likely cease all corporate travel.

**Importantly, lower energy costs actually provide a number of positive factors that we believe more than offset any potential impacts.**  First, and most importantly, is the potential increase in domestic travel as we believe lower gas prices will stimulate additional leisure demand for our brand.  Second is the potential for increases in revenue from corporate accounts that benefit from reductions in oil and gas pricing. Finally, we anticipate lower utility costs, which represent one of our largest operating expenses at our owned hotels.

121.    During the Q&A session of the conference call, analysts sought additional information about the Company's Texas operations.  Defendant Goldberg misleadingly noted "we continue to perform overall in Texas very strong in the first several months of 2015 ."  The following exchange took place:

Thomas Allen- Morgan Stanley- Analyst:

Good afternoon.  **Just talking about your Texas exposure a little more.** Wayne, in your prepared remarks you said that you had budgeted some impact to 2015 similar to how you budgeted some impact in 2014 from the supply increases.  Can you help us think about numerically how you are thinking about maybe the RevPAR in 2015 in places like Houston and then places like Midland and the oil towns? What are you factoring in, in your 2015 guidance? Thank you.

Defendant Goldberg:

First of all, we are seeing some impacts as we anticipated in Midland, Odessa, Victoria and San Angelo.  **Those are the four markets where we own and operate hotels that have the most impact.  Again, in a couple of those markets, we saw the impact begin in 2014. And again, the impact of those properties did not impact or negatively impact our overall performance, nor do we anticipate they will in 2015, nor have they in the first several months of the year.**

We are seeing, as expected, a little bit of softening in Houston, overall, as well. However, those impacts are more than made up by very strong performance in Dallas, San Antonio, Austin and all of those other markets that we operate in Texas. Again, we have accounted for the impact.  **The impact that we are seeing is in line with what we've anticipated and what we planned for, and we continue to perform overall in Texas very strong in the first several months of 2015.**

122.    Later during the Q&A session of the conference call, analysts sought additional information about the impact of lower energy prices on the Company's operations. Defendant Cline falsely and misleadingly stated that La Quinta did not "see any disproportionate EBITDA exposure driven by oil and gas industry." The following exchange took place:

Shaun Kelley- BofA Merrill Lynch- Analyst:

. . . And then my other question would be, we have gotten **a few people who have asked whether or not there is a disproportion out of profitability coming from your exposure for hotels in Texas.** We obviously know your revenue mix; I think you've been really clear on all that. But maybe to put the issue to bed, if you could comment on, is there any material difference in EBITDA mix exposure to Texas or oil-specific regions relative to revenue or RevPAR? That would be great.

Defendant Keith Cline:

No, as you think about it, if you look at proxy for the number of hotels in Texas, and let's just use simple math and apply that to EBITDA, right? Just as an example. We are still looking at an oil and gas business not just in Texas, but through the entire country that is roughly 3% of our system wide revenue. It relates to 4 owned hotels in the markets that Wayne articulated and 21 franchise properties that are in both Texas and in the Dakotas in oil drilling areas. Our exposure there is really some subset of 3% on our own properties. There really is a lot of EBITDA, the rest is franchise business. It really, as Wayne indicated, is a small part of our Business that's directly related to oil and gas. **We don't see any disproportionate EBITDA exposure driven by oil and gas industry.**

123.    These statements regarding Texas and the impact of lower oil prices on La Quinta's business were false and misleading. La Quinta's business was already suffering materially by late 2014 early 2015 as a result of the sudden and swift drop in oil prices and its broader impact on the Texas economy.

124.    Defendants were aware, by virtue of their real time monitoring of room and occupancy rates, that La Quinta's hotels in proximity to oil producing areas in Texas charged rates far in excess of La Quinta's national average, and that they would no longer be able to charge such

35

outsized rates when demand dwindled with the downturn in the oil industry and the Texas economy generally. *See* ¶¶ 44-50, 71-91. And by mid-January 2015, rates at La Quinta hotels that serviced oil workers began to drop precipitously. *See* ¶¶ 71-91.

125.    In fact, by November 2014, occupancy rates had already started to plunge at La Quinta's Midland's property, which was La Quinta's most profitable property in 2014. Management was aware that La Quinta's revenues attributable to the oil industry were dwindling and made finding new sources of income to make up for the shortfall a priority for its Sales Managers no later than the beginning of January 2015. *See* ¶¶ 81-85, 87-90.

126.    Defendants' statements were therefore false and misleading because they did not disclose the actual known negative impacts on La Quinta's business as well as the nature and extent of the known risks facing La Quinta's business in 2015.

127.    Additionally, La Quinta's statement that "[o]verall, the lodging industry remains healthy, with a steadily improving economy and strong transient travel demand" and that " La Quinta is extremely well-positioned to continue to capture this demand as we capitalize on our refreshed and upgraded portfolio and our repositioned brand," was false and misleading because Defendants knew that they were losing business due to the poor condition of their hotels.

128.    Specifically, Defendants were aware that: (i) La Quinta's properties were dilapidated and in dire need of renovations across the Company's entire chain; (ii) that the poor state of La Quinta's facilities put them at a competitive disadvantage, had cost them customers and made attracting new customer difficult, and (iii) renovations would require the expenditure of significant resources and result in the closure of revenue producing rooms. *See* ¶¶ 92-109.

129.    The next day, on February 25, 2015, La Quinta filed the 2014 Form 10-K with the SEC, which was signed by the Individual Defendants.  The 2014 Form 10-K contained materially false and misleading representations about La Quinta's risk factors, management's discussion and analysis, disclosure controls and Defendants Goldberg's and Cline's false and misleading certifications thereon, which stated, in pertinent part, as follows:

I, [Defendants Goldberg and Cline], certify that:

1.    I have reviewed this Annual Report on Form 10-K for the fiscal year ended December 31, 2014 of La Quinta Holdings Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report)

> that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

130.   The above certifications by Defendants Goldberg and Cline were repeated, in all material respects, in the Form 10-Q that La Quinta filed with the SEC later in the Class Period on April 30, 2015 and July 30, 2015.

131.   Among other misleading and incomplete statements of material fact, the 2014 Form 10-K identified, in pertinent part numerous risk factors, including: (i) "the geographic concentration of our hotels"; (ii) "delays or increased expense relating to our efforts to develop, redevelop or renovate our hotels"; (iii) "inability to protect our brand standards"; (iv) "risks resulting from significant investments in owned real estate"; (v) "failures or interruptions in, material damage to, or difficulties in updating, our information technology systems, software or websites"; and (vi) "disruptions to our reservation system." *Id.* at 1.

132.   The 2014 Form 10-K also identified several specific "[m]acroeconomic and other factors beyond our control can reduce demand for rooms at hotels that we own or franchise. These factors include": (i) "changes in general economic conditions, including the severity and duration

of any downturn in the U.S. or global economy and financial markets"; (ii) "decreased corporate or government travel-related budgets and spending and cancellations, deferrals or renegotiations of group business"; and (iii) "oil prices."  *Id.* at 21-22.

133.    With respect to La Quinta's renovations of owned properties, the 2014 Form 10-K stated in pertinent part:

> Our efforts to renovate, redevelop or develop could be delayed or become more expensive, which could reduce profits or impair our ability to compete effectively**.**
>
> **We must maintain and renovate our hotels to remain competitive, maintain the value and brand standards of these hotels and comply with applicable laws and regulations.  From time to time we evaluate our hotels to determine whether additional capital expenditures are required and will provide an acceptable return on investment.**
>
> Our strategy includes maintenance and renovation of our hotels and may include redevelopment, development and conversion of hotels, which is subject to a number of risks including:
>
> \* \* \* \* \*
>
> lack of availability of rooms for revenue-generating activities during construction, modernization or renovations projects.

*Id.* at 24.

134.    The 2014 10-K also noted that the concentration of La Quinta's hotels in Texas, among other locations, rendered La Quinta particularly vulnerable to regional events, such as a downturn in the oil industry:

> **Our hotels are geographically concentrated, which exposes our business to the effects of regional events and occurrences**.
>
> We have a concentration of hotels in Texas, Florida and California. Specifically, as of December 31, 2014, approximately 42% of rooms in our system were located in Texas, Florida and California with approximately 25% of rooms in our system located in Texas. In addition, as of December 31, 2014, approximately 29% of our

pipeline properties are to be located in Texas. The concentration of hotels in one region or a limited number of markets may expose us to risks of adverse economic developments that are greater than if our portfolio were more geographically diverse. These economic developments include regional economic downturns, significant increases in the number of our competitors' hotels in these markets and potentially higher local property, sales and income taxes in the geographic markets in which we are concentrated. **For example, given our concentration of hotels in Texas, a downturn in the oil and gas industry could have an adverse effect on our business**. In addition, our hotels are subject to the effects of adverse acts of nature, such as winter storms, hurricanes, hail storms, strong winds, earthquakes and tornados, which have in the past caused damage such as flooding and other damage to our hotels in specific geographic locations, including in the Texas, Florida and California markets. Depending on the severity of these acts of nature, the damage to our hotels could require us to close all or substantially all of our hotels in one or more markets for a period of time while the necessary repairs and renovations, as applicable, are undertaken. Additionally, we cannot assure you that the amount of our hurricane, windstorm, earthquake, flood or other casualty insurance we maintain from time to time would entirely cover damages caused by any such event.

