UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Police and Fire Retirement System of the City of Detroit, <br><br> Plaintiff, <br><br> –v– <br><br> La Quinta Holdings Inc. *et al.*, <br><br> Defendants. | 16-cv-3068 (AJN) <br><br> MEMORANDUM & ORDER |

ALISON J. NATHAN, District Judge:

In this securities fraud putative class action, Lead Plaintiff, the Police and Fire Retirement System of the City of Detroit, seeks to hold various Defendants liable for four categories of alleged misstatements and omissions made in connection with the public offerings of Defendant La Quinta Holdings Inc.'s ("La Quinta") stock. The defendants have filed motions to dismiss Plaintiff's second amended complaint in its entirety. Because Plaintiff has failed to plausibly allege any material misstatements or omissions, the Court grants the motions to dismiss.

## I.    BACKGROUND

The following facts are derived from Plaintiff's second amended complaint and are assumed to be true for purposes of this motion. *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 147 (2d Cir. 2014).

### A.    The Parties

Defendant La Quinta operates a hotel chain serving primarily midscale and upper-midscale markets. Second Amended Complaint ("SAC") ¶¶ 2, 38 (Dkt No. 79). La Quinta has

1

hotels in the United States, Mexico, and Honduras. SAC ¶2. The company's hotels are geographically concentrated, with approximately 25% of the hotels located in Texas. SAC ¶ 2, 54. At the beginning of 2014, La Quinta was a privately held company. SAC ¶¶ 2, 39. On April 14, 2014, La Quinta completed its initial public offering. SAC ¶ 40. In November 2014, La Quinta completed an initial secondary public offering ("SPO"). *Id.* The company conducted a second SPO in March 2015. SAC ¶ 41.

Lead Plaintiff, the Police and Fire Retirement System of the City of Detroit, purchased La Quinta common stock. SAC ¶ 10. Plaintiff brings this federal securities class action on behalf of (1) all purchasers of La Quinta common stock between November 19, 2014 and February 24, 2016 (the "Class Period"), and (2) a subclass of all those who purchased La Quinta common stock in the Company's secondary public offering that took place on March 24, 2015. SAC ¶ 1. Plaintiff alleges that it, in particular, purchased La Quinta common stock "during the Class Period and in the March 2015 SPO." SAC ¶ 10.

In addition to naming La Quinta as a defendant, Plaintiff also names the Blackstone Group L.P. ("Blackstone") as a defendant. Blackstone is a private equity, investment banking, asset management, and financial services corporation based in New York City. SAC ¶ 17. Blackstone was the majority shareholder of La Quinta before the company went public. SAC ¶ 2. Prior to the November 2014 initial public offering, Blackstone owned 62.8% of La Quinta's common stock. SAC ¶¶ 40-41. After the March 2015 SPO, Blackstone owned only 26.9% of the company's stock. *Id.*

Several individuals associated with La Quinta are also named as defendants in this lawsuit. Defendant Wayne B. Goldberg ("Goldberg") served as the President, Chief Executive Officer, and a Director of La Quinta until his September 17, 2015 resignation. SAC ¶¶ 12, 159.

Defendant Keith A. Cline ("Cline") was the Executive Vice President and Chief Financial Officer of La Quinta. SAC ¶ 13. Plaintiff also names Defendant James H. Forson ("Forson"), the Senior Vice President, Chief Accounting Officer and Treasurer of La Quinta, as a defendant. SAC ¶ 14. Defendants Glenn Alba, Alan J. Bowers, Henry G. Cisneros, Giovanni Cutaia, Brian Kim, Michael Nash, Mitesh Shah, and Gary M. Sumers all served as members of La Quinta's Board of Directors. SAC ¶ 15. Defendants Goldberg, Cline, Forson, Alba, Bowers, Cisneros, Cutaia, Kim, Nash, Shah, and Sumers are collectively referred to by the Plaintiff and the Court as the "Individual Defendants." SAC ¶ 16.

### B.  The Decline in La Quinta's Stock Prices

The price of La Quinta's stock declined during the class period. At the beginning of the class period, La Quinta stock traded at a high of $24.89 per share, and the stock was sold at the price of $23.71 per share during the March 2015 SPO. SAC ¶ 5. Prices for La Quinta's stock significantly declined throughout 2015 and early 2016. By September 2015, La Quinta stock was trading at $16.05. SAC ¶ 160. By February 2016, the company's stock was trading at only $10.19. SAC ¶ 173.

### C.  The Alleged Misrepresentations and Omissions

Plaintiff alleges that La Quinta's stock prices declined throughout 2015 and 2016 because "the truth concerning La Quinta's operations" was revealed. SAC ¶ 5. According to Plaintiff, Defendants made a variety of misstatements and omissions that hid from the public operational and other difficulties that La Quinta was facing, and these misstatements and omissions caused La Quinta's stock prices to be artificially inflated during the public offerings. Plaintiff identifies four categories of purported misrepresentations and omissions, each of which is outlined below.

### 1.    The Impact of Declining Oil Prices

A significant portion of Plaintiff's second amended complaint and brief in opposition to the motion to dismiss focuses on the alleged effect declining oil prices had on La Quinta. *See, e.g.*, SAC ¶¶ 52-91; Opp. at 3-7, 17-29. As mentioned, La Quinta's hotel locations are geographically concentrated, with 25% of the company's hotels located in Texas. SAC ¶ 2. According to Plaintiff, La Quinta relies heavily on corporate oil and gas related business and that a "disproportionate share of La Quinta's profits" derives from hotels in close proximity to oil fields in Texas. SAC ¶ 71.