As a result of our geographic concentration of hotels, we will face a greater risk of a negative impact on our revenues in the event these areas are more severely impacted by adverse economic and competitive conditions and extreme weather than other areas in the United States.

*Id.* at 25.

135.    Lastly, with respect to La Quinta's information technology and reservations systems, the 2014 Form 10-K states:

**Failure of third party technology providers or vendors to provide services and technology in a satisfactory manner could adversely affect our business.**

**We rely on third parties for the performance of a significant portion of our information technology functions worldwide and the provision of information technology and business process services**. The success of our business depends in part on maintaining our relationships with these third parties and their continuing ability to perform these functions and services in a timely and satisfactory manner. **If we experience a loss or disruption in the provision of any of these functions or services, or they are not performed in a satisfactory manner, we may have difficulty in finding alternate providers on terms favorable to us, in a timely manner or at all, and our business could be adversely affected**.

We rely on certain software vendors to maintain and periodically upgrade many of our information technology systems so that they can continue to support our business. The software programs supporting many of our systems were licensed to us by independent software developers. The inability of these developers or us to continue to maintain and upgrade these information systems and software programs would disrupt or reduce the efficiency of our operations if we were unable to convert to alternate systems in an efficient and timely manner.

*Id.* at 30.

\* \* \* \* \*

**Our reservation system is an important component of the La Quinta brand and a disruption to its functioning could have an adverse effect on our hotels.**

We license software from unaffiliated third parties for the La Quinta hotels reservation system. Losing these licenses may adversely affect our ability to maintain a technically adequate reservations system, which, in the absence of suitable alternatives, would inhibit our ability to conduct our business (including our ability to attract and retain franchise arrangements) and, ultimately, diminish our ability to generate revenue.

**We manage a reservation system that communicates reservations to our owned and franchised hotels that have been made by individuals directly, either online or by telephone to our call centers, or through intermediaries like travel agents, internet travel web sites and other distribution channels**. The cost, speed, efficacy and efficiency of the reservation system, as well as protection of personal or confidential information of its users, are important aspects of the business and are major considerations of franchisees in choosing to affiliate with the La Quinta brand. **Any degradation of, failure of adequate development relative to, or security breach of, our reservation system may adversely affect our business**.

Our reservation system relies on data communications networks operated by unaffiliated third parties. Any significant interruption of the function of our reservation system (or significant parts of our reservation system) may adversely affect our business as well as our ability to generate revenues.

*Id.* at 32.

136.    These statements were false and misleading.  La Quinta's business was already suffering materially by late 2014 early 2015 as a result of the sudden and swift drop in oil prices and its broader impact on the Texas economy, as well as the dilapidated state of its facilities, and

problems with its new reservation system.

137.    Defendants were aware, by virtue of their real time monitoring of room and occupancy rates, that La Quinta's hotels in proximity to oil producing areas in Texas charged rates far in excess of La Quinta's national average, and that they would no longer be able to charge such outsized rates when demand dwindled with the downturn in the oil industry and the Texas economy generally. *See* ¶¶ 44-50, 71-91. And by mid-January 2015, rates at La Quinta hotels that serviced oil workers began to drop precipitously. *See* ¶¶ 71-91.

138.    In fact, by November 2014, occupancy rates had already started to plunge at La Quinta's Midland's property, which was La Quinta's most profitable property in 2014. Management was aware that La Quinta's revenues attributable to the oil industry were dwindling and made finding new sources of income to make up for the shortfall a priority for its Sales Managers no later than the beginning of January 2015. *See* ¶¶ 81-85, 87-90.

139.    Defendants were also aware that: (i) La Quinta's properties were dilapidated and in dire need of renovations across the Company's entire chain; (ii) that the poor state of La Quinta's facilities put them at a competitive disadvantage, had cost them customers and made attracting new customer difficult, and (iii) renovations would require the expenditure of significant resources and result in the closure of revenue producing rooms. *See* ¶¶ 92-109.

140.    The 2014 Form 10-K also failed to disclose the material adverse effect on the Company's operating income associated with business disruptions caused by the transitioning of its call center.

141.    As noted in La Quinta's Form 10-Q for the quarter ended March 31, 2015 (the "Q1 Form 10-Q"), during the first quarter of 2015, La Quinta had been in the process of transitioning its

reservation call center to a new provider.  This process was fraught with "disruptions" causing the Company to lose a material amount of business.  The transition had already started by the beginning of 2015, and Defendants negligently failed to disclose the known material adverse effects on the Company's business associated with this event and uncertainty.

142.    Defendants' statements were therefore false and misleading because they did not disclose the actual known negative impacts on La Quinta's business as well as the nature and extent of the known risks facing La Quinta's business in 2015.

**3.      April 29, 2015 Press Release and Earnings Call, and April 30, 2015 Q1 Form 10-Q**

143.    On April 29, 2015, La Quinta issued a press release announcing "STRONG RESULTS FOR THE FIRST QUARTER 2015," the period ended March 31, 2015.  For the quarter, La Quinta reported system-wide comparable RevPAR increased 8.2%.  Defendant Goldberg commented on the Company's business, stating, in pertinent part, as follows:

> Our first quarter 2015 results are reflective of our ongoing commitment to deliver enhanced value to all of our stakeholders.  We once again delivered strong performance across our key metrics, including growth in RevPAR, franchise units, Adjusted EBITDA, and Adjusted EBITDA margin.  **The lodging industry remains healthy, particularly in our segments, and the steady economic environment continues to drive strong transient leisure and business travel demand**.  In the first quarter, we continued to expand our system with the opening of five franchise properties, including our first hotel in Honduras, brining our system to 870 hotels with approximately 86,700 rooms.  This unit growth, along with our increased occupancy, allows our geographic reach and customer base to continue to grow.  Franchise interest in the La Quinta brand remains robust and our system growth is supported by an increasing pipeline.  **We also continued to deliver on a key element of our growth strategy, expanding our brand in urban and central business district locations**.  I am pleased to announce that in the first quarter we signed new franchise agreements for urban locations in the Chelsea neighborhood of Manhattan, Miami Midtown, and Oklahoma City Bricktown.  In addition, we signed a franchise agreement for the development of our first hotel in Santiago, Chile.  Furthermore, we have continued to de-lever our balance sheet and we remain focused

on our strategic objectives, all of which are designed to increase shareholder value.

144.    With respect to the Company's 2015 outlook, Defendants stated, in pertinent part, as follows:

**Outlook**

Based upon management's current estimates, the Company is updating its guidance for full year 2015 and is expecting:

|  | **Updated Guidance** | **Prior Guidance** |
| --- | --- | --- |
| RevPAR growth on a system-wide comparable hotel basis | 6.0 percent to 7.0 percent | 5.5 percent to 7.0 percent |
| Adjusted EBITDA | $402 million to $410 million | $398 million to $410 million |
| Interest expense | Approximately $87 million | Approximately $87 million |
| Franchise hotel openings | 50 to 55 | 50 to 55 |
| Weighted average shares of common stock outstanding | Approximately 131.7 million | Approximately 131.7 |

145.    Later that evening, on April 29, 2015, La Quinta held a conference call with analysts and investors to discuss La Quinta's 2015 first quarter operating results. During the conference call, Defendant Cline made misleading statements with respect to La Quinta's 2015 outlook stating, in pertinent, part, as follows:

Finally, I will provide an update on our outlook for 2015.  As Wayne mentioned earlier, we are optimistic about our ongoing opportunities for continued growth.  The momentum that we experienced last year has continued into the early part of 2015 as the solid lodging environment is providing a nice tailwind to our operating performance and growth initiatives.  Due to our strong performance in the first quarter, we are bringing up the bottom end of our RevPAR and adjusted EBITDA guidance.  For full-year 2015, we now anticipate RevPAR on a system-wide comparable basis to increase between 6% and 7% as compared to 2014. We expect pro forma adjusted EBITDA between $402 million and $410 million and expect to open between 50 and 55 new franchise locations.

Similar to the discussion during our year-end call, we'd also like to provide guidance on important elements of earnings per share. We continue to expect total interest expense for 2015 to be approximately $87 million, which includes cash interest on our term loan, effects of our swap, and unused revolver commitment fees, as well as non-cash interest related to amortization of deferred finance cost. This amount is impacted by the amount and timing of our scheduled and planned discretionary debt repayment. We expect run rate, share-based compensation expense for 2015 to be approximately $14 million, and we expect weighted-average fully diluted outstanding shares of approximately 131.7 million shares.

146.     Defendant Goldberg commented on La Quinta's 2015 growth and outlook, and noted that La Quinta had seen a "minimal impact resulting from volatility in oil prices" and that "lower oil prices are a net benefit to our business," stating, in pertinent part, as follows:

We have had a very strong start to the year. Industry conditions remained favorable, and the macroeconomic environment continues to support ongoing transient travel growth. **Ongoing demand for the La Quinta brand, both from consumers and from franchise partners is strong** and we remain optimistic about our future.

* * *

From a geographic perspective, this performance is in line with what we had anticipated and communicated on our year-end call. **We have seen minimal impact resulting from volatility in oil prices.** As was contemplated in our guidance for the year, we have experienced a decline in the small number of markets that have been impacted by reduced oil production. As also mentioned during our year-end call, we believe lower oil prices are a net benefit to our business, particularly as it relates to lower gasoline prices for our leisure guests and the drive-to nature of many of our locations.