In 2014, oil prices crashed. SAC ¶ 57. From July 2014 to December 2014, the price of crude oil dropped by more than 50%. *Id.* The decline in oil prices had a significant negative impact on Texas's entire economy, sparking layoffs and a recession. SAC ¶ 59-61, 65, 68-69.

Plaintiff alleges that the decline in oil prices and overall recession in Texas hit La Quinta particularly hard, given the concentration of its hotels in Texas and the company's reliance on the oil and gas industry. SAC ¶ 71. According to Plaintiff, the boom in oil prices that existed prior to 2014 had inflated La Quinta's business compared to the company's historical performance. SAC ¶¶ 74-76; Opp. at 18-19. After oil prices crashed, however, "La Quinta's rates in oil producing areas . . . started dropping precipitously." SAC ¶ 77. La Quinta's occupancy in these hotels also significantly declined. SAC ¶¶ 66, 90, 114. The decline in both rates and occupancy materially affected La Quinta's bottom line. SAC ¶¶ 113, 123. According to Plaintiff, it was "well known within La Quinta, including by La Quinta's management" that oil prices were having a negative impact on La Quinta's business. SAC ¶ 80. In this lawsuit, Plaintiff seeks to hold Defendants liable for failing to disclose their knowledge about the impact declining oil prices was having on La Quinta's business and for affirmatively misrepresenting

that the company was not financially impacted.  Opp. at 18-24.

### 2.    The Need for Renovations

In addition to the oil-related claims, many of Plaintiff's allegations are related to La Quinta's apparent need for company-wide renovations to its hotels.  According to Plaintiff, during the class period, La Quinta's hotels across the country were "dilapidated" and "in dire need of renovation."  SAC ¶¶ 96, 101, 116.  This was problematic because, according to Plaintiff, "the poor state of La Quinta's facilities put them at a competitive disadvantage, had cost them customers and made attracting new customer [*sic*] difficult" and because "renovations would require the expenditure of significant resources and result in the closure of revenue producing rooms."  SAC ¶ 116; *see also id.* ¶¶ 92, 98.  Plaintiff alleges that La Quinta repeatedly refused to devote enough resources to timely refurbishing and renovating its hotels.  SAC ¶¶ 93, 95, 100.

According to Plaintiff, the truth about La Quinta's need for renovations and failure to undertake the necessary repairs was revealed on February 24, 2016.  On that day, La Quinta announced it was instituting an "accelerated renovation program," whereby La Quinta would spend millions of dollars[1] above and beyond what was already budgeted for renovations on improving the quality of La Quinta hotels.  SAC ¶¶ 109, 171; Opp. at 11.  Plaintiff contends that, if La Quinta had timely kept up with renovations, the company would not have needed to institute an accelerated renovation program.  *See* Opp. at 8, 10.

### 3.    The Call Center Transition

Next, Plaintiff alleges that Defendants committed securities fraud by failing to make certain disclosures about La Quinta's call center.  La Quinta books reservations for its hotel

---

[1] As explained below, the parties dispute the value of the accelerated renovation program.

rooms partly through call centers. SAC ¶ 135. Plaintiff alleges that at some point "during the first quarter of 2015," La Quinta decided to transition its reservation call center to a new provider. SAC ¶ 141. This transition process was apparently "fraught with 'disruptions'" that caused La Quinta "to lose a material amount of business." *Id.* Plaintiff admits that La Quinta disclosed the trouble with the call center and the effect it had on La Quinta's financial performance during the Quarter 2 Earnings Call, which occurred on July 29, 2015. Dkt No. 89-3 at 2-3; Opp. at 9 n.3.

### 4.    The Sale of Certain Hotels

Finally, Plaintiff bases its securities fraud claims partly on the sale of certain La Quinta properties. This allegation can be divided into two subcategories. First, Plaintiff challenges a statement made about the sale of a La Quinta hotel near the Oklahoma City airport. SAC ¶ 149. During an April 29, 2016 conference call, La Quinta announced that it was selling this property to a franchise partner. *Id.* When describing the sale, Defendant Goldberg called the transaction a "win-win-win." *Id.* Plaintiff alleges that this statement was fraudulent, or at the very least misleading, because La Quinta eventually recorded a $4 million loss on the sale of this property. SAC ¶ 153; Opp. at 8.

Second, Plaintiff challenges statements made in relation to the potential sale of twenty-four other properties. In 2015, La Quinta contemplated selling these twenty-four properties. SAC ¶ 153. According to Plaintiff, Defendant Cline stated with respect to these twenty-four hotels that there were "built-in gains on these assets." SAC ¶ 148. Plaintiff alleges that it was fraudulent or misleading for Defendant Cline to describe the hotels in such a manner when La Quinta eventually recorded a $42 million impairment charge in association with these hotels. SAC ¶¶ 150(f), 153.