147.     During the Q&A session of the conference call, analysts sought additional information about the impact of oil prices on the Company in oil-related markets. Defendant Goldberg minimized the impact of lower oil prices and commented that lower gas prices were "a tailwind, not a headwind." The following exchange took place:

45

Thomas Allen- Morgan Stanley- Analyst:

. . . . And, just one quick follow-up is just you highlighted that you are feeling actually a net benefit from the lower oil prices.  But, can you help us think about for the few markets where you are feeling an impact, what kind of declines you are seeing?  There were clearly concerns that there would be massive declines there.  And, maybe for a market like Houston, could you give us any stats around RevPAR in that market?  That would be helpful.

Defendant Goldberg:

I will give you a couple of data points.  **First and foremost, we talk about the effect of lower gas prices being a net -- a tailwind, not a headwind**.  We saw very strong performance in Miami-Fort Lauderdale, Tampa-St. Petersburg, Phoenix, Orlando, San Diego, Los Angeles in the peak season for those properties which is in the wintertime.  That peak leisure demand in those markets.

**We see very strong demand for Memorial Day weekend which is a leisure demand time.  So, we feel very good that that should then translate into a strong peak season as we get into the summer months for the majority of the properties** that would be considered their peak leisure season.

There our markets, as you indicated, where we are seeing some impact.  **Houston is down.  It is down-- again, it is down a little bit over 2%.  Nothing that we are overly concerned about.  However, Dallas is up** -- and Dallas is up.  **Austin is up**.  San Antonio, again, we have a couple things going on in San Antonio, **but San Antonio is up**.

Let me think where I am missing here?  But, we have other large markets in Texas doing well.  So, again, there are some impacts to those markets we've said and we anticipated, and they are in line with or up -- or down less than we assumed.

Defendant Cline:

To that point, Thomas, those markets where we know there is a much larger impact- Midland, Odessa, San Angelo, Victoria.  Those markets are down double-digit RevPAR as you would expect, and once again, that's reflected in the guidance we provided.

148.    Later during the Q&A session of the conference call, when analysts sought information about the sale of Company-owned hotels, Defendant Cline noted that La Quinta had

46

been presented with offers to buy Company-owned properties on a regular basis and that there were "built-in gains on these assets," and noted that "cutting a large check for taxes [on the built-in gains] is something we would like to avoid." The following exchange took place:

Chris Woronka - Deutsche Bank- Analyst:

. . . . If you were to -- as we think about maybe some strategic redevelopment projects or even a few sales and refranchises. **Is there a situation where you could sell a few owned hotels,** and to the extent there is a tax situation, then redeploy proceeds into developing, say, urban hotels on your balance sheet in a 1031 exchange? Is that within your wheelhouse?

Defendant Cline:

Sure. Clearly, **we are presented -- given the attractiveness of our brand -- with offers on a regular basis for franchisees to refranchise locations. But, you are on point exactly. There is built-in gains on these assets.** And, if we do a transaction, it needs to be accretive as Wayne said. **So, cutting a large check for taxes is something we would like to avoid.** So, in those cases, if there is a chance or us to put footprint in an urban location that we're then enabled to accelerate growth in our franchise business in that region that would make a lot of sense.

149.    Defendants Cline and Goldberg also discussed the sale of a Company-owned hotel near Oklahoma City. While Defendants Cline and Goldberg made positive statements about the transaction, including "[w]e got an attractive economic value for the property, and we feel that this is a no-brainer and it is a win-win-win," they deceptively failed to disclose that La Quinta lost millions of dollars on the sale of the property, stating, in pertinent part, as follows:

Defendant Goldberg:

We are also excited to announce that we have entered into an agreement to sell our owned hotel near Oklahoma City airport to a current franchise partner. This franchise partner will temporarily operate the existing hotel as a franchise La Quinta while developing a brand-new Del Sol hotel prototype on the adjacent land. This transaction generates a long-term revenue stream through our franchise segment with a brand-new Del Sol hotel prototype. Allows us to redeploy capital that would have otherwise been used for renovation, strengthens our relationship with a valued

47

franchise partner, and it delivers attractive economics on one of our oldest exterior corridor hotels.

* * *

The Oklahoma City transaction is a great opportunity.  It **is a win-win-win.**  Our guests will ultimately win. Our Company wins. Our franchise partner wins.  We dealing with a very high profile partner here who has done a number of deals with us. We will end up with a beautiful asset.

This is one of the older assets and our property.  In fact, this is one of the oldest assets probably in our system.  This was an acquisition many years ago.  It is an old, two-story exterior quarter hotel that is actually older than our Company because the hotel was built prior to La Quinta even being founded.  But, it was in-- it was due for a renovation. There were just a number of reasons that this made sense.  **We got an attractive economic value for the property, and we feel that this is a no-brainer and it is a win-win-win**.

Again, we have some properties that I can tell you there's no question we have some enduring locations, and we have some properties that are prime for the potential to be redevelopment opportunities with franchise partners or even if we were to consider to do something with some of these assets that might be enduring locations that are high barrier-to-entry.  High ADR-type markets. These are markets that we've always said strategically we would invest in.  We will invest today with key money for a location like that.

Again, so there could be other properties-- we do have properties that we know fit that description. But, it is not something that we are aggressively working on right now.  Other than if we have opportunities we will pursue those, and I assure you that we won't do anything that doesn't drive value for our shareholders and all of our stakeholders.

150.    The statements referenced above in ¶¶ 143-49 were materially false and misleading at the time they were made because they misrepresented and failed to disclose the following adverse facts which were known to Defendants, or recklessly disregarded by them:

   (a)    that the downturn in the price of oil was negatively impacting the Company's business;

   (b)    that La Quinta was experiencing a known, but undisclosed, material slowdown

48

in demand for its hotel rooms in its key Texas market during the Class Period, *see* ¶¶ 71-91;

(c)     that La Quinta was experiencing known, but undisclosed, disruptions associated with a "transition" of the Company's reservation call center, which was having a material adverse effect on the Company's operations, *see* ¶ 154;

(d)     that La Quinta was experiencing market share losses and declining customer demand due, in part, to its outdated facilities, *see* ¶¶ 92-109;

(e)     that contrary to Defendant Goldberg's representation that the Company was positioned to "capitalize on our refreshed and upgraded portfolio," a significant number of La Quinta's hotels were in need of major renovation that would require significant capital expenditures and result in operational disruptions, *see id.*;

(f)     that La Quinta had received offers to purchase certain of its properties and, contrary to Defendant Cline's representation that there were "built-in gains on these assets," the amounts buyers were willing to pay for such assets were materially less than their reported values, and that La Quinta would be taking an impairment charge on such sales;

(g)     that (a)- (e) above were reasonably likely to have a material adverse effect on La Quinta's future operating results;

(h)     that the certifications issued by Defendants Goldberg and Cline associated with the Company's disclosure controls were materially false and misleading; and

(i)     that, based on the foregoing, Defendants lacked a reasonable basis for the Company's 2015 guidance and their positive statements about La Quinta's then-current business and future financial prospects.

151. On April 30, 2015, La Quinta filed its Form 10-Q for the quarter ended March 31, 2015 with the SEC, which was signed by Defendants Cline and Forson. The Q1 Form 10-Q contained materially false and misleading representations about La Quinta's risk factors, management's discussion and analysis, disclosure controls, and Defendants Goldberg's and Cline's false and misleading certifications thereon.

152. Among other misleading statements, the Q1 Form 10-Q incorporated by reference the "Risk Factors – Risks related to our business and industry" from La Quinta's 2014 Form 10-K. Those risk factors are quoted, in relevant part, in ¶¶ 131-35. Those statements, as incorporated in the Q1 Form 10-Q are false and misleading for the same reasons set forth in ¶¶ 136-42.

**4.    July 29, 2015 Press Release, Earnings Call and July 30, 2015 Q2 form 10-Q –**
**The Truth Is Partially Revealed**

153. After the market closed on July 29, 2015, the Company issued a press release announcing the financial results for its 2015 second quarter ended June 30, 2015 ("Q2"). For Q2, La Quinta reported less than expected RevPAR growth of 4.0%. In addition, the Q2 earnings press release also noted that the Company's earnings were adversely affected by a $4 million loss on the sale of a property and an approximate *$42 million* impairment charge associated with the potential sale of 24 owned Company hotels, stating, in pertinent part, as follows:

> **The Company entered into discussions for the sale of 24 of its owned hotels.**
> There is no guarantee that these sales will occur, but the Company believes that a sale of these assets would have many benefits, including an aggregate sales price with an accretive EBITDA multiple, the opening of several markets to new franchise development as the vast majority of these hotels will be removed from the La Quinta system, improvement of key operating metrics, and acceleration of the Company's debt reduction. Due to the potential reduced holding period of these assets, **the Company recorded an impairment charge of approximately $42 million in the quarter.**

As previously announced, **during the second quarter of 2015, the Company sold one of its owned hotels for $3.0 million and recorded a loss on sale of $4.0 million related to this transaction.** The purchaser subsequently signed franchise agreements to temporarily operate the existing hotel as a franchised La Quinta, while developing a brand-new Del Sol prototype hotel on the site.