### D. Procedural History

This lawsuit, brought as a putative class action, was filed on April 25, 2016. Dkt No. 1. On July 21, 2016, the Court appointed the Police and Fire Retirement System of the City of Detroit as Lead Plaintiff. Dkt No. 61. The newly appointed lead plaintiff filed an amended complaint on September 30, 2016. Dkt No. 66. On December 2, 2016, two motions to dismiss were filed, one by Defendant Goldberg individually and one by the remaining defendants. Dkt Nos. 69, 71. The Court *sua sponte* granted Plaintiff leave to amend the complaint in response to arguments raised in the motions to dismiss. Dkt No. 74. Plaintiff accordingly filed the second amended complaint, the operative complaint for purposes of this Memorandum & Order, on December 30, 2016. Dkt No. 79. The defendants renewed their two motions to dismiss. Dkt Nos. 80, 82.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When deciding whether a complaint states a claim, the Court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337 (2d Cir. 2011). Regardless of the amount of factual matter included in the complaint, the Court must grant a motion to dismiss when the plaintiff's allegations, even if true, do not state a plausible claim of relief. *See Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir. 1997).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the

complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The Court may also consider facts of which judicial notice may be taken. *See Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Documents filed with the SEC may be judicially noticed for the purposes of showing that such information was publicly available. *Garber*, 347 F. App'x at 669.

"In securities fraud cases, the Private Securities Litigation Reform Act ('PSLRA') requires a complaint to 'specify each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (alterations in original) (quoting 15 U.S.C. § 78u–4(b)(1)). Federal Rule of Civil Procedure 9(b) similarly requires a party alleging fraud to "state with particularity the circumstances constituting fraud."

## III.    DISCUSSION

Plaintiff's second amended complaint asserts five claims against the defendants. First, Plaintiff brings a claim under Section 10(b) of the Exchange Act and Rule 10b–5 against Defendants La Quinta, Goldberg, Cline, and Forson. SAC ¶¶ 244-48. Plaintiff also brings claims under Section 11 and Section 12(a)(2) of the Securities Act against all of the defendants. SAC ¶¶ 221-38. Finally, Plaintiff brings two control person liability claims, one under Section 15 of the Securities Act against the Individual Defendants and Blackstone and one under Section 20(a) of the Exchange Act against Defendants Goldberg, Cline, Forson, and Blackstone. SAC ¶¶ 239-43, 249-53. As explained below, because Plaintiff has failed to plausibly allege any

material misstatements or omissions, the Court dismisses the second amended complaint in its entirety.

## A.    All of Plaintiff's Claims Require a Material Misrepresentation or Omission

Plaintiff brings three primary claims:  Section 10(b) and Rule 10b-5, Section 11, and Section 12.  "Section 10(b) makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors," *Novak v. Kasaks*, 216 F.3d 300, 305 (2d Cir. 2000) (alterations in original) (quoting 15 U.S.C. § 78j(b)), and Rule 10b-5 specifies that this statute proscribes "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," *id.* (quoting 17 C.F.R. § 240.10b–5).  "Section 11 provides a cause of action for material misstatements and omissions in registration statements," and "Section 12(a)(2) provides a cause of action for material misstatements and omissions in prospectuses and oral communications." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 760 (S.D.N.Y. 2012) (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010)).  In sum, all three of these claims require that Plaintiff plausibly allege "a material misrepresentation or omission by the defendant[s]." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Plaintiff also brings two control person liability claims, pursuant to Section 15 and Section 20(a).  These claims are derivative of Plaintiff's other three claims and require a

"primary violation" of Section 10(b), Section 11, or Section 12. *See Feiner Family Tr. v. VBI Corp.*, 352 F. App'x 461, 464 (2d Cir. 2009). Accordingly, if Plaintiff does not state a Section 10(b), Section 11, or Section 12 claim because Plaintiff fails to plausibly allege a material misstatement or omission, then Plaintiff's control person liability claims also necessarily fail. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011) (holding that "[b]ecause the Plaintiffs have failed to state a primary violation under Section 10(b), they cannot establish control person liability under Section 20(a)" or under Section 15).

The standard for determining whether a defendant made a material misstatement or omission is essentially the same under Section 10(b), Section 11, and Section 12. *See Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). Under all three sections, a defendant may be held liable if he makes "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., LP*, 634 F.3d 706, 715-16 (2d Cir. 2011); *see also Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360; *Rombach*, 355 F.3d at 169 n.4, 172 n.7. In deciding whether this standard is satisfied, the Court should consider "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach*, 355 F.3d at 172 n.7 (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)).

Importantly for purposes of this case, a securities fraud claim for misrepresentations or omissions does not lie when the company "disclosed the very . . . risks about which [a plaintiff] claim[s] to have been misled." *Ashland*, 652 F.3d at 338; *see also Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 4-5 (2d Cir. 1996) (affirming dismissal of federal securities claims when

"[t]he prospectuses warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed"); *Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 350 (S.D.N.Y. 2005) (concluding that a plaintiff "failed to allege material misrepresentations or omissions sufficient to state a securities fraud claim" because the claim was "premised on facts that were adequately disclosed"). When evaluating whether a company provided sufficient disclosures, the Court should consider not only the disclosures the company makes, but also "information already in the public domain and facts known or reasonably available to the shareholders." *Garber*, 347 F. App'x at 668 (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993)). The overarching inquiry is whether "the 'total mix' of information made available" to investors sufficiently disclosed the purported risk. *Id.* (citation omitted).