154. In addition, the Q2 earnings press release announced that La Quinta had lowered its 2015 RevPar growth and pro-forma adjusted EBITDA guidance.[3] The Q2 earnings press release noted that the Company experienced "several unusual items during the second quarter, some of which will have continuing impacts in the second half of the year, which significantly impact RevPAR and Pro Forma Adjusted EBITDA." These items included: (i) a decline in business in Texas, which the press release deceptively attributed to "inclement weather," (ii) the "transition of the Company's reservation call center," and (iii) the closure of one of the Company's largest owned

---

[3] According to the Q2 earnings press release:
"EBITDA" and "Adjusted EBITDA." Earnings before interest, taxes, depreciation and amortization ("EBITDA") is a commonly used measure in many industries. We adjust EBITDA when evaluating our performance because we believe that the adjustment for certain items, such as restructuring and acquisition transaction expenses, impairment charges related to long-lived assets, non-cash equity-based compensation, discontinued operations, and other items not indicative of ongoing operating performance, including other items relating to the IPO Transactions, provides useful supplemental information to management and investors regarding our ongoing operating performance. We believe that EBITDA and Adjusted EBITDA provide useful information to investors about us and our financial condition and results of operations for the following reasons: (i) EBITDA and Adjusted EBITDA are among the measures used by our management team to evaluate our operating performance and make day-to-day operating decisions; and (ii) EBITDA and Adjusted EBITDA are frequently used by securities analysts, investors, lenders and other interested parties as a common performance measure to compare results or estimate valuations across companies in our industry.

hotels for structural repairs.

155.    In response to these partial corrective disclosures/materializations of the concealed risk, the price of La Quinta common stock declined from a closing price of $22.13 on July 29, 2015 to a closing price of $21.35 on July 30, 2015.

156.    Defendants, however, continued to mislead investors by failing to fully disclose the known impact of the downturn in the Texas economy as well as the dilapidated condition of La Quinta's properties on the Company's performance.

157.    On July 30, 2015, La Quinta filed its Form 10-Q for the quarter ended June 30, 2015 (the "Q2 Form 10-Q") with the SEC, which was signed by Defendants Cline and Forson.  The Q2 Form 10-Q contained materially false and misleading representations about La Quinta's risk factors, management's discussion and analysis, disclosure controls, and Defendants Goldberg's and Cline's false and misleading certifications thereon.

158.    Among other misleading statements, the Q2 Form 10-Q incorporated by reference the "Risk Factors – Risks related to our business and industry" from La Quinta's 2014 Form 10-K. Those risk factors are quoted, in relevant part, in ¶¶ 131-35.  Those statements, as incorporated in the Q2 Form 10-Q are false and misleading for the same reasons set forth in ¶¶ 136-42.

**5.    September 17, 2015 Press Release and Conference Call, and *Mad Money* Analysis – More of The Truth Is Partially Revealed**

159.    After the market closed on September 17, 2015, La Quinta issued press releases announcing, among other things, that it had further reduced its 2015 financial guidance, and that Defendant Goldberg had "stepped down from his leadership positions in the Company by mutual agreement with the Company's Board of Directors."  Goldberg's resignation was a materialization

of the risks that Defendants concealed during the Class Period.

160.    In response to these revelations, the price of La Quinta common stock declined more than 15%, from a closing price of $18.97 on September 17, 2015 to a closing price of $16.05 on September 18, 2015.

161.    On Monday, September 21, 2015, Jim Cramer, host of CNBC's Mad Money television program, castigated La Quinta and Defendant Goldberg on national television stating that "*management has now pretty much lost all credibility*."  Cramer noted that "one of the main reasons we liked La Quinta was because [Defendant] Goldberg was so bullish on his repeated appearances here on Mad Money. Not only that, but whenever there were concerns about the Company, he'd show up and reassure us that there was nothing to worry about. Now Goldberg is gone for who knows what reason and its turning out that *[Defendant Goldberg's] reassurances were a lot less credible than they had seemed*."  The Mad Money report continued:

> Jim Cramer:
>
> Let me walk you through some of Goldberg's overly ambitious statements.  The last time we heard from Goldberg was back on May 8 [2015], less than a month before his stock peeked and started going down the drain.  Hey, I asked him about La Quinta's prospects and here's what he said - -
>
> Defendant Goldberg:
>
> We will continue to grow this brand.  We feel very good about the outlook in the horizon.  We have a lot of momentum.
>
> Jim Cramer:
>
> **Now that interview took place well into the second quarter a time when La Quinta really should have had some clarity of the softness that was occurring in its business** -don't you think? **It just doesn't look good when the CEO says he feels very good about the outlook and then two months later he slashes the outlook dramatically.  This** kind of thing **tells you that management is either**

**clueless or way to promotional, and neither one is a good thing**.

Then the previous time we spoke to Goldberg back on February 25 [2015], **I grilled him about the impact of lower oil and gas prices in La Quinta's business, given that 30% of his sales came from Texas.  We would expect there would be a lot less corporate travel given the collapse in the price of crude**.  I kind of said listen I don't get it! Oh, but **Goldberg had the answers; he basically said the bears, well they were wrong**, watch this - - -

Defendant Goldberg:

We view lower oil and lower gas prices as a net positive to our business.

Jim Cramer:

In retrospect, it's looking like that's simply not the case.  **When you consider the nose dive in La Quinta's performance this August when the price of oil crashed down to its lowest level since the great recession, it seems pretty clear that lower oil is not a positive to La Quinta's business**.  Now look, I got La Quinta wrong – *mia culpa* – **I should have been** more skeptical and **less willing to believe the CEO's exuberant bullishness** but I was quite enamored.  Here's the bottom line though, when the facts change, you gotta change your mind.  Boy-o-boy, have the facts changed at La Quinta. With the immediate resignation of its yes promotional CEO and the Company cutting its 4 year forecast for the second time in 2 months. When this kind of disaster strikes, you know what you have to do?  You have to be willing to admit that you got it wrong.  Simply walk away rather than trying to convince yourself if this is the pull back of some sort of buying opportunity, it isn't. In fact, I would say that when Goldberg left the office he took the bull case for La Quinta with him.

6.      **October 28, 2015 Press Release and Q3 Conference Call – More of the Truth Is Partially Revealed**

162.    On October 28, 2015, after the market closed, La Quinta announced its operating results for the 2015 third quarter, for the three month period ending September 30, 2015.  That same day, the Company held a conference call with analysts and investors to discuss La Quinta's 2015 third quarter operating results (the "Q3 conference call").  On the Q3 conference call, Defendant Cline explained that La Quinta needed "to enhance the consistency of the brand experience across

54

our platform, which will likely require incremental investment." In this regard, Defendant Cline noted:

> What we've experienced in this environment **over the past call it six months or so is an increasing pressure in the competitive landscape,** and that spreads across everything from **the quality of assets** to loyalty programs and the network effect and the increasing competitive environment to distribution channels and disruption there, and as I mentioned, the transparency of the hospitality experience. So as we think about it, we're taking a look at potential investment alternatives into all of these areas that we will assess and discuss more on our year-end earnings call.

In other words, La Quinta's properties were in dire need of major renovations.

163.    Later, on the conference call, Defendant Cline further clarified that La Quinta's hotels were in need of major renovation. Defendant Cline commented that guests have a "level of expectation" from the La Quinta brand and that "we intend to make certain that our physical assets support that expectation."

164.    La Quinta, however, still failed to disclose the full scope of the necessary renovations at that time.

165.    With respect to business in La Quinta's Texas market, Defendant Cline admitted on the Q3 conference call, that "[c]ertainly in Texas, we're seeing a weakening in oil markets." Defendant Cline contrasted the Company's Texas and non-Texas business as follows:

- in the first quarter of 2015, Texas was up 4.5%, while the rest of the country was up almost 10%;

- in the second quarter of 2015, Texas was down about 3%, while the rest of the country was up almost 6.5%; and

- in third quarter of 2015, Texas was down about 4%, while the rest of the country was up about 4.7%.

166.    Also, on the Q3 conference call, Defendant Cline acknowledged that "the ongoing transition of the call center did weigh on our performance in the quarter."

167.    In response to these revelations, the price of La Quinta common stock declined by another 9%, from a closing price of $16.50 on October 28, 2015 to a closing price of $15.02 on October 29, 2015.

**7.    February 24, 2016 Press Release and Q4 Conference Call, and the End of the Class Period**

168.    On February 24, 2016, after the market closed, La Quinta announced its operating results for the 2015 fourth quarter, for the three month period ending December 31, 2015.  That same day, the Company held a conference call with analysts and investors to discuss La Quinta's 2015 fourth quarter operating results (the "Q4 conference call").

169.    During the conference call, Defendant Cline admitted that La Quinta's performance suffered due to "several unique challenges ranging from the transition of our call center . . . and ongoing pressures from a prolonged and significant pull back in oil prices and production," and that the "extent and depth of the pull back in oil pricing and production has significantly impacted demand for hotel in oil markets."

170.    Defendant Cline also stated that in order to improve the "quality and depth of our franchise," La Quinta would be instituting "an accelerated renovation program for our owned hotels." Defendant Cline explained that "[o]ur typical renovation program has consisted of 25 to 30 of our owned hotels each year," that the "enhanced program contemplates we renovate an additional 100 to 120 hotels over the next two years, and that as La Quinta "move[s] forward with this strategy" it would work to "minimize displacement" and "disruption."