### B. Plaintiff Fails to Plausibly Allege a Material Misrepresentation or Omission With Respect to All Four Categories of Challenged Statements

In this case, Plaintiff alleges that Defendants made material misrepresentations or omissions with respect to four categories of statements. For the following reasons, the Court concludes that, even assuming Plaintiff's allegations are true, Defendants did sufficiently disclose the risks related to declining oil prices, the need for renovations, the call center transition, and the sale of certain La Quinta properties and that Plaintiff fails to plausibly allege any misstatements or omissions. The Court accordingly grants the motions to dismiss in their entirety without reaching the other arguments raised in those motions.

### 1. Information Related to the Impact of Declining Oil Prices Was Adequately Disclosed

Plaintiff first claims that Defendants failed to adequately disclose the negative effects declining oil prices had on La Quinta. As a reminder, oil prices drastically declined in late 2014, and this caused a recession in Texas. SAC ¶ 57. Plaintiff claims that the drop in oil prices had a

11

deleterious financial impact on La Quinta, especially given the concentration of the company's hotels in Texas and the company's focus on corporate oil and gas related business. SAC ¶¶ 113, 123.

The Court concludes that the information available to Plaintiff, both through La Quinta's public disclosures and information in the public domain, sufficiently apprised Plaintiff of this risk. As Plaintiff admits in the second amended complaint, La Quinta made a number of disclosures related to the geographic concentration of its hotels and the impact changing oil prices could have on the company. For example, La Quinta disclosed that its "hotels are geographically concentrated," and more specifically, that "approximately 25% of rooms in [La Quinta's] system [are] located in Texas" and "approximately 29% of [La Quinta's] pipeline properties [were] to be located in Texas." SAC ¶ 134. La Quinta further explained that this geographic concentration exposed the company to risks; the company disclosed that the concentration of its hotels "exposes [its] business to the effects of regional events and occurrences," more so than "if [the company's] portfolio were more geographically diverse." *Id.* The company even gave a specific warning about oil and gas, disclosing that "given [its] concentration of hotels in Texas, a downturn in the oil and gas industry could have an adverse effect on our business." *Id.* In sum, as Plaintiff alleges in the second amended complaint, Defendants explicitly disclosed to investors that a decline in oil prices could negatively impact La Quinta, especially given the company's heavy reliance on business in Texas.

Additionally, the drop in oil prices that caused the purported decline in La Quinta's performance was publicly known. Throughout the second amended complaint, Plaintiff repeatedly relies on information in the public domain describing the declining oil prices. *See* SAC ¶ 57 (citing information from the U.S. Energy Information Administration about the drop in

12

prices of oil in late 2014); *id.* ¶¶ 68-69 (relying on reports from the Federal Reserve Bank of Dallas); *id.* ¶ 70 (relying on a CNN Money article about declining oil prices); *id.* ¶ 80 (relying on "concerns raised by market outsiders" regarding the impact of oil prices on La Quinta's business); *see generally* SAC ¶¶ 57-70. As mentioned, a Court should consider such publicly available information when analyzing whether a defendant made a false or misleading representation or omission. *See Garber*, 347 F. App'x at 668 (noting that, when deciding whether there has been a material misrepresentation or omission, a court should consider "the 'total mix' of information made available," including "information already in the public domain and facts known or reasonably available to the shareholders" (citations omitted)); *Bettis v. Aixtron SE*, No. 16 Civ. 00025 (CM), 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016) ("The real problem with Plaintiff's claim is that, by his own admission, the information that he claims was omitted was public information, equally available to the Defendants and investors alike.").

The Court concludes that all of this information, when combined, sufficiently apprised investors of the risks Plaintiff identifies. *See Ashland*, 652 F.3d at 335 (granting motion to dismiss securities fraud case "in light of [the defendant's] publicly-filed statement explicitly disclosing the very liquidity risks about which [the plaintiff] claim[ed] to have been misled"). Through La Quinta's disclosures and the publicly available information, Plaintiff knew that (1) La Quinta's hotels were geographically concentrated in Texas, (2) this geographic concentration exposed La Quinta to risks associated with adverse regional events, (3) that the concentration of hotels in Texas specifically exposed La Quinta to potential negative impacts if oil and gas prices declined, and (4) that oil prices declined in 2014. Armed with this information, a reasonable investor would have inferred that, when oil prices did actually decline in 2014 (information that was publicly available to all potential investors), La Quinta's business would experience a

13

downturn.  This conclusion that the risk was sufficiently disclosed is bolstered by the fact that Plaintiff's second amended complaint relies on analyses from market outsiders who made precisely this inference.  *See* SAC ¶¶ 71-80.

Although Plaintiff admits that La Quinta made disclosures regarding its concentration of hotels in Texas and the impact regional occurrences like a decline in the oil and gas industry could have on the company, Plaintiff nonetheless contends that La Quinta's disclosures were misleading because, at the same time the Texas market was deteriorating due to declining oil prices, Defendants represented that La Quinta was doing financially well.  Opp. at 19-20.  This argument fails, however, because La Quinta's representations that it was performing well overall were not inconsistent with the fact that the Texas market was suffering.  Plaintiff concedes that Defendants openly admitted that revenues from some of La Quinta's Texas properties were suffering as a result of the decline in oil and gas prices.  *See* SAC ¶¶ 120-21.  Defendants represented, however, that the company was nonetheless performing fine overall because La Quinta's properties in other areas of the United States were doing well, in part because the decline in oil prices had increased leisure travel.  SAC ¶ 120.  Plaintiff's allegations note that La Quinta is a national hotel chain, with hotels located across the United States.  SAC ¶¶ 2, 24, 25.  Furthermore, Plaintiff never alleges that Defendants were lying when they asserted that La Quinta was doing well in other parts of the country.  The Court therefore concludes that Plaintiff fails to plausibly allege a misstatement or omission, as it was not false or misleading for La Quinta to represent that it was performing well notwithstanding the impact of oil prices given the company's apparent successes in other areas of the country.