171.    Later during the Q&A session of the conference call, Defendant Cline provided more detail regarding the extent and cost of the planned accelerated renovations during the following exchange:

Chris Woronka - Deutsche Bank- Analyst:

Good afternoon, guys.  I wanted to ask you on the – I appreciate the detail on your plan for 2016 on the capital spend . . . .  Can you give us a drill down a little bit more into what that entails at each property?

Defendant Cline:

Now in terms of the scope of these renovations, it is likely that we could take a look at the scope of the renovations and make sure that we are touching all of the right areas.  Paying particular attention to bathrooms, bathroom floors, and lobby floors, to make sure we are really getting the hotel renovated properly and touching all areas we need to. **So it's a little more than the $600 million** . . . .

172.    The 2015 fourth quarter conference call was the first time Defendants disclosed the need for an accelerated renovation program, that the work would include full (as opposed to "soft") renovations, and that the additional renovations would cost hundreds of millions of dollars.

173.    As a result of this revelation, the price of La Quinta's common stock fell by 10%, from a closing price of $11.37 on February 24, 2016 to a closing price of $10.19 on February 25, 2016.

174.    The market for La Quinta common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and misleading statements and omissions alleged herein, La Quinta common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and other members of the Class purchased or otherwise acquired La Quinta common stock relying upon the integrity of the market price of La Quinta common stock and market information relating to La Quinta, and have been damaged thereby.

175.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of La Quinta common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

176.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about La Quinta operations, acquisitions, and future financial prospects.  These material misstatements and omissions had the cause and effect of creating in the market an incorrect positive assessment of La Quinta common stock and its business, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

**G.    Additional Scienter Allegations**

177.    For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldberg, Cline, and Forson.

178.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the

investing public in the name of the Company, or in their own name during the Class Period, were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding La Quinta, their control over, and/or receipt and/or modification of La Quinta's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

179.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including Defendants Goldberg, Cline, and Forson.

180.    Defendants Goldberg, Cline, and Forson, because of their positions with La Quinta, controlled the contents of La Quinta's public statements during the Class Period. Defendants Goldberg, Cline, and Forson were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, Defendants Goldberg, Cline, and Forson knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of La Quinta's corporate statements and are, therefore, responsible and liable for the representations

contained therein.

181.    Defendants Goldberg, Cline, and Forson had real-time access to rate and occupancy data for each La Quinta hotel, which they admitted they continually reviewed. *See* 2014 Form 10-K, at 10 ("senior management continually review our room rates, and price rooms into the demand curve based on the prevailing market conditions at each owned hotel"). Accordingly, Defendants were aware of internal information that contradicted their public statements concerning the state of their business in Texas.

182.    In addition, the scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certifications of Defendants Goldberg and Cline, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about La Quinta was made known to them and that the Company's disclosure related controls were operating effectively.

183.    Defendants were also motivated to engage in this course of conduct to allow Company insiders to sell an unusually large amount of their personally held La Quinta common stock at inflated prices. As noted herein, Blackstone, the largest beneficial owner of La Quinta common stock during the Class Period, sold approximately 46.9 million shares, or 57% of its common stock holdings in the Company to the public at artificially inflated prices in the November 2014 and March 2015 SPOs for net proceeds of approximately $1.01 billion.

184.    Moreover, Blackstone was knowledgeable of and had control of La Quinta's operations during the Class Period. Both prior to and during the Class Period La Quinta's Board of Directors ("Board") consisted of nine directors. And from the start of the Class Period through at least June 9, 2015, La Quinta's Board consisted of five directors who were appointed by Blackstone

and who were Blackstone employees.[4]   The following Blackstone-affiliated directors not only

constituted a majority of LaQuinta's Board during the Class Period, but also had extensive real-estate

experience:

(a)    Glenn Alba has been on La Quinta's Board of Directors from 2013 to date.

Mr. Alba is a Managing Director in the Real Estate Group of Blackstone,

where he is involved in the asset management of a broad range of

Blackstone's real estate investments in the U.S. and Europe including office,

hotel, multi-family and industrial assets;

(b)    Michael Nash served on La Quinta's Board from February 2014 to June 9,

2015.   While serving as a director of La Quinta, Mr. Nash was a Senior

Managing Director of the Real Estate Group of Blackstone an the Chief

Investment Office of Blackstone Real Estate Debt Strategies.   He was also a

member of the Real Estate Investment Committee for both Blackstone Real

Estate Debt Strategies and Blackstone Real Estate Advisors;

(c)    Gary M. Sumers has been serving on La Quinta's Board from February 2014

to date.  At the time of his appointment, Mr. Sumers was Blackstone's Senior

Managing Director and Chief Operating Officer in the Real Estate Group,

where he headed Blackstone Real Estate Advisors' Strategic Asset

Management Group, including the oversight of all financial reporting

---

[4] According to La Quinta's April 8, 2015, Schedule 14A Annual Proxy Statement, Blackstone also had input in nominating the other members of La Quinta's Board of Directors. *See id.* at 9 (stating that directors not appointed by Blackstone alone, "were recommended by Blackstone and our management").

activities and responsibility for property disposition activities;[5]

(d)    Giovanni Cutaia has been serving on La Quinta's Board from November 2014 to date. Mr. Cutaia is a Senior Managing Director and Chief Operating Officer of asset management in the Real Estate Group at Blackstone. Defendant Nash is a Senior Managing Director in the Real Estate Group of Blackstone, the Chief Investment Officer of Blackstone Real Estate Debt Strategies and a member of the Real Estate Investment Committee for both Blackstone Real Estate Debt Strategies and Blackstone Real Estate Advisors; and,

(e)    Brian Kim started serving on La Quinta's Board in November 2014. Mr. Kim is a Managing Director in the Real Estate Group at Blackstone. Mr. Kim also serves as the Chief Financial Officer, Vice President and Managing Director of BRE Select Hotels Corp., and currently serves on its Board of Directors.[6]

185.    Thus, while La Quinta admitted in the Prospectus for the March 2015 SPO that Blackstone maintains "significant influence" over La Quinta business affairs, Blackstone, in fact, controlled La Quinta at that time, because Blackstone appointees/employees (both current and former) constituted a majority of La Quinta's Board of Directors.

---

[5] *See* La Quinta Holdings Inc., February 10, 2014 Form S-1 Registration Statement, at 148 n.2 ("Messrs. Alba, Nash, Stein and Sumer are each employees of Blackstone . . . .").

[6] Upon the completion of the November 2014 SPO, Messrs. Cutaia and Kim replaced Jonathan D. Gray and William J. Stein on La Quinta's Board of Directors. Messrs. Gray and Stein were also Blackstone appointees and employees.

186.    Defendants Goldberg and Cline also engaged in substantial insider sales during the Class Period, and mislead investors regarding their plans to sell additional La Quinta shares during the class period.

187.    Specifically, on January 5, 2015, Defendant Goldberg sold approximately 100,000 La Quinta shares, while on January 8, 2015, Defendant Cline sold 66,256 La Quinta shares.  And then on February 3, 2015, Goldberg sold another 100,000 La Quinta shares.

188.    These insider sales caught the attention of market analysts.  For example, a January 14, 2015, Seeking Alpha article entitled *Time to Sell?  Insiders Dump La Quinta Stock*, commented that La Quinta's CFO and CEO "dumped $3.5 million of stock last week in 3 transactions, and that such aggressive sales were "not a good sign."  The article further noted that "these sales represented over 25% of the CFO's stock and 10% of the CEO's stock in La Quinta," and that although such sales were made pursuant to a 10b5-1 trading plan, such sales "were far more aggressive than is usual for that type of plan" and that "to the outside observer, it looks like they are selling as fast as possible."

189.    That Seeking Alpha further noted that "[a] disproportionate share of La Quinta's profits may be coming from hotels in close proximity to oil fields, and management and insiders would be the first to know how much exposure is there and how quickly room rates and room utilization [are] falling.  Their sales are indicative of La Quinta's likely precarious situation, particularly considering La Quinta's large debt load."

190.    The timing and magnitude of Defendants' insider sales also caught the attention of analysts during La Quinta's February 24, 2015, Q4 Earnings Call.  In response, Defendant Goldberg stated: "I will tell you from myself, from my stand point and from [Defendant Cline's] standpoint,

we have no current plans to sell any shares or any plans in place to sell any additional shares."

However, as revealed in the chart below, Defendants Goldberg and Cline made additional sales of La Quinta shares.