### 2.    Plaintiff Fails to Identify a Material Misstatement or Omission With Respect to La Quinta's Need for Renovations

Next, Plaintiff seeks to hold Defendants liable for failing to make sufficient disclosures related to La Quinta's need to invest in renovations. According to Plaintiff, Defendants "concealed the fact [that La Quinta] hotels across the entire chain were in dire need of renovations, which resulted in lost business." SAC ¶ 2. For the following reasons, the Court concludes that Plaintiff has once again failed to adequately allege a material misstatement or omission.

The primary thrust of Plaintiff's renovations-related allegations is that Defendants failed to disclose La Quinta's "dire" need to invest in renovations. *See, e.g.*, ¶ 2 ("Defendants . . . *concealed* the fact its hotels across the entire chain were in dire need of renovations." (emphasis added)); ¶ 36 ("Defendants . . . failed to disclose that their properties were extremely dilapidated and in dire need of renovations, that the poor condition of its hotels cost them business, and that it would cost the Company hundreds of millions of dollars to modernize their properties in order to remain competitive."); Opp. at 10 ("[The] LQ Defendants . . . failed to disclose that LQ was delaying (or, at a minimum, falling behind in making) necessary capital improvements."). But a defendant can be held liable for failing to disclose particular information only if the defendant had "an affirmative duty to disclose the information but fail[ed] to do so." *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14cv9826, 2017 WL 95176, at *2 (S.D.N.Y. Jan. 10, 2017) (quoting *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009)); *see also Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360. Plaintiff never identifies, in either the second amended complaint or opposition brief, a specific duty or obligation requiring La Quinta to disclose its need for renovations. *See* Opp. at 10-17.

Even if Plaintiff had identified a duty to disclose, or to the extent Plaintiff does identify a purportedly affirmative misstatement or misleading statement, the Court would nonetheless

dismiss the renovations claims because the risks identified by Plaintiff were adequately disclosed. La Quinta disclosed to investors that it needed to invest in renovations in order to remain profitable, and it also disclosed that it regularly reviewed whether renovations were needed. *See* SAC ¶ 111; Def. Ex. 1 at 9 (Dkt No. 83-1) ("Our business is capital intensive and our failure or the failure of our franchises to make necessary investments could adversely affect the quality and reputation of our brand."); Def. Ex. 5 at 7 (Dkt No. 83-5) ("[W]e . . . annually review each hotel to assess the need for renovations based on asset condition.").[2] The company also specifically disclosed the risks associated with a failure to renovate its hotels. *See, e.g.*, SAC ¶ 111 ("Our business is capital intensive and our failure or the failure of our franchises to make necessary investments could adversely affect the quality and reputation of our brand."); *id.* ¶ 131 (citing La Quinta's 2014 Form 10-K, which identified "delays or increased expense relating to our efforts to develop, redevelop or renovate our hotels" as a risk factor faced by the company). La Quinta further disclosed that it did in fact invest a significant amount in renovations; the company represented that it spent $102.9 million in 2012, $115.5 million in 2013, $78.6 million in 2014, and $100.8 million in 2015 on renovations. Def. Ex. 5 at 77; Mot. at 7.

Plaintiff does not allege that any of these statements were outright false. Instead, Plaintiff contends that Defendants statements about the need to make renovations were misleading because they failed to disclose that Defendants were not spending enough on renovations. *See* Opp. at 12-13. To support this allegation, Plaintiff points to Defendant Cline's February 24, 2016 statement, in which he announced that La Quinta was instituting an "accelerated renovation

---

[2] When analyzing whether Defendants made sufficient disclosures, in addition to relying on the allegations in the second amended complaint, the Court has relied on several documents filed by La Quinta with the SEC. The Court relies upon these documents both because Plaintiff's second amended complaint relies upon them and because these documents are judicially noticeable. *See DiFolco*, 622 F.3d at 111; *Garber*, 347 F. App'x at 669.

16

program," whereby La Quinta would spend an additional $120 million[3] over two years on renovations. SAC ¶ 170.

The problem with Plaintiff's allegation is that La Quinta did in fact disclose the possibility of additional expenditures on renovations. La Quinta disclosed that it engaged in "typical" renovations on a yearly basis. Def. Ex. 5 at 7; Dkt No. 89-5 at 4 (Defendant Cline explaining that La Quinta "typical[ly]" renovated between "25 to 30 . . . hotels each year"); Opp. at 12-13. While Plaintiff alleges that various statements made by Defendants were misleading because Defendants failed to disclose that La Quinta needed to make additional renovations, this is contradicted by judicially noticeable documents demonstrating that La Quinta did in fact disclose the risk that it may need to make additional investments in renovations. *See Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (noting that a motion to dismiss may properly be granted when a plaintiff's allegations were "contradicted . . . by facts of which [the court] may take judicial notice" (second alteration in original) (quoting *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995))). Specifically, La Quinta disclosed that periodically, the company needed to invest in additional "cyclical" renovations. Def. Ex. 5 at 7. According to the company, historically, the cycle time for these additional renovations "was approximately three