191. In total, Company insiders sold approximately 47,738,204 million shares of their personally held La Quinta common stock at inflated prices, yielding those insiders proceeds of approximately $1.03 billion during the Class Period:

| Date | Shares Sold | Blackstone Price Price | | Date |
|---|---|---|---|---|
| **November 25, 2014 Offering** | | | | |
| 11/25/2014 | 8,853,478 | $ | 20.00 | $ 177,069,560.00 |
| 11/25/2014 | 1,219,112 | $ | 20.00 | $ 24,382,240.00 |
| 11/25/2014 | 688,482 | $ | 20.00 | $ 13,769,640.00 |
| 11/25/2014 | 231,546 | $ | 20.00 | $ 4,630,920.00 |
| 11/25/2014 | 93,680 | $ | 20.00 | $ 1,873,600.00 |
| 11/25/2014 | 249,468 | $ | 20.00 | $ 4,989,360.00 |
| 11/25/2014 | 342,673 | $ | 20.00 | $ 6,853,460.00 |
| 11/25/2014 | 397,679 | $ | 20.00 | $ 7,953,580.00 |
| 11/25/2014 | 116,607 | $ | 20.00 | $ 2,332,140.00 |
| 11/25/2014 | 3,983,186 | $ | 20.00 | $ 79,663,720.00 |
| 11/25/2014 | 1,007,709 | $ | 20.00 | $ 20,154,180.00 |
| 11/25/2014 | 1,434,461 | $ | 20.00 | $ 28,689,220.00 |
| 11/25/2014 | 3,685,388 | $ | 20.00 | $ 73,707,760.00 |
| 11/25/2014 | 115,469 | $ | 20.00 | $ 2,309,380.00 |
| 11/25/2014 | 581,062 | $ | 20.00 | $ 11,621,240.00 |
| **Total:** | 23,000,000 | Percent of Ownership Sold: 28% | | $ 460,000,000.00 |
| **March 25, 2015 Offering** | | | | |
| 03/25/2015 | 7,987,378 | $ | 23.08 | $ 184,348,684.24 |
| 03/25/2015 | 1,099,851 | $ | 23.08 | $ 25,384,561.08 |
| 03/25/2015 | 621,131 | $ | 23.08 | $ 14,335,703.48 |
| 03/25/2015 | 208,894 | $ | 23.08 | $ 4,821,273.52 |
| 03/25/2015 | 84,516 | $ | 23.08 | $ 1,950,629.28 |
| 03/25/2015 | 225,063 | $ | 23.08 | $ 5,194,454.04 |
| 03/25/2015 | 309,150 | $ | 23.08 | $ 7,135,182.00 |
| 03/25/2015 | 358,776 | $ | 23.08 | $ 8,280,550.08 |
| 03/25/2015 | 105,200 | $ | 23.08 | $ 2,428,016.00 |
| 03/25/2015 | 3,593,527 | $ | 23.08 | $ 82,938,603.16 |
| 03/25/2015 | 909,128 | $ | 23.08 | $ 20,982,674.24 |

| Date | Shares Sold | Price | | Proceeds | |
|---|---|---|---|---|---|
| 03/25/2015 | 1,294,134 | $ | 23.08 | $ | 29,868,612.72 |
| 03/25/2015 | 3,324,860 | $ | 23.08 | $ | 76,737,768.80 |
| 03/25/2015 | 104,173 | $ | 23.08 | $ | 2,404,312.84 |
| 03/25/2015 | 524,219 | $ | 23.08 | $ | 12,098,974.52 |
| 04/02/2015 | 1,198,106 | $ | 23.08 | $ | 27,652,286.48 |
| 04/02/2015 | 164,977 | $ | 23.08 | $ | 3,807,669.16 |
| 04/02/2015 | 93,169 | $ | 23.08 | $ | 2,150,340.52 |
| 04/02/2015 | 31,335 | $ | 23.08 | $ | 723,211.80 |
| 04/02/2015 | 12,678 | $ | 23.08 | $ | 292,608.24 |
| 04/02/2015 | 33,759 | $ | 23.08 | $ | 779,157.72 |
| 04/02/2015 | 46,373 | $ | 23.08 | $ | 1,070,288.84 |
| 04/02/2015 | 53,816 | $ | 23.08 | $ | 1,242,073.28 |
| 04/02/2015 | 15,780 | $ | 23.08 | $ | 364,202.40 |
| 04/02/2015 | 539,029 | $ | 23.08 | $ | 12,440,789.32 |
| 04/02/2015 | 136,369 | $ | 23.08 | $ | 3,147,396.52 |
| 04/02/2015 | 194,120 | $ | 23.08 | $ | 4,480,289.60 |
| 04/02/2015 | 498,730 | $ | 23.08 | $ | 11,510,688.40 |
| 04/02/2015 | 15,626 | $ | 23.08 | $ | 360,648.08 |
| 04/02/2015 | 78,633 | $ | 23.08 | $ | 1,814,849.64 |
| **Total** | 23,862,500 | Percent of Ownership Sold: 25% | | $ | 550,746,500.00 |
| **In aggregate Blackstone sold approximately 57% of their Ownership** | | | | | |
| **Cary** | | | | | |
| **Date** | **Shares Sold** | **Price** | | **Proceeds** | |
| 11/25/2014 | 549 | $ | 21.48 | $ | 11,792.52 |
| 12/31/2014 | 855 | $ | 22.06 | $ | 18,861.30 |
| 04/14/2016 | 2,196 | $ | 23.06 | $ | 50,639.76 |
| 06/01/2015 | 9,404 | $ | 24.49 | $ | 230,303.96 |
| 07/13/2015 | 9,592 | $ | 23.50 | $ | 225,412.00 |
| **Total** | 22,596 | Percent of Ownership Sold: 12% | | $ | 537,009.54 |
| **Chloupek** | | | | | |
| **Date** | **Shares Sold** | **Price** | | **Proceeds** | |
| 11/25/2014 | 10,500 | $ | 21.52 | $ | 225,960.00 |
| 11/28/2014 | 10,500 | $ | 22.00 | $ | 231,000.00 |
| 12/01/2014 | 5,250 | $ | 22.04 | $ | 115,710.00 |
| 12/03/2014 | 1,125 | $ | 22.50 | $ | 25,312.50 |
| 12/31/2014 | 704 | $ | 22.06 | $ | 15,530.24 |
| 02/25/2015 | 2,220 | $ | 22.77 | $ | 50,549.40 |
| 03/11/2015 | 1,905 | $ | 23.02 | $ | 43,853.10 |
| 03/12/2015 | 10,000 | $ | 23.29 | $ | 232,900.00 |
| 03/18/2015 | 8,641 | $ | 23.76 | $ | 205,310.16 |
| 03/19/2015 | 5,200 | $ | 23.78 | $ | 123,656.00 |
| 03/20/2015 | 8,641 | $ | 24.25 | $ | 209,544.25 |
| 03/25/2015 | 1,359 | $ | 24.25 | $ | 32,955.75 |

| Date | Shares Sold | Price | | Proceeds | |
|---|---|---|---|---|---|
| 04/14/2016 | 1,830 | $ | 23.06 | $ | 42,199.80 |
| 04/27/2015 | 17,500 | $ | 24.11 | $ | 421,925.00 |
| 04/30/2015 | 17,500 | $ | 24.58 | $ | 430,150.00 |
| 06/01/2015 | 5,371 | $ | 24.49 | $ | 131,535.79 |
| **Total** | 108,246 | Percent of Ownership Sold: 35% | | $ | 2,538,091.99 |
| **Cline** | | | | | |
| **Date** | **Shares Sold** | **Price** | | **Proceeds** | |
| 12/31/2014 | 1,234 | $ | 22.06 | $ | 27,222.04 |
| 01/08/2015 | 66,256 | $ | 21.55 | $ | 1,427,816.80 |
| 06/01/2015 | 8,752 | $ | 24.49 | $ | 214,336.48 |
| **Total** | 76,242 | Percent of Ownership Sold: 28% | | $ | 1,669,375.32 |
| **Forson** | | | | | |
| **Date** | **Shares Sold** | **Price** | | **Proceeds** | |
| 12/15/2014 | 2,994 | $ | 21.71 | $ | 64,999.74 |
| 12/31/2014 | 242 | $ | 22.06 | $ | 5,338.52 |
| 03/09/2015 | 10,000 | $ | 22.50 | $ | 225,000.00 |
| 03/11/2015 | 3,996 | $ | 23.02 | $ | 91,987.92 |
| 04/20/2015 | 21,000 | $ | 22.92 | $ | 481,320.00 |
| 04/23/2015 | 1,294 | $ | 24.00 | $ | 31,056.00 |
| 04/24/2015 | 5,700 | $ | 24.07 | $ | 137,199.00 |
| 06/01/2015 | 1,722 | $ | 24.49 | $ | 42,171.78 |
| **Total** | 46,948 | Percent of Ownership Sold: 41% | | $ | 1,079,072.96 |
| **Goldberg** | | | | | |
| **Date** | **Shares Sold** | **Price** | | **Proceeds** | |
| 11/25/2014 | 3,090 | $ | 21.48 | $ | 66,373.20 |
| 12/08/2014 | 100,000 | $ | 22.02 | $ | 2,202,000.00 |
| 12/31/2014 | 4,936 | $ | 22.06 | $ | 108,888.16 |
| 01/05/2015 | 39,271 | $ | 22.08 | $ | 867,103.68 |
| 01/06/2015 | 60,729 | $ | 21.08 | $ | 1,280,167.32 |
| 02/03/2015 | 100,000 | $ | 21.58 | $ | 2,158,000.00 |
| 04/14/2016 | 16,837 | $ | 23.06 | $ | 388,261.22 |
| 06/01/2015 | 37,329 | $ | 24.49 | $ | 914,187.21 |
| **Total** | 362,192 | Percent of Ownership Sold: 22% | | $ | 7,984,980.79 |
| **Lombardi** | | | | | |
| **Date** | **Shares Sold** | **Price** | | **Proceeds** | |
| 11/25/2014 | 732 | $ | 21.48 | $ | 15,723.36 |
| 12/31/2014 | 906 | $ | **22.06** | $ | 19,986.36 |
| 03/11/2015 | 11,394 | $ | 23.02 | $ | 262,289.88 |
| 03/20/2015 | 11,394 | $ | 24.02 | $ | 273,683.88 |
| 04/14/2016 | 2,928 | $ | 23.06 | $ | 67,519.68 |
| 04/20/2015 | 5,697 | $ | 22.87 | $ | 130,290.39 |