---

[3] Plaintiff contends that the acceleration renovations program was valued at $600 million, *see* Opp. at 11-12, while Defendants contend that the value was $120 million, Mot. at 14. The parties' discrepancy stems from the fact that the parties rely on different transcripts of the February 26 phone call. *Compare* Dkt No. 89-5 at 7 (Plaintiff's transcript), *with* Dkt No. 89-5 at 4 (Defendants' transcript). It is clear, however, that the accelerated renovation program was valued only at $120 million. Even in the transcript relied upon by Plaintiff, Defendant Cline repeatedly notes that the value of the accelerated renovation program is $120 million. *See* Dkt No. 89-5 at 4 ("This enhanced program contemplates we renovate an additional 100 to 120 hotels over the next two years by investing an additional estimated $60 million in capital in each of the next two years."); *id.* at 7 (noting that La Quinta was going to spend "$60 million per year" on additional renovations); *id.* ("[It]'s $60 million incremental per annum."). Additionally, the Court has listened to a recording of Defendant Cline's statement, which makes it clear the $600 million figure referenced in Plaintiff's transcript is a typographical error. Def. Ex. 22. The Court may properly listen to the recording, even at the motion to dismiss stage. *See Garcia v. Does*, 779 F.3d 84, 87-88 (2d Cir. 2015) (noting that, in a motion to dismiss, a court must accept a plaintiff's allegations as true "*to the extent* that they are not contradicted by the video evidence" that the plaintiff conceded was authentic). In any event, the precise value of the accelerated renovation program is ultimately irrelevant, as the Court would conclude that there was no misrepresentation or omission even if the program had cost $600 million.

years." *Id.* Plaintiff alleges that La Quinta suffered from rundown hotels "during the class period," which spans from November 2014 to February 2016, and the accelerated renovation program was announced on February 24, 2016. SAC ¶¶ 1-2. Accordingly, the accelerated renovation program falls within this three-year period for which La Quinta explicitly disclosed that it might need to make additional renovations. In other words, although Plaintiff claims that the accelerated renovation program supports their allegation that La Quinta failed to undertake needed renovations and demonstrates that La Quinta's statements about renovations were misleading, Defendant Cline's announcement of the accelerated renovation program was actually consistent with Defendants' disclosure that "[f]rom time to time" the company "evaluate[s] [its] hotels to determine whether additional capital expenditures are required." SAC ¶ 133. Overall, even if it true, as Plaintiff alleges, that La Quinta hotels needed additional renovations because they were dilapidated, Defendants sufficiently disclosed this risk and the fact that the company would likely need to make additional investments in renovations on a cyclical basis. Because La Quinta disclosed the risk about which Plaintiff claims to have been misled, the Court concludes that Plaintiff has failed to plausibly allege a material misstatement or omission with respect to La Quinta's need for renovations. *See Ashland,* 652 F.3d at 338.

### 3.    Defendants Disclosed the Problems with the Call Center Transition

Third, Plaintiff claims that Defendants made material misrepresentations and omissions with respect to La Quinta's switch to a new call center. According to the second amended complaint, "during the first quarter of 2015, La Quinta had been in the process of transitioning its reservation call center to a new provider." SAC ¶ 215. But this transition was allegedly "fraught with 'disruptions'" and "technical problems" that caused La Quinta "to lose a material amount of

18

business." SAC ¶¶ 2, 215. Plaintiff claims that the failure to disclose this information violated federal securities law.

An initial problem with Plaintiff's allegation is that, similar to the deficiency in the renovations context, Plaintiff does not identify why La Quinta was required to disclose information related to the call center transition. Under federal securities law, liability for failure to disclose certain information exists only if there is "an affirmative legal disclosure obligation." *Litwin*, 634 F.3d at 715; *see also In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) (noting that "an omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts" (alteration in original) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993))). Plaintiff does not identify a duty to disclose, in either the second amended complaint or its briefing. *See* SAC ¶¶ 140-42, 150(c); Opp. at 9 n.3, 29-30. In fact, in its forty-nine page opposition brief, Plaintiff devotes only a single paragraph and one footnote to its call center allegations. Opp. at 9 n.3, 29-30. Not only does Plaintiff fail to identify a duty to disclose, the Court's independent research has uncovered precedent suggesting that La Quinta in fact had no duty to disclose. *See, e.g., In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 324 (S.D.N.Y. 2010) (noting that failure to disclose "a matter of mismanagement" is "not actionable" under federal securities law (quoting *Acito v. IMCERA Grp.*, 47 F.3d 47, 53 (2d Cir. 1995)); *Northern Telecom*, 116 F. Supp. 2d at 459 ("A company is generally not obligated to disclose internal problems because the securities laws do not require management to bury the shareholders in internal details and because public disclosure of internal management and engineering problems falls outside the securities laws." (alterations and citations omitted)). *See generally Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) ("Issuers must be forthright with their investors, but securities law does

not impose on them an obligation to disclose every piece of information in their possession."). Finally, while the Court recognizes that that when a corporation chooses to speak it has a duty to be both accurate and complete, *see Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)), Plaintiff does not identify any affirmative statement that Defendants made that would be misleading without further disclosures related to the call center.