| Date | Shares Sold | Price | | Proceeds | |
|---|---|---|---|---|---|
| 04/22/2015 | 5,698 | $ | 23.55 | $ | 134,187.90 |
| 04/23/2015 | 1,423 | $ | 24.00 | $ | 34,152.00 |
| 04/24/2015 | 20,395 | $ | 24.07 | $ | 490,907.65 |
| 04/30/2015 | 5,698 | $ | 24.54 | $ | 139,828.92 |
| 05/18/2015 | 35,577 | $ | 24.47 | $ | 870,569.19 |
| 06/01/2015 | 9,679 | $ | 24.49 | $ | 237,038.71 |
| 06/08/2015 | 35,578 | $ | 24.30 | $ | 864,545.40 |
| **Total** | 147,099 | Percent of Ownership Sold: 38% | | $ | 3,540,723.32 |
| **Trivedi** | | | | | |
| **Date** | **Shares Sold** | **Price** | | **Proceeds** | |
| 11/25/2014 | 20,000 | $ | 21.36 | $ | 427,200.00 |
| 11/26/2014 | 20,000 | $ | 21.52 | $ | 430,400.00 |
| 11/28/2014 | 20,000 | $ | 21.80 | $ | 436,000.00 |
| 12/01/2014 | 3,308 | $ | 22.00 | $ | 72,776.00 |
| 12/31/2014 | 906 | $ | 22.06 | $ | 19,986.36 |
| 04/14/2015 | 2,928 | $ | 23.06 | $ | 67,519.68 |
| 06/01/2015 | 9,851 | $ | 24.49 | $ | 241,250.99 |
| 07/14/2015 | 4,418 | $ | 24.00 | $ | 106,032.00 |
| 07/16/2015 | 30,970 | $ | 24.08 | $ | 745,757.60 |
| **Total** | 112,381 | Percent of Ownership Sold: 28% | | $ | 2,546,922.63 |
| | | | | | |
| **Total Shares Sold** | 47,738,204 | **Total Proceeds** | | $ 1,030,642,676.55 | |

## H.    Loss Causation

192.    For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldberg, Cline, and Forson.

193.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of La Quinta common stock and operated as a fraud or deceit on Class Period purchasers of La Quinta common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of La Quinta common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

194.    As a result of their purchases of La Quinta common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.,* damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused La Quinta common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $24.94 per share on May 28, 2015.

195.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of La Quinta's business and future financial prospects.  When the truth about the Company was revealed to the market, the price of La Quinta common stock fell significantly. The declines in the price of La Quinta common stock detailed herein removed the inflation therefrom, causing real economic loss to investors who had purchased La Quinta common stock during the Class Period.

196.    The declines in the price of La Quinta common stock after the corrective disclosures (*see* ¶¶ 155, 160, 167, 173), came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in La Quinta common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

197.    The economic loss, *i.e.,* damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of La Quinta common stock and the subsequent significant declines in the value of La Quinta common

stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### I.    No Safe Harbor

198.    For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants La Quinta, Goldberg, Cline, and Forson.

199.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of La Quinta who knew that those statements were false when made.

### J.    Applicability of Presumption of Reliance:  Fraud on the Market Doctrine

200.    At all relevant times, the market for La Quinta common stock was an efficient market for the following reasons, among others:

(a)    La Quinta common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, La Quinta filed periodic public reports with the SEC and the NYSE;

(c)      La Quinta regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      La Quinta was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

201.    As a result of the foregoing, the market for La Quinta common stock promptly digested current information regarding La Quinta from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of La Quinta common stock during the Class Period suffered similar injury through their purchase of La Quinta common stock at artificially inflated prices and a presumption of reliance applies.

## II.

### ALLEGATIONS PERTINENT TO THE SECURITIES ACT CLAIMS

202.    This section incorporates ¶¶ 52-79, 87, 90, 92, 96-98, 100-101, 105-09, 153-54, 162-63, 165-66, 168-71, but specifically excludes any allegations of fraud or fraudulent conduct.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

203.    On March 12, 2015, La Quinta filed with the SEC its Form S-1 registration statement (the "Form S-1") for the March 2015 SPO. On March 24, 2015, the SEC declared the Form S-1, as amended, effective.

204.    On March 25, 2015, La Quinta filed with the SEC a prospectus (the "Prospectus")

for the March 2015 SPO offering to register for sale 23,862,500 shares of the Company's common

stock (including 3,112,500 shares of the Company's common stock pursuant to an over allotment

option issued to the Underwriter Defendants) owned by Blackstone at a price of $23.71 per share.

Blackstone, the largest beneficial owner of La Quinta common stock at the time of the March 2015

SPO, sold 40% of its common stock holdings in La Quinta to the public in the March 2015 SPO for

net proceeds of approximately $550.8 million.

205.    The March 2015 SPO was sold pursuant to the Form S-1, as amended, and the

Prospectus (jointly referred to herein as the "Registration Statement").  The Registration Statement

was negligently prepared and, as a result, contained inaccurate statements of material fact and

omitted material information required to be disclosed therein.

206.    Specifically, the Registration Statement failed to disclose known trends, events,

demands, commitments and uncertainties that were reasonably likely to have a material effect on the

Company's operating results.    These known, but undisclosed, trends, events, demands,

commitments, and uncertainties caused the financial information of La Quinta reported in the

Registration Statement not to be necessarily indicative of the Company's future operating results.

207.    Under the rules and regulations governing its preparation, the Registration Statement

was required to disclose information called for by Item 303 of Regulation S-K.  *See* 17 C.F.R. §

229.303, *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

208.    Item 303(a) of Regulation S-K required the Registration Statement to describe "any

known trends or uncertainties that have had or that the registrant reasonably expects will have a

material favorable or unfavorable impact on net sales or revenues or income from continuing

operations."

209.    The instructions to Item 303(a) of Regulation S-K required that the disclosure in the Registration Statement to "focus specifically" on material events and uncertainties known to management that would cause La Quinta's previously reported financial information not to be indicative of future operating results, stating, in pertinent part, as follows:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

210.    As set forth in the SEC's interpretative guidance to Item 303 of Regulation S-K, requires not only a "discussion," but also an "analysis" of known material trends, events, demands, commitments, and uncertainties.  In this regard, disclosure of a trend, demand, commitment, event or uncertainty is required when it is reasonably likely that the trend, uncertainty or other event will have a material effect on the company's liquidity, capital resources or results of operations.

211.    The Registration Statement failed to disclose the following material trends, events, and/or uncertainties as follows: (i) declining customer demand in La Quinta's key Texas market; (ii) ongoing disruptions caused by the transitioning of the Company's call center operations; and (iii) declining customer demand and market share losses due, in part, to certain of La Quinta's facilities being outdated and in need of major renovation, thereby necessitating that the Company make significant capital expenditures and undergo operational disruptions.

212.    The Registration Statement failed to disclose the reasonable likely material adverse effect on the Company's revenues and operating income ensuing from declining customer demand

in La Quinta's key Texas market.

213.    As explained, *supra,* prior to the filing of the Registration Statement the steep decline in oil prices was not only projected to negatively impact Texas' economy as a whole beyond the energy industry,  but was having real time negative effects on La Quinta's business: (i) La Quinta's Midland's hotel – the top earning hotel in the entire chain in 2014 – began experiencing significant declines in occupancy and was forced to lower rates drastically; and (ii) other La Quinta hotels in oil producing regions – which charged rates significantly in excess of La Quinta's national average and therefore were a prime generator of revenues – were slashing their rates, *see* ¶¶ 72-79.

214.    The Registration Statement also failed to disclose the material adverse  effect on the Company's operating income associated with business disruptions caused by the transitioning of its call center.

215.    As noted in La Quinta's Form 10-Q for the quarter ended March 31, 2015 (the "Q1 Form 10-Q"), during the first quarter of 2015, La Quinta had been in the process of transitioning its reservation call center to a new provider.  This process was fraught with "disruptions" causing the Company to lose a material amount of business.  The Registration Statement negligently failed to disclose the known material adverse effects on the Company's business associated with this event and uncertainty.

216.    In addition, prior to the March 2015 SPO, La Quinta began experiencing declining customer demand and market share losses ensuing from poor guest experiences at a number of its facilities.  Indeed, prior to the March 2015 SPO, the Company's marketing department had determined that, unlike before, La Quinta was experiencing difficulty attracting new guests to its facilities.

217. The CWs, the decline in customer demand, market share losses and difficulties attracting new guests to its facilities were due in large part to a significant number of its facilities being outdated and in need of major renovation. In fact, the dilapidated state of La Quinta's properties chain wide – but especially in its three main locations: Texas, Florida and California – was the subject of numerous customer complaints. Due to the poor state of its properties, La Quinta announced on October 28, 2015, that it would have to spend several hundred million dollars to refurbish its properties.

218. The Registration Statement negligently failed to disclose known material adverse effects on the Company's revenues and operating results associated with the uncertainty and change in demand by hotel guests, as well as the fact that La Quinta would have to dedicate a significant amount of money to revitalize its *entire hotel chain* in order to remain competitive.