Even assuming that La Quinta did have a duty to disclose the complications related to the call center transition, Plaintiff's allegations reveal that the company did in fact disclose this information. *See Ashland*, 652 F.3d at 335. In the company's 2014 10-K, which was released before the call center transition occurred, La Quinta disclosed that the "reservation system is an important component of the La Quinta brand and a disruption to its functioning could have an adverse effect on [their] hotels." Def. Ex. 5 at 32. The company further disclosed that "[a]ny significant interruption of the function of our reservation system (or significant parts of our reservation system) may adversely affect our business as well as our ability to generate revenues." *Id.* In the financial quarter immediately following the call center transition, the company did disclose the problems with the call center. Specifically, during a July 29, 2015 phone call discussing the second quarter's earnings, Defendant Goldberg stated that the company had "a projected shortfall against [the] previous expectations for the full-year," which was caused in part due to "the ongoing stabilization of our reservation call center." Def. Ex. 13 at 3 (Dkt No. 83-13). During that same call, Defendant Cline similarly stated that "during the second quarter, there were several unusual items that impacted [La Quinta's] top line performance," including "the higher than expected disruption from the transition of our reservation call center." *Id.*

20

Plaintiff admits that La Quinta did disclose the problems related to the call center transition. Opp. at 9 n.3. Plaintiff appears to argue, however, that Defendants should have disclosed this information sooner. Opp. at 9 n.3, 29-30. Although vague, Plaintiff appears to maintain that these disclosures should have occurred in the first quarter of 2015.

Plaintiff fails to plausibly allege why the disclosures should have been made earlier. As the Second Circuit has explained, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito*, 47 F.3d at 53. Furthermore, "the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC.'" *Northern Telecom*, 116 F. Supp. 2d at 458 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 850 n.12 (2d Cir. 1968) (en banc)). Here, Defendants disclosed the financial impact caused by the disruption in the reservation call center during the second quarter of 2015, which was the quarter immediately following when the disruption allegedly occurred. Def. Ex. 13 at 3. This disclosure is sufficient to bar any claim of securities fraud.

Because Plaintiff failed to identify a duty to disclose the information related to the call center transition and because, in any event, La Quinta did disclose the information Plaintiff identifies, the Court grants the motion to dismiss with respect to the allegations related to the call center transition.

4. **Defendants' Statements Regarding the Sale of Particular La Quinta Properties Were Not False or Misleading**

Finally, Plaintiff alleges that Defendants made material misrepresentations or omissions with respect to the sales of certain hotel properties. Plaintiff takes issue with two different sales. First, Plaintiff contends that Defendant Goldberg made a material misstatement when describing

21

the benefits of a sale of a hotel property located in Oklahoma City. SAC ¶¶ 149, 153. Second, Plaintiff argues that Defendant Cline made material misstatements or omissions with respect to the potential sale of twenty-four other hotels. SAC ¶¶ 148, 150(f), 153. Even assuming Plaintiff's allegations are true, the Court concludes that there was no misrepresentation or omission.

Plaintiff first challenges statements made with respect to the sale of a particular hotel located in Oklahoma City. In describing the forthcoming sale during a conference call, Defendant Goldberg called it a "win-win-win." SAC ¶ 149. Plaintiff alleges that it was false or misleading to call this sale a "win-win-win" when La Quinta later recorded a $4 million loss on the property. SAC ¶ 153; Opp. at 8, 29.

Defendant Goldberg's statement is an opinion. This is because his comment about the sale being a "win-win-win" was not an "objective fact," but rather an expression about his expectations for the sale. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015), *aff'd sub nom. Tongue*, 816 F.3d 199. A defendant can be held liable for an opinion statement under federal securities law, as long as the plaintiff demonstrates that the speaker did not hold the belief the speaker expressed, the supporting fact supplied was untrue, or the speaker omitted information that made the statement misleading. *Tongue*, 816 F.3d at 210 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327, 1332 (2015)).

Defendant Goldberg's "win-win-win" comment is a small part of a larger statement. When evaluating whether a defendant's statements would have mislead a reasonable investor, a court should consider the representations "together and in context." *Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 376 (quoting *Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360); *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) (noting "the

well-established principle that a statement or omission must be considered in context" (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010))).  As alleged in the second amended complaint, Goldberg's statement was:

> We are also excited to announce that we have entered into an agreement to sell our owned hotel near Oklahoma City airport to a current franchise partner. This franchise partner will temporarily operate the existing hotel as a franchise La Quinta while developing a brand-new Del Sol hotel prototype on the adjacent land. This transaction generates a long-term revenue stream through our franchise segment with a brand-new Del Sol hotel prototype. Allows us to redeploy capital that would have otherwise been used for renovation, strengthens our relationship with a valued franchise partner, and it delivers attractive economics on one of our oldest exterior corridor hotels.
>
> . . .
>
> The Oklahoma City transaction is a great opportunity. It is a win-win-win. Our guests will ultimately win. Our Company wins. Our franchise partner wins. We dealing with a very high profile partner here who has done a number of deals with us.  We will end up with a beautiful asset.
>
> This is one of the older assets and our property. In fact, this is one of the oldest assets probably in our system. This was an acquisition many years ago. It is an old, two-story exterior quarter hotel that is actually older than our Company because the hotel was built prior to La Quinta even being founded. But, it was in-- it was due for a renovation. There were just a number of reasons that this made sense. We got an attractive economic value for the property, and we feel that this is a no-brainer and it is a win-win-win.

SAC ¶ 149 (alteration in original).

Even if it is true that La Quinta recorded a $4 million loss on the Oklahoma City property, the Court dismisses Plaintiff's securities fraud claims premised on the "win-win-win" statement because, when Goldberg's statement is read in context, Plaintiff fails to plausibly allege that there was anything untrue or misleading about the statement.  Defendant Goldberg never represents that selling the property will result in a profit for La Quinta.  To the contrary, his statements about how the property was one of La Quinta's "oldest assets" and in need of renovations, along with his comment that the company was getting an "attractive economic value for the property," suggest that the property had a lower value, and that La Quinta was seeking to

23

a minimize a loss. In any event, Defendant Goldberg explicitly explained the rationale behind his opinion that the sale constituted a "win-win-win." In his view, La Quinta benefited, or "won" from the sale, because even if the property was sold at loss, La Quinta avoided the costs of renovating the hotel, thereby freeing up capital that could be redeployed elsewhere. SAC ¶ 149. Goldberg explained La Quinta further benefited because the franchise partner was going to renovate the hotel, which would result in La Quinta gaining "a beautiful asset" that could increase La Quinta's brand value in the eyes of potential customers. *Id.* Relatedly, the sale was a "win" for customers, who would benefit from having a newly renovated hotel available for their use. *Id.* And finally, the franchise partner "won" because it obtained the property wanted *Id.* Overall, Goldberg supported his claim that the sale of the Oklahoma City hotel was a "win-win-win," and Plaintiff does not allege that Goldberg did not truly believe in the benefits of the sale or that his opinion was false. The Court therefore concludes that Plaintiff failed to plausibly allege a misrepresentation or omission.

Second, Plaintiff challenges statements purportedly made with respect to the potential sale of twenty-four La Quinta hotels. According to Plaintiff, Defendant Cline claimed that these twenty-four hotels had "built-in gains." SAC ¶ 150(f). Plaintiff alleges that this statement was misleading because La Quinta ultimately recorded a $42 million impairment charge[4] on these twenty-four hotels. SAC ¶¶ 150(f), 153; Opp. at 29.

Yet again, Plaintiff's interpretation is unreasonable. The allegedly false "built-in gains" statement was made during an April 29, 2015 phone call, during which Defendant Cline had the following exchange with a Deutsche Bank analyst:

Chris Woronka - Deutsche Bank- Analyst:

---

[4] An "impairment charge" refers to the writing off of goodwill. *See Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 388 (E.D.N.Y. 2009).

24

> . . . If you were to -- as we think about maybe some strategic redevelopment projects or even a few sales and refranchises. Is there a situation where you could sell a few owned hotels, and to the extent there is a tax situation, then redeploy proceeds into developing, say, urban hotels on your balance sheet in a 1031 exchange? Is that within your wheelhouse?

> <u>Defendant Cline:</u>
> Sure. Clearly, we are presented -- given the attractiveness of our brand – with offers on a regular basis for franchisees to refranchise locations. But, you are on point exactly. There is built-in gains on these assets. And, if we do a transaction, it needs to be accretive as Wayne [Goldberg] said. So, cutting a large check for taxes is something we would like to avoid. So, in those cases, if there is a chance or us to put footprint in an urban location that we're then enabled to accelerate growth in our franchise business in that region that would make a lot of sense.

SAC ¶ 148 (alteration in original).  On July 29, 2015, La Quinta issued a statement stating that it had "entered into discussions for the sale of 24 of its owned hotels" and "[d]ue to the potential reduced holding period of these assets, the Company recorded an impairment charge of approximately $42 million in the quarter."  SAC ¶ 153.

Assuming arguendo it would have been false or misleading to describe the twenty-four hotels as having "built-in gains" when those hotels were ultimately associated with a $42 million impairment charge, Plaintiff's securities fraud claims must fail because Plaintiff's allegations, even if true, fail to demonstrate that Defendant Cline was actually referencing these specific hotels when he made his "built-in gains" comment.  As alleged in the second amended complaint, when Defendant Cline made the challenged statement, he was answering a general question about the hypothetical tax consequences of an imaginary sale of unidentified La Quinta hotels.  *See* SAC ¶ 148.  He never referenced specific hotels, let alone the twenty-four hotels Plaintiff focuses on in the pleadings.  *See id.*  A reasonable investor reviewing Defendant Cline's statement would not assume that Defendant Cline was representing or implying that the twenty-four hotels identified in the complaint would not incur an impairment charge if sold.

## IV.    CONCLUSION

In sum, the Court has concluded that Plaintiff has failed to plausibly allege any material misrepresentations or omissions because, even if Plaintiff's allegations are true, Defendants adequately disclosed all of the risks Plaintiff identifies. Because all five of Plaintiff's claims require Plaintiff to plausibly allege a material misrepresentation or omission, the Court therefore grants the motions to dismiss in their entirety. These dismissals are with prejudice both because Plaintiff was giving notice and opportunity to amend its complaint and because amendment would be futile. *See* Dkt No. 74 (giving Plaintiff an opportunity to respond and warning that failure "to cure any defects that have been made apparent by the Defendants' briefing" may result in dismissal).

This resolves Docket Numbers 69, 71, 80, and 82. The request for oral argument, *see* Docket Number 92, is denied as moot.

The Clerk of the Court is respectfully directed to close this case.

SO ORDERED.

Dated: _____ 2017
New York, New York

_____
ALISON J. NATHAN
United States District Judge