219. In addition, the Registration Statement negligently failed to disclose significant known risks that caused the March 2015 SPO to be speculative or risky. Item 3 of Form S-1 required the Registration Statement to furnish the information called for under Item 503 of Regulation S-K, 17 C.F.R. § 229.503, including, among other things, a "discussion of the most significant factors that make the offering speculative or risky."

220. The Registration Statement negligently failed to disclose the then-existing (as opposed to potential) key risks, including those associated with La Quinta's key Texas market, the business disruptions caused by the transitioning of the Company's call center, and the change in customer demand for the Company's hotels due to, *inter alia*, the dilapidated nature of its properties, as well as the need to expend significant capital renovating its properties.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

221.    Lead Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 202-220 (including the allegations incorporated by reference in ¶ 202), but specifically excludes any allegations of fraud or fraudulent conduct.  This claim for relief does not sound in fraud.  For purposes of asserting this and its other claims under the Securities Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

222.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S. C. §77k, on behalf of the Subclass against all Defendants.

223.    The Registration Statement for the March 2015 SPO was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made accurate, and omitted to state material facts required to be stated therein.

224.    Lead Plaintiff acquired La Quinta common stock pursuant to the Registration Statement, without knowledge of the untruths and/or admissions alleged herein.  Lead Plaintiff and the Subclass sustained damages when the price of La Quinta common stock declined substantially as the material inaccuracies in the Registration Statement were revealed to the market.

225.    Defendant La Quinta was the registrant for the March 2015 SPO.  As such, La Quinta is strictly liable to the Lead Plaintiff and the Subclass under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement and its failure to be complete and accurate.

226. The Individual Defendants signed the Registration Statement either personally or through an Attorney-in-Fact and caused its issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact. As such, the Individual Defendants are liable to Lead Plaintiff and the Subclass.

227. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Underwriter Defendants are strictly liable to Lead Plaintiff and the Class.

228. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate. By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

229. At the time of Lead Planitiff's purchases of La Quinta common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures

herein.  Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Lead Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities were offered to the public and the time this action was commenced in this Court.  La Quinta's per share price on April 26, 2016 – the date that the Section 11 claims were first filed – was $11.76.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

230.     Lead Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 202-229 (including the allegations incorporated by reference in ¶ 202), but specifically excludes any allegations of fraud or fraudulent conduct and/or motive.   This claim for Relief does not sound in fraud.  For purposes of asserting this and its other claims under the 1933 Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

231.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of Lead Plaintiff and the Subclass against all Defendants.

232.     Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Registration Statement.  Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the March 2015 SPO.  The Registration Statement contained a Prospectus that was used to induce investors, such as Lead Plaintiff and the other members of the Subclass, to purchase the stock registered in the March 2015 SPO.

233.     The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not inaccurate, and omitted to state material

facts required to be stated therein.  Defendants' actions of solicitation included participating in the preparation of the false and inaccurate Registration Statement and participating in road shows to market the March 2015 SPO to investors.

234.  The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.  But for their participation in the SPO, including their solicitation as set forth herein, the March 2015 SPO could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a)  made the decision to underwrite the March 2015 SPO and do it at the price set forth in the Registration Statement.  The Underwriter Defendants drafted, revised and/or approved the Registration Statement and participated in its being declared effective by the SEC.  The Prospectus was calculated to create interest in La Quinta common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose; and

(b)  orchestrated all activities necessary to affect the sale of the stock in the March 2015 SPO to the investing public, by issuing stock, promoting the stock and supervising their distribution and ultimate sale to the investing public.

235.  The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the defective and inaccurate Registration Statement and participating in efforts to market the March 2015 SPO to investors.

236.  Defendants owed to the purchasers of La Quinta common stock, including Lead Plaintiff and the other Subclass members, the duty to make a reasonable and diligent investigation

of the statements contained in the Registration Statement and to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants, in the exercise of reasonable care, should have known that the Registration Statement contained misstatements and omissions of material fact.

237.    Lead Plaintiff and the other members of the Subclass purchased La Quinta common stock pursuant to the Registration Statement, and neither Lead Plaintiff nor the other Subclass members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement.

238.    By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiff, individually, and on behalf of the Subclass, hereby offers to tender to Defendants those shares of stock that Lead Plaintiff and the other Subclass members continue to own, in return for the consideration paid for those shares together with interest thereon.  Subclass members who have sold their shares are entitled to rescissory damages.

**COUNT III**

**Violation of Section 15 of the Securities Act**
**Against the Individual Defendants and Blackstone**

239.    Lead Plaintiff repeats and re-alleges each and every allegations contained in ¶¶ 202-238 (including the allegations incorporated by reference in ¶ 202), but specifically excludes any allegations of fraud or fraudulent conduct and/or motive.  This claim for Relief does not sound in fraud.  For purposes of asserting this and its other claims under the 1933 Act, Lead Plaintiff does not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent.

240.    This Count is asserted by Lead Plaintiff on behalf of itself and the Subclass against all the Individual Defendants and Blackstone for violations of Section 15 of the Securities Act.

241.    The Individual Defendants and Blackstone acted as controlling persons of La Quinta within the meaning of Section 15 of the Securities Act.  As La Quinta admitted in the Prospectus for the November 2014 SPO: "Our Sponsor [*i.e.*, Blackstone] controls us . . . . [I]mmediately following this Offering . . . our Sponsor will still be able to significantly influence the composition of our board of directors . . . . [and] [o]ur Sponsor will continue to have significant influence with respect to our management, business plans and policies . . . ."  Blackstone, in fact, controlled La Quinta through at least June 2015, however, because a majority of La Quinta's Board of Directors at that time were both Blackstone appointees and employees.

242.    By reason of their ownership interest, senior management positions, and/or directorships at the Company, the Individual Defendants individually, and acting pursuant to a common plan, and Blackstone had the power to control  and exercised the same to cause La Quinta to engage in the conduct complained of herein and were therefore control persons of La Quinta.  By reason of such conduct, the Individual Defendants and Blackstone are liable pursuant to Section 15 of the Securities Act.

243.    Each of the Individual Defendants and Blackstone were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the March 2015 SPO to be successfully completed.

**COUNT IV**

**Violation of Section l0(b) of the Exchange Act and Rule l0b-5
Promulgated Thereunder Against Defendants La Quinta, Goldberg, Cline, and Forson**

244.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, with the exception of ¶¶ 202-43.

245.    During the Class Period, Defendants La Quinta, Goldberg, Cline and Forson (the "Count IV Defendants") disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

246.    The Count IV Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Lead Plaintiff and others similarly situated in connection with their purchases of La Quinta common stock during the Class Period.

247.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for La Quinta common stock.  Lead Plaintiff and the Class would not have purchased La Quinta common stock at the prices they paid, or at all, if they

81

had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

248.    As a direct and proximate result of these Defendants' wrongful conduct, the Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of La Quinta common stock during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Goldberg, Cline, Forson, and Blackstone

249.    Lead Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, with the exception of ¶¶ 202-43.

250.    Defendants Goldberg, Cline, Forson, and Blackstone (the "Count V Defendants") acted as controlling persons of La Quinta within the meaning of Section 20(a) of the Exchange Act.

251.    Defendants Goldberg, Cline, and Forson, because of their positions with La Quinta, controlled the contents of La Quinta's public statements during the Class Period.  Defendants Goldberg, Cline and Forson were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, Defendants Goldberg, Cline, and Forson knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and made or caused to be made positive representations that were false and misleading.

252.    Defendant Blackstone, by virtue of its status of La Quinta as the Company's dominant shareholder, and the fact that it appointed a majority of La Quinta's Board of Directors (through at least June 2015), controlled the contents of and/or caused La Quinta to issue public statements that Blackstone knew omitted, or recklessly disregarded, the adverse facts specified herein from the public and made, or caused to be made, positive representations that were false and misleading. Blackstone did so in order to artificially inflate La Quinta's share and thereby profit from the November 2014 and March 2015 SPOs in an amount far greater than if the truth had been revealed and had been reflected in La Quinta's stock price.

253.    Accordingly, the Count V Defendants had the power and authority to cause La Quinta and its employees to engage in the wrongful conduct complained of herein.  La Quinta controlled each of the Count V Defendants and all of its employees. By reason of such conduct, the Count V Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Lead Plaintiff, on behalf of itself and the Class and Subclass, pray for judgment as follows:

A.    Awarding the Lead Plaintiff and other members of the Class and Subclass damages together with interest thereon;

B.    With respect to Count II, ordering that the March 2015 SPO be rescinded;

C.    Awarding the Lead Plaintiff and other members of the Class and Subclass their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding the Lead Plaintiff and other members of the Class and Subclass such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated:    December 30, 2016
          New York, New York

KIRBY McINERNEY LLP

By:   _Andrew M. McNeela_

Ira M. Press
Peter Linden
Andrew M. McNeela
825 Third Avenue, 16th Floor
New York, New York 10022
Tel.: (212) 371-6600
Fax: (212) 751-2540
Email: ipress@kmllp.com

*Lead Counsel for Lead Plaintiff
and the Proposed Class*

ALLEN BROTHERS PLLC
James Allen, Sr.
400 Monroe Street, Suite 620
Detroit, Michigan 48226
Tel.: (313) 962-7777
Fax: (313) 962-0581

*Counsel for Lead Plaintiff*

